## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FAIRCHILD CORPORATION, et al.,[1] | ) | Case No. 09- |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

## MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION WITH RESPECT TO SALE OF BANNER AEROSPACE AND RELATED ASSETS FOR (I) AN ORDER (A) ESTABLISHING BIDDING PROCEDURES INCLUDING, WITHOUT LIMITATION, BREAK-UP FEE PROVISIONS AND OTHER BID PROTECTIONS, (B) APPROVING FORM OF ASSET PURCHASE AGREEMENT, (C) APPROVING FORM AND MANNER OF NOTICE OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (D) SCHEDULING SALE HEARING DATE TO CONSIDER FINAL APPROVAL OF SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (II) AN ORDER APPROVING (A) THE SALE, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (B) TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF

The Fairchild Corporation ("Fairchild") and the other debtors and debtors-in-possession

in the above-captioned cases (collectively with Fairchild, the "Debtors") file this motion (the

"Motion") in connection with the sale of assets of Banner Aerospace Holding Company I, Inc.

("Banner") and its subsidiaries, each a Debtor,[2] and assets of Fairchild Realty LLC ("Fairchild

Realty"), also a Debtor, used by Banner in its operations (collectively, the "Acquired Assets").

The Debtors move for entry of an order pursuant to sections 105(a), 363, 365, 503 and 507 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Rule 6004-1

---

[1] The last four digits of Fairchild's federal tax identification number are 8587. The mailing address for Fairchild is 1750 Tysons Boulevard, Suite 1400, McLean, VA 22102. Due to the large number of Debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers and their addresses is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed noticing and claims agent at http://chapter11.epiqsystems.com/fairchild.

[2] Banner consists of six wholly owned subsidiaries: DAC International, Inc., Matrix Aviation, Inc., NASAM Incorporated, GCCUS, Inc., Professional Aircraft Accessories, Inc. and Professional Aviation Associates, Inc. (collectively, the "Banner Subsidiaries").

(i) for entry of an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") (a) establishing bidding procedures in the form attached as **Exhibit 1** to the Bidding Procedures Order (the "Bidding Procedures") in connection with the sale of the Acquired Assets (the "Sale"), including, without limitation, approving the terms and conditions for payment of a break-up fee and expense reimbursement (the "Bidder Protections") to Phoenix Banner LLC (the "Stalking Horse Bidder"), (b) approving the asset purchase agreement substantially in the form attached as **Exhibit 1** to the Sale Order (defined below) (the "Asset Purchase Agreement"), (c) approving form and manner of notices in connection with the Sale and treatment of executory contracts and unexpired leases and (d) scheduling a hearing (the "Sale Hearing") to consider approval of the Sale and assumption and assignment of the Designated Contracts (defined below); (ii) for entry of an order substantially in the form attached hereto as **Exhibit B** (the "Sale Order") approving (a) the Sale of the Acquired Assets, free and clear of all liens, claims, encumbrances and other interests (collectively, the "Interests"), pursuant to the Asset Purchase Agreement, to the Stalking Horse Bidder or to another qualified bidder submitting a higher or otherwise better offer (the "Successful Bidder") in accordance with the Bidding Procedures and (b) assumption and assignment of certain executory contracts and unexpired leases, free and clear of the Interests, to the Stalking Horse Bidder (or other Successful Bidder); and (iii) granting such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors rely on the Declaration of Donald E. Miller, Chief Restructuring Officer of each of the Debtors, in Support of First Day Pleadings (the "Miller Declaration"), filed contemporaneously with this Motion, and respectfully state as follows:

### Jurisdiction

1. On March 18, 2009 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter

11 of the bankruptcy code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No creditors' committee has yet been appointed in the Chapter 11 Cases by the United States Trustee. The Debtors are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The statutory predicates for the relief sought herein are sections 105(a), 363, 365, 503 and 507 Bankruptcy Code, Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

### A.     The Debtors' Businesses.

4. The Debtors are a multi-faceted group of companies with a history dating back to 1961. Until recently, the parent Debtor, Fairchild, was publicly traded on the New York Stock Exchange (the "NYSE"). Over the years the Debtors have acquired and sold a wide variety of businesses. As of the Petition Date, the Debtors' operations are in two distinct divisions: Fairchild Sports and Banner Aerospace, each of which has several companies in its group. In addition to these two operating divisions, Fairchild owns several parcels of real estate in Farmingdale, New York, which it has been in the process of selling or developing.

5. **Fairchild Sports**. Fairchild Sports ("Fairchild Sports") consists of three businesses: Polo Express ("Polo"), Hein Gericke ("HG") and Fairchild Sports USA ("FSUSA"),

each concentrating primarily on motorcycle protective apparel, helmets and technical accessories for motorcyclists. Polo is a German company which operates 94 retail shops in Germany and Switzerland.[3] HG is also a German company and operates 139 retail shops in five European countries. FSUSA operates, designs and distributes operations in the United States, supporting the HG stores and independently selling to third-party retailers. While neither Polo nor HG is a Debtor in the Chapter 11 Cases, FSUSA is one of the Debtors.

6.    **Banner**. Banner Aerospace Holding Company I, Inc. ("<u>Banner</u>") is a related group of aerospace businesses consisting of six (6) companies: DAC International, Inc.; GCCUS, Inc.; Matrix Aviation, Inc.; NASAM Incorporated; Professional Aircraft Accessories, Inc.; and Professional Aviation Associates, Inc. Together, the Banner companies provide two basic types of services: (i) distribution of aerospace equipment (avionics, instrumentation, radar systems, King Air or Learjet parts) and (ii) repair/overhaul of Beechcraft, Gulfstream, Embraer, Lockheed, Boeing and Bombardier aircraft (with specializations in pressurization, instrumentation, avionics, aircraft accessories and airframe components). Banner's distribution operations stock and distribute a wide variety of aircraft parts to commercial airlines, air carriers, fixed-base operators and corporate operators and other aerospace companies. Banner's repair and overhaul services specialize in landing gear, pressurization components and instruments for customers worldwide. Other than certain foreign business shells, each of the Banner companies are Debtors in the Chapter 11 Cases.

7.    Fairchild's real estate includes several substantial parcels in Farmingdale, New York, all near Republic Airport, the largest of which, 19.2 acres, is awaiting development

---

[3] As a result of a transaction in January 2009, Polo is no longer majority-owned by the Debtors. Fairchild nonetheless continues to indirectly own 49% of Polo. The Debtors believe that the commencement of the Chapter 11 Cases will have little effect on the Polo operations. In March 2009, HG's need for capital and a concern over the potential upstream liability to Fairchild arising in an insolvency by HG, the Debtors entered into a transaction with the Managing Director of HG and other executives, whereby they took ownership of HG in return for securing capital for the company and future cash consideration to Fairchild.

permits. Development of these parcels has been stalled by complex litigation with New York State Department of Transportation, the owner of Republic Airport.

B.    <u>Economic Performance and Other Challenges</u>.

8.    The Debtors as a whole have experienced annual operational losses for more than ten years. While not all of these losses are attributable to present business operations (they are, in part, due to challenges facing operations that were once part of the Debtors), current operations as a whole continue to operate at a loss. Both Polo and Banner have been working to keep pace with recent economic events challenging their businesses worldwide. However, the remainder of the Debtors' operations have been more severely hurt by these economic events.

9.    On a stand-alone basis, both Banner and Polo have been profitable. Banner employs over 190 salaried and hourly employees, working primarily in locations throughout the United States. It posted annual revenues exceeding $85 million and net operating income of $6.5 million for the fiscal year ended September 30, 2007. In fiscal 2007, Polo posted annual revenues exceeding $140 million and net operating income of $12 million. This collective net operating income was offset in 2007 by operational losses at FSUSA and HG combined with substantial Fairchild corporate overhead for losses exceeding $59 million.

10.    Until this year, Fairchild's Class A Common Stock was publicly traded on the NYSE under the symbol "FA." On January 5, 2009, Fairchild was notified by letter that trading would be suspended before the opening of the trading session on January 9, 2009 as a result of Fairchild's failure to remain above the NYSE's continued listing standard regarding average global market capitalization. The Class A Common Stock was thereafter removed from listing on, and registration with, the NYSE at the opening of business on February 5, 2009. Fairchild remains a registrant with filing requirements under the Securities Exchange Act of 1934.

5677097

11.    On November 8, 2004, a shareholder derivative action was filed in the Delaware Chancery Court against certain former officers and directors of Fairchild, some of whom continue to serve, alleging, primarily, that Fairchild's former (and now deceased) Chairman and CEO, Jeffrey Steiner, and to a lesser extent, his son, Eric Steiner, had received from Fairchild payments to which they were not entitled and/or were excessive (the "Derivative Action"). The Derivative Action resulted in the entry of a Amended and Supplemental Stipulation of Settlement of The Fairchild Corporation Stockholder Derivative Litigation (the "Consent Decree") approved by the Chancery Court on November 23, 2005. Among other things, the Consent Decree provided that:

- Jeffrey Steiner would reimburse Fairchild for legal expenses and fees incurred in connection with certain specified litigation;

- Both Jeffrey Steiner's and Eric Steiner's employment agreements would be reduced in term and in amount of compensation;

- An "Oversight Committee" consisting of non-management directors would be established to review and give prior approval for all transactions, compensation or other payments to any executive officer;

- Fairchild would conduct a review and overhaul of the process by which business expenses are approved and reimbursed, including the elimination of corporate credit cards for non-sales employees;

- Fairchild would close its Paris office;

- Fairchild would not lease any aircraft from Steiner-related entities; and

- Changes would be made to the way existing Executive and Compensation Committees were empowered, constituted and conducted.

C.    Turnaround Efforts.

12.    Beginning in 2006, the Phoenix Group ("Phoenix") indicated an interest in establishing a position in the companies. Phoenix is a Delaware limited liability company that, through managed funds, has specialized in making privately negotiated equity and equity-related investments in North American small-capitalization public companies with turnaround

opportunities. Phoenix is managed by its main principals, Philip S. Sassower and Andrea Goren, who together have over 40 years of experience in turning around publicly traded companies. The Debtors had a series of negotiations with Phoenix that ultimately resulted in Phoenix, through Phoenix FA Holdings, LLC, acquiring from outside shareholders approximately 30.5% of the outstanding Class A Common Stock of Fairchild in December of 2007.

13. Following the investment by Phoenix, Fairchild underwent a series of changes in management and the composition of the Board of Directors (the "Board"), as follows:

- Following the investment, Messrs. Sassower and Goren were elected by the Board as independent members;

- On May 13, 2008, the Board, following an annual meeting of the shareholders of Fairchild, asked Mr. Sassower to take on the role as Chairman, with Jeffrey Steiner, remaining in his role as Director and Chief Executive Officer and Eric Steiner remaining as Director, President and Chief Operating Officer;

- On October 7, 2008, Jeffrey Steiner resigned from his role as Chief Executive Officer due to illness. On that same date, the Board asked Mr. Sassower to take on the additional role of Chief Executive Officer, which he agreed to do with Eric Steiner on a shared, acting basis, as Chief Executive Officer;

- On November 1, 2008, Jeffrey Steiner passed away, creating a vacancy on the Board that has not been filled;

- On December 12, 2008, Eric Steiner resigned from his role as Acting Co-Chief Executive Officer, President and Chief Operating Officer. He remains a Director. As a result of Eric Steiner's resignation, Mr. Sassower was asked and agreed to become sole Acting Chief Executive Officer;

- On December 29, 2008, Warren D. Persavich, President and former Senior Vice President and Chief Financial Officer of Banner, resigned. At the same time, Richard P. Nyren, Fairchild's Controller, left the Debtors for another position; and

- On December 31, 2008, Donald E. Miller, Fairchild's Executive Vice President, General Counsel and Secretary, retired.

14. The net result of these overwhelming changes in management has been that Mr. Sassower, himself new to Fairchild but presently both Chairman of the Board and Acting Chief Executive Officer, has been left with the task of managing the Debtors' operations and

-7-

finding and implementing a turnaround strategy in the best interest of the Debtors, their estates, and all parties in interest. Despite the unlikelihood that Phoenix's investment in Fairchild will recover anything from the efforts, Mr. Sassower has accepted no compensation from the Debtors in return for Fairchild's ever-increasing demand for his services, and has made extraordinary efforts to find a solution to Fairchild's issues.

15.     Among other things, Fairchild's management has significantly reduced corporate overhead, much of which was disproportionately high as a legacy from the Debtors' previous, much larger organization and its former composition. For example, the Debtors currently employ only thirteen salaried employees and consultants in their corporate offices, down from over forty in August 2008. It has also closed two satellite executive offices used primarily by Jeffrey Steiner, and discharged all personnel associated with those offices. The resulting annual reduction in base salary alone has been nearly $5 million.

16.     Further, in an effort to secure a €20 million working capital facility required to support Polo's business, the Debtors in January 2009 sold 51% of their stake in Polo to Polo's founder, Klaus Esser. The sale, for €15 million, allowed the Debtors to repay Hein Gericke's outstanding loans from Sparkasse and HSBC of approximately €10 million, releasing a related pledge on Polo's equity and allowing Polo to receive urgently required working capital funding from a banking syndicate that also includes Sparkasse and HSBC. The sale further resulted in €1.8 million in much needed funds for the Debtors, with another €2.5 million in funds which is presently held in escrow though may be made available at a later date.

17.     Fairchild's Oversight Committee has also begun the process of investigating and, where appropriate, asserting claims against the Estate of Jeffrey Steiner, who may have wrongfully extracted value from the Debtors.

18.     The Debtors also engaged the independent services of the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis") and the turnaround advisory firm of CRG Partners Group LLC ("CRG") to assist the Debtors in developing strategies to deal with the Debtors' deteriorating financial and operating condition.  Neither Curtis nor CRG had previously worked for the Debtors, Phoenix or any of their respective affiliates.

19.     Despite the efforts of Mr. Sassower and the Debtors, it has not been enough. Given the state of the current world economy, drastically changed exchange rates and the overall depression in sales and corresponding revenue reduction all businesses are presently experiencing, the Debtors have been unable to cope with falling revenues and at the same time address legacy liabilities: while the value of the Debtors' assets are drastically reduced when marked to the current market, their liabilities have been growing.  All of the Debtors' businesses have been hampered with numerous legacy liabilities, including underfunded pension obligations, retiree benefits, environmental claims, tort and other litigation. The development of their real estate assets has been blocked by expensive, obstructionist litigation.  For example, the Debtors have been unable to make their last two quarterly pension fund payments of nearly $1 million each due to insufficient liquidity to make the payments and satisfy operational costs.

20.     Without, therefore, the relief afforded by chapter 11, realizing any significant value for the Debtors' businesses and a recovery for its pre-petition creditors would be impossible.

D.     Need for Relief.

21.     Given the foregoing factors, the Debtors have determined that chapter 11 affords them the best possible tool to preserve and realize upon the going-concern value of the Banner entities and the equity ownership in Polo, and their real estate ventures, while at the same time addressing the significant impact of the legacy liabilities of the Debtors as a whole.  The Debtors

further believe that the forum provided in these Chapter 11 Cases will allow them to effectively realize upon their claims against third parties noted above.

22.     In consultation with their professionals and after careful examination by the Debtors' Board of Directors, the Debtors have determined that chapter 11, combined with an expeditious sale of the Banner companies through an auction process, is the best and most efficient way to maximize a return for the Debtors, their estates, and all parties-in-interest.  In making this decision, the Debtors have taken into account the volatility to Banner's primarily service-based companies, the need to provide continuity and stability for Banner's customers and creditors and the further goal of preserving the employment of the Banner employees.

23.     To further these efforts, Phoenix offered to the Board that if a buyer for Banner can not be found, Phoenix will purchase the Banner companies and finance the Chapter 11 Cases through the consummation of such a sale.  The purpose of the offer was to allow the Debtors to know that both options were available, while having the opportunity to seek higher and/or better offers.  In keeping with Phoenix's offer, and, given the inherent conflict presented by Phoenix's offer, the Board and Mr. Miller, who the Board retained to act as Chief Restructuring Officer and to report directly to it, instructed both CRG and Curtis to make a substantial effort to locate an independent buyer for Banner and another source of financing.

E.     The Acquired Assets.

24.     The Acquired Assets consist of substantially all the assets of Banner, the Banner Subsidiaries and Fairchild Realty (collectively, the "Sellers")[4] that are used in or otherwise related to Banner's and/or the Banner's Subsidiaries' distribution of aircraft parts to commercial airlines and air cargo carriers, fixed-base operators, corporate aircraft operators and other

---

[4] The Sellers may also consist of such other entities that are party to the Asset Purchase Agreement.  Fairchild Realty is included as one of the Sellers as it is selling real estate on which one of the Banner facilities operates.  No other assets of Fairchild Realty are included within the Acquired Assets.

aerospace companies worldwide, component repair, overhaul services and design services to aircraft (the "Business") including, but not limited to, all cash, accounts receivable, inventory, plant, property and equipment, fixed assets, intangible property (including intellectual property), permits and licenses (to the extent assignable), prepaid expenses, goodwill and real property, and further including the Designated Contracts, but excluding certain assets of Sellers as set forth in the Asset Purchase Agreement (the "Excluded Assets").[5]

F.    The Stalking Horse Bidder and the Phoenix DIP Loan.

25.    The Stalking Horse Bidder is a Delaware limited liability company, newly formed for the purpose of purchasing the Acquired Assets. The Stalking Horse Bidder is an affiliate of Phoenix.

26.    As set forth above, Phoenix is a minority shareholder in Fairchild; two Phoenix principals – Philip S. Sassower and Andrea Goren – are members of Fairchild's Board of Directors, and Mr. Sassower has been Acting Chief Executive Officer of Fairchild since October 2008 upon the resignation, for health reasons, of Fairchild's founder Jeffrey S. Steiner. Accordingly, the Stalking Horse Bidder may be an insider of one or more of the Debtors within the meaning of section 101(31) of the Bankruptcy Code. The Debtors have therefore taken extraordinary steps to make sure the Sale has been and continues to be conducted at arms' length. All negotiations with respect to the Sale have been conducted by or at the direction of Mr. Miller, the Debtors' Chief Restructuring Officer under the supervision of and reporting to the Debtors' outside directors, and neither Messrs. Sassower nor Goren participated in Board votes with respect thereto. Further, the Bidding Procedures have been designed to ensure an open and fair sale process whereby interested parties have a full opportunity to participate.

---

[5] The description of the Acquired Assets contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

5677097

27.     Contemporaneously with the filing of this Motion, the Debtors have also filed a motion seeking to enter into the short-term financing arrangement proposed by Phoenix (the "Phoenix DIP Loan"). The Phoenix DIP Loan is essentially a bridge loan to work in conjunction with Banner's existing financing from PNC Bank, N.A. ("PNC"), whose agreement to continue to extend credit to Banner postpetition (the "PNC DIP Loan") is also before the Court for approval.

28.     The Phoenix DIP Loan and the PNC DIP Loan ensure that the Debtors will have sufficient liquidity to complete the Sale of the Acquired Assets while safeguarding the going-concern value of Banner between the Petition Date and the closing of the Sale. By the Phoenix DIP Loan and the PNC DIP Loan, the Debtors will be afforded the necessary working capital for the rest of the Debtors to continue the Chapter 11 Cases prior to receiving the proceeds from the Sale.

### Relief Requested

29.     By this Motion, the Debtors seek entry of orders (i) (a) approving the Bidding Procedures in connection with the Sale of the Acquired Assets, including, without limitation, approving the terms and conditions of the Bidder Protections, (b) approving the form of Asset Purchase Agreement, (c) approving form and manner of notices of and treatment of executory contracts and unexpired leases in connection with the Sale and (d) scheduling the Sale Hearing to consider approval of the Sale and assumption and assignment of the Designated Contracts; (ii) approving (a) the Sale of the Acquired Assets, free and clear of the Interests, pursuant to the Asset Purchase Agreement, to the Stalking Horse Bidder (or other Successful Bidder) in accordance with the Bidding Procedures and (b) assumption of the Designated Contracts, and assignment to the Stalking Horse Bidder (or other Successful Bidder); and (iii) granting such other and further relief as the Court deems just and proper.

A.     The Bidding Procedures.

30.     The Debtors seek approval of the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.

31.     Pursuant to Local Rule 6004-1(c)(i), the following is a summary of certain key provisions of the proposed Bidding Procedures:[6]

(a)     Provisions Regarding Qualification of Bidders.     In order to participate in the bidding process, a person interested in acquiring the Acquired Assets (a "Potential Bidder") must first deliver to Banner Holding and its counsel (the "Participation Requirements") (i) an executed confidentiality agreement in form and substance acceptable to Banner Holding and its counsel; (ii) identification of the Potential Bidder and any Principals (as defined in the Bidding Procedures), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; and (iii) written evidence satisfactory to Sellers that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction, including current financial statements (audited if they exist), contact names and numbers for verification of financing sources; and evidence of internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction.

(b)     Provisions Governing Qualified Bids.

(i)     Deadlines.  The proposed deadline for submitting bids by a Qualified Bidder is April 24, 2009, at 5:00 p.m. (prevailing Eastern time) (the "Bid Deadline").

(ii)     Form of Bid.

(1)     Executed Transaction Documents.  A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents").  A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price) and a clean copy of such revised Asset Purchase Agreement, executed by the Qualified Bidder.  The Contemplated Transaction Documents must include a written commitment satisfactory to Sellers of its financial

---

[6] The description of the Bidding Procedures contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Bidding Procedures, the Bidding Procedures shall control.

5677097

ability and intention to promptly complete the transaction without delay and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including Sellers' costs and expenses). The Bid shall further provide that, if chosen as the Successful Bidder, such Qualified Bidder will agree to close the transaction within ten (10) business days of entry of the order of the Bankruptcy Court approving the sale to such Qualified Bidder.

(2) <u>Evidence of Corporate Authority</u>. A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to Sellers of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "<u>Principals</u>").

(3) <u>Evidence of Financing Sources</u>. A Bid must contain written evidence satisfactory to Sellers that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, <u>inter alia</u>, the following: (A) the Qualified Bidder's current financial statements (audited if they exist); (B) contact names and numbers for verification of financing sources; (C) evidence of the Qualified Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (D) any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to Sellers demonstrating that such Qualified Bidder has the ability to close the contemplated transaction without delay; provided, however, that Sellers shall determine, in their reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications.

(iii) <u>Required Deposits</u>. Each Bid must be accompanied by a deposit (the "<u>Good Faith Deposit</u>") in the form of cash or a certified bank check payable to the order of Banner Holding in an amount of $1,000,000. In the event that any Bid is determined by

Sellers not to be a Qualified Bid, the Qualified Bidder shall be refunded its deposit and all accumulated interest thereon within three business days after that determination.

(iv)     Other Conditions.

(1)     Irrevocable.  A Bid must be irrevocable until two business days after the Acquired Assets have been sold pursuant to the Closing of the sale approved by the Bankruptcy Court (the "Termination Date") and be no more burdensome to the Debtors or their estates than the Asset Purchase Agreement.

(2)     Same Terms.  The Bid shall propose a contemplated transaction involving substantially all the Assumed Liabilities under the Asset Purchase Agreement, and shall contain substantially all of the material terms and conditions contained in the Asset Purchase Agreement.

(3)     No Financing or Diligence Contingencies.  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Asset Purchase Agreement.   The Stalking Horse Bidder is qualified to participate in the Auction, notwithstanding the financing and other contingencies as set forth in the Asset Purchase Agreement.

(4)     No Fees Payable to Qualified Bidder.  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue (a) a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures and (b) a claim under section 506(c) of the Bankruptcy Code.

(c)     Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder.

(i)     No-Shop or No Solicitation Provisions.  None.

(ii)     Break-Up/Topping Fees and Expense Reimbursement. Subject to approval of the Bankruptcy Court, a break-up fee in an

amount equal to $1.5 million, and expense reimbursement in an amount up to $500,000 shall be payable to the Stalking Horse Bidder upon the closing of the sale of the Acquired Assets to a competing bidder. The expense reimbursement shall also be payable to the Stalking Horse Bidder in the event that the Asset Purchase Agreement terminates without a Closing (other than due to a sale to a competing bidder) for reasons not attributable to the Stalking Horse Bidder.

(iii) <u>Bidding Increments</u>. Qualified Bids must provide for aggregate consideration equal to $36.65 million, which is the sum of (i) the break-up fee of $1.5 million, plus (ii) the expense reimbursement of up to $500,000, plus (iii) $250,000, and plus (iv) the Purchase Price under the Asset Purchase Agreement with Buyer of approximately $34.4 million. The Debtors propose that no later than 4:00 p.m. (prevailing Eastern time) on April 28, 2009, Sellers will notify all Qualified Bidders and the Notice Parties of the highest and best Qualified Bid, as determined by Sellers (the "<u>Baseline Bid</u>"). During the Auction (assuming one is held), bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least 1% higher than the most recent prevailing bid.

(iv) <u>Treatment of Break-Up/Topping Fees and Expense Reimbursement at Auction</u>. The Stalking Horse Bidder shall not be entitled to a credit equal to its break-up fee or expense reimbursement when bidding at the auction. The Stalking Horse Bidder shall continue to be entitled to a break-up fee and expense reimbursement upon submitting a higher or otherwise better bid than its initial bid.

(d) <u>Modification of Bidding Procedures</u>. The proposed Bidding Procedures provide that Sellers shall have the right to adopt modifications to certain of the rules set forth in the Bidding Procedures that will better promote the goals of the Bidding Procedures and that are not inconsistent with any of the Bidding Procedures or of any Bankruptcy Court order.

(e) <u>Closing with Alternative Backup Bidders</u>. Following the approval of the Sale of the Acquired Assets to the Successful Bidder at the Sale Hearing, if any Successful Bidder fails to consummate an approved Sale within ten days after entry of the Sale Order, the Debtors, unless such Sale Order is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate promptly the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

32.     The Debtors have attempted to include in the Bidding Procedures each of the elements of Local Rule 6004-1(c)(ii).  To the extent that circumstances prohibited that (such as where the Auction location has not yet been determined given due to not knowing the number of Qualified Bids and the size of the forum required), the Debtors hereby respectfully request that, pursuant to the Local Rules, those requirements be waived.

B.     The Bidder Protections.

33.     The Stalking Horse Bidder and its professionals have expended, and likely will continue to expend, considerable time and energy pursuing the purchase of the Acquired Assets and the assumption and assignment of the Designated Contracts, and have engaged in lengthy, good-faith negotiations and have forgone other potential investment opportunities.  The Purchase Agreement is the culmination of these efforts.

34.     In recognition of this expenditure of time, energy, resources and lost opportunities, the Debtors have agreed, subject to this Court's approval, that, in the event upon the closing of the Sale of the Acquired Assets to a competing bidder other than the Stalking Horse Bidder, the Debtors will pay to the Stalking Horse Bidder a break-up fee in an amount equal to $1.5 million (the "Break-Up Fee") and an expense reimbursement in an amount up to $500,000 (the "Expense Reimbursement").  The Debtors have agreed further that, subject to this Court's approval, the Expense Reimbursement shall also be payable to the Stalking Horse Bidder in the event that the Asset Purchase Agreement terminates without a Closing (other than due to a sale to a competing bidder) for reasons not attributable to the Stalking Horse Bidder.

35.     In addition, the Bidding Procedures provide for certain overbid protections, to ensure that each successive bid at the auction provides a certain minimum level of additional value to the estates to warrant consideration as a higher and/or better bid.  Accordingly, no later than 4:00 p.m. on the day prior to the scheduled Auction, Sellers will notify all Qualified Bidders

-17-

and the Notice Parties of the highest and best Qualified Bid, as determined by Sellers (the "Baseline Bid"). During the Auction (assuming one is held), bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least 1% higher than the most recent prevailing bid.

36.     The Debtors searched for an alternative stalking horse that would also be willing to provide financing but were unable to find such a bidder other than the Stalking Horse Bidder. The Debtors respectfully submit that the bidding protections, when considered alongside the Phoenix DIP Loan (which is decidedly below market), are reasonable.

C.     Credit Bidding.

37.     In connection with the Sale of the Acquired Assets, the Debtors' secured creditors may seek to credit bid some or all of their claims for their respective collateral (a "Credit Bid"). The Debtors seek the Court's allowance of credit bidding in connection with any Sale to the full extent of Bankruptcy Code section 363(k).

D.     The Purchase Agreement.

38.     After extensive arm's-length, good-faith negotiations among the parties and their respective advisors, Sellers and the Stalking Horse Bidder executed the Asset Purchase Agreement, pursuant to which they have agreed, among other things, on the following:[7]

> (a)     Purchase Price. The Purchase Price will consist of (i) $5,000,000 in cash by wire transfer of immediately available funds, less the amount of outstanding indebtedness at Closing under the Junior DIP Loan (the "Cash Amount"), plus (ii)(A) the amount of Buyer's Indebtedness incurred by Buyer at Closing in connection with the refinancing/repayment of the PNC DIP Agreements, entered into to carry out the refinancing of the Sellers' (other than Fairchild Realty) existing obligations arising under the PNC Credit Agreements, plus (B) credit on a dollar-for-dollar basis for all of Sellers' outstanding indebtedness to Buyer immediately prior to Closing under the Junior DIP Loan, plus (C) to the extent not otherwise included in

---

[7] The description of the Asset Purchase Agreement contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

clause (D) the amounts paid by Buyer as Cure Costs to cure defaults under the Designated Contracts, and plus (D) the Assumed Liabilities, to the extent not already counted herein; the Cash Amount plus A, B, C and D are hereinafter subject to adjustment, if any, in accordance with Section 2.5 (as adjusted, the "Purchase Price"). At Closing, Buyer shall pay to the Sellers the Cash Amount less the amount of the Holdback.

(b)     Holdback and Superpriority Claims.    The Asset Purchase Agreement provides for a Holdback from the Purchase Price in the amount of $500,000 to cover (i) certain healthcare claims of Transferred Employees, (ii) claims by the Buyer for any shortfall in accordance with the Purchase Price Adjustment under Section 2.5, and (iii) Sellers' obligations for indemnification claims. The Asset Purchase Agreement also provides that such claims owing in excess of the Holdback shall be entitled to superpriority administrative expense claim status up to a cap of $250,000 subject to exceptions.

(c)     Purchase Price Adjustment Under Section 2.5. Section 2.5 of the Asset Purchase Agreement provides a mechanism by which the Purchase Price may be adjusted upward or downward based upon the difference between the Sellers' Preliminary Statement of Adjusted Consolidated Net Worth, dated as of February 28, 2009, and a Closing Date Statement of Adjusted Consolidated Net Worth. Decreases in net worth will result in Net Worth Shortfall, to be paid from the Holdback or else resulting in an administrative claim against the Sellers' estates, and increases in net worth result in an increase in the Purchase Price subject to reduction for any pending healthcare or indemnification claims.

(d)     Excluded Assets.    The following are not part of the Acquired Assets (the "Excluded Assets"):  all (i) goodwill other than the Acquired Goodwill; (ii) all Tax records and personal records (other than related to the Transferred Employees); provided, that the Sellers shall provide the Buyer with copies of any such Tax and (to the extent permitted by applicable Law) personal records upon the Buyer's request; (iii) all insurance policies and the rights and proceeds thereunder relating to any of the Excluded Assets or Excluded Liabilities; (iv) all rights in connection with, and assets of, any Employee Benefit Plans; provided, that the disposition or retention of assets in any such Employee Benefit Plan vested in any Transferred Employees shall be dealt with in accordance with the terms and conditions of the Employee Benefit Plans and Law; and (v) all rights, title and interest in the assets set forth in Section 1.2(e) of the Sellers' Disclosure Schedule.

(e)     Assumed Liabilities.    Buyer shall assume the following (collectively, the "Assumed Liabilities") as set forth in Section 9.1 of the Asset Purchase Agreement under the definition of Assumed Liabilities.

(f)   Excluded Liabilities.   Buyer shall not assume certain liabilities (collectively, the "Excluded Liabilities") as set forth in Section 1.4 of the Asset Purchase Agreement.

(g)   Representations and Warranties.   Usual and customary for transactions of this nature. Representations and warranties shall survive for a period of 150 days after the closing.   Actual damages incurred by Buyer resulting from Sellers' breach of a representation or warranty shall be entitled to satisfaction initially from the Holdback, and any claim of Buyer for amounts of damages in excess of any amounts satisfied from the escrow amount shall be entitled to superpriority administrative expense claim status under sections 503(b) and 507(b) of the Bankruptcy Code, subject to a cap of $250,000 for all superpriority administrative expense claims under the Asset Purchase Agreement.   Such Holdback and superpriority administrative expense claim shall be the sole amount recoverable, and Buyer's sole remedy, for any claims arising under the Asset Purchase Agreement, except in the case of fraud, intentional misrepresentation or deliberate or willful misconduct of Sellers or with respect to any breach of Section 8.3 or Article V or VII of the Asset Purchase Agreement or any right of Buyer to specific performance.

(h)   Sale Free and Clear.   The transactions contemplated by the Asset Purchase Agreement will be completed pursuant to section 363 of the Bankruptcy Code and an order of the Bankruptcy Court in a form satisfactory to Buyer approving the Asset Purchase Agreement (the "Sale Order"), which shall include (i) findings of fact and conclusions of law that Buyer acquires the Acquired Assets free and clear of all liens, claims, interests and encumbrances of all kind against Sellers or the Acquired Assets whether known or unknown and a release of Buyer from any successor liability, (ii) provisions enjoining creditors and others from bringing claims against Buyer arising prior to the Closing, and (iii) findings that Buyer is not a successor-in-interest of Fairchild or Banner Holding for any purpose and that Buyer acted in good faith and negotiated at arms' length in connection with the Asset Purchase Agreement.

(i)   Waiver and Release. The Asset Purchase Agreement requires the Sellers not to assert, and to waive and release at Closing, all avoidance claims and causes of action under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds thereof, against (1) any employee of the Sellers or their affiliates performing services under the Transition Services Agreement and (2) any supplier of Sellers relating to the Acquired Assets.

(j)   Conduct of Business.   The Asset Purchase Agreement contains covenants customary for transactions of this nature including, but not limited to, covenants by Seller to operate the Business in the ordinary course consistent with past practice and in accordance with Sellers'

5677097

Budget previously agreed to by Buyer (attached hereto as **Exhibit E**)(the "Budget"), preserve intact its business organization and maintain its customary relationships with creditors, licensors, suppliers and customers of the Business and maintain all material Licenses and Permits, subject to any of Seller's obligations as debtors or debtors-in-possession under the Bankruptcy Code.

(k) <u>Financing</u>. In connection with the commencement of the Chapter 11 Case, Sellers and Fairchild will negotiate and seek Bankruptcy Court approval of (i) a subordinated debtor-in-possession financing with Buyer (or an affiliate of Buyer) (the "Junior DIP Loan") and (ii) a senior secured, super-priority debtor-in-possession financing with PNC (the "Senior DIP Loan" and collectively with the Junior DIP Loan, the "DIP Loans").

(l) <u>Closing Conditions</u>. The Asset Purchase Agreement contains certain conditions set forth in Sections 6.1, 6.2 and 6.3 of the Asset Purchase Agreement.

(m) <u>Employees</u>. Buyer shall be entitled to review information about Sellers' employees to the extent permitted by applicable Law and to interview such employees prior to Closing for the purpose of extending offers of employment upon a Closing under the Asset Purchase Agreement. Employees of Sellers who accept such offer of employment ("Transferred Employees") shall be terminated by Sellers immediately prior to Closing to permit such Transferred Employees to commence employment with Buyer on the later of the first business day after the Closing or the date of acceptance. Buyer's offers of employment to Sellers' employees will include benefits that are comparable in the aggregate to those currently being received by such employees. Prior to the Closing, Sellers will provide notice to the Transferred Employees that any employee of Sellers who is offered and accepts employment by Buyer at comparable compensation levels will not be entitled to severance under Seller's practices. Buyer shall be responsible for any WARN Act obligations arising as a result of the termination of any Transferred Employee's employment by Buyer after the Closing date.

(n) <u>Transition Services</u>. For a reasonable time after the Closing Date, but in no event for more than one hundred twenty (120) days after the Closing Date, Stalking Horse Bidder and each Seller shall, and Stalking Horse Bidder and such Seller shall cause their respective affiliates, to provide Stalking Horse Bidder or such Seller (as the case may be) the transition services and assistance described in the Transition Services Agreement as Stalking Horse Bidder or such Seller may reasonably request in order to facilitate a more efficient transition of the operation of the Business to Stalking Horse Bidder following the Closing Date. The manner, scope and amount of such services and assistance shall be mutually defined by the respective transition implementation teams of Stalking Horse Bidder and Sellers, acting reasonably and in good faith.

(o)　Termination. The Asset Purchase Agreement shall terminate 75 days after the Petition Date if the Bankruptcy Court has not by that time approved the Asset Purchase Agreement and entered the Sale Order. Buyer shall be entitled to expense reimbursement in the event that the Asset Purchase Agreement terminates without a Closing for reasons not attributable to Buyer.

E.　Form and Manner of Notice of Sale and Treatment of Executory Contracts and Unexpired Leases.

39.　Upon entry of an order approving the Bidding Procedures, the Debtors propose to give notice of the Bidding Procedures, the date and time of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing, by sending a notice (the "Notice of Auction and Sale Hearing"), substantially in the form attached to this Motion as **Exhibit C** to the following parties: (i) the United States Trustee; (ii) counsel to PNC Bank, Blank Rome LLP, One Logan Square, 130 North 18th Street, Philadelphia, Pennsylvania 19103-6998, Attn: Lawrence F. Flick II, Esq. and Regina Stango Kelbon, Esq.; (iii) counsel to the Stalking Horse Bidder, Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036-4039, Attn: Rick B. Antonoff, Esq. and Jonathan J. Russo, Esq. and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Robert J. Dehney, Esq.; (iv) counsel to any official committee of unsecured creditors, and counsel to any other official committees appointed pursuant to section 1102 of the Bankruptcy Code; (v) the Internal Revenue Service and all known state and local taxing authorities to which the Sellers are subject; (vi) the Securities and Exchange Commission; (vii) the Office of the United States Attorney for the District of Delaware; (viii) counsel to the Pension Benefit Guaranty Corporation; (ix) all known creditors of the Debtors, and their counsel if known; (x) all parties that have filed requests for notice in the Chapter 11 Cases, and their counsel if known; (xi) all parties (other than Debtors) to relevant contracts or leases (including Designated Contracts), and their counsel, if known; (xii) any entities previously solicited to acquire, or known to have an interest in acquiring, the Acquired Assets; (xiii) any person or entity known to

-22-

have asserted a lien or interest in all or any portion of the Acquired Assets, and their counsel if known; (xiv) all taxing authorities or recording offices known to have an interest in the relief requested; (xv) all employees affected by the relief requested herein, and their counsel if known; (xvi) the U.S. Department of State, Directorate of Defense Trade Controls; (xvii) the U.S. Department of Commerce, Bureau of Industry and Security; and (xviii) the U.S. Department of the Treasury, Office of Foreign Assets Control.

40.     The Debtors further seek authority, effective upon the Closing, to assume and assign to the Successful Bidder (or the Back-Up Bidder, as the case may be), pursuant to sections 363 and 365 of the Bankruptcy Code, the Designated Contracts.

41.     Upon entry of an order approving the Bidding Procedures, the Debtors propose to send a notice substantially in the form attached to this Motion as **Exhibit D** (the "Notice of Proposed Assumption and Assignment") to each known counterparty to an executory contract or unexpired lease (each, a "Contract") that the Successful Bidder (or the Back-Up Bidder, as the case may be) may elect to assume and have the Sellers assume and assign to it at Closing (each, a "Counterparty") and its counsel if known, at the last known address available to the Debtors, by first-class mail.  Such notice identifies a Contract by (i) the name and date of the Contract (if available), (ii) the non-debtor party to the Contract, and (iii) the address of such Counterparty for notice purposes.  Such document shall also (i) set forth the amount determined by the Debtors to be necessary to be paid to the Counterparty to cure any existing defaults under the executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code in the event that such executory contract or unexpired lease is designated (the "Cure Amount"), and (ii) delineate a procedure for transferring to the Successful Bidder (or the Back-Up Bidder, as the case may be) the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Contract.

42.     The Notice of Auction and Sale Hearing shall be filed and sent, and the Notice of Proposed Assumption and Assignment shall be sent, each such that they provide 20 days' notice of the Sale Hearing as required pursuant to Bankruptcy Rule 2002(a)(2).

43.     The Successful Bidder (or the Back-Up Bidder, as the case may be) shall have until Closing to designate which of the Contracts it wishes to assume and have the Sellers assume and assign to Buyer at Closing (the "Designated Contracts") (such date being referred to herein as the "Contract Designation Date"). In all cases, appropriate additions and deletions to Section 1.5(a) of the Sellers' Disclosure Schedule (and corresponding additions and deletions to Section 1.2 of the Sellers' Disclosure Schedule) shall be made to reflect such elections made by the Successful Bidder (or the Back-Up Bidder, as the case may be), and within two business days following the Closing the Debtors shall file on the Court's docket Section 1.5(a) of the Sellers' Disclosure Schedule identifying the Designated Contracts.

44.     Sections 1.5(b) and (c) of the Asset Purchase Agreement address procedures for potential assumption and assignment of Contracts related to the Business not disclosed on Section 1.5(a) of the Sellers' Disclosure Schedule and new Contracts entered into after the commencement of the Chapter 11 Cases. Sections 1.5(f) of the Asset Purchase Agreement provides that in the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Acquired Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Sellers shall, subject to any approval of the Bankruptcy Court that may be required, fully cooperate with the Buyer in endeavoring to obtain such consent.

45.     The proposed Notice of Auction and Sale Hearing and the proposed Notice of Proposed Assumption and Assignment each specify, among other things, that objections to entry

-24-

of the Sale Order as requested in this Motion and/or objections relating to a proposed Cure Amount shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served by the objection deadline set forth in the Bidding Procedures Order, on (i) counsel to the Debtors, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, Attn: Steven J. Reisman, Esq. and Timothy A. Barnes, Esq. and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, Esq. and Michael J. Merchant, Esq.; (ii) counsel to the Stalking Horse Bidder, Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036-4039, Attn: Rick B. Antonoff, Esq. and Jonathan J. Russo, Esq. and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Robert J. Dehney, Esq.; (iii) counsel to PNC Bank, Blank Rome LLP, One Logan Square, 130 N. 18th Street, Philadelphia, PA 19103, Attn: Lawrence F. Flick II, Esq. and Regina Stango Kelbon, Esq.; (iv) the U.S. Trustee; and (v) counsel to any official committee of unsecured creditors, and counsel to any other official committees appointed pursuant to section 1102 of the Bankruptcy Code. The Debtors request that failure to file and serve such objections by the objection deadline set forth in the Bidding Procedures Order in accordance with the foregoing procedure shall be deemed a waiver of such objection and the objecting party shall be forever barred from asserting such objections.

46.     Pursuant to the proposed Bidding Procedures, all interested parties reserve their right to object to the selection of the Successful Bidder (and the Back-Up Bidder) at the Sale Hearing (including the assignment of any such objector's Contract thereto, other than any objection relating to a proposed Cure Amount, which must be filed and served in accordance with the foregoing procedures). At the Sale Hearing the Debtors, the Successful Bidder and the Back-Up Bidder shall have the burden of establishing that the requirements under

sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code regarding adequate assurances of future performance are satisfied.

47.     Section 5.17 of the Asset Purchase Agreement provides that Cure Amounts shall be paid within five business days after the Closing, except as otherwise agreed by the Successful Bidder (or the Back-Up Bidder, as the case may be) and the non-Debtor counterparty to the Designated Contract.

F.     The Sale Hearing.

48.     The Debtors intend to present the Successful Bid for approval by the Bankruptcy Court at the Sale Hearing. The Debtors' presentation of a particular Bid to the Bankruptcy Court for approval does not constitute acceptance of the Bid.

49.     Pursuant to Rule 6004-1(b)(iv) of the Local Rules, the Debtors are required to highlight certain provisions of this Motion relating to approval of the Sale. The following is a listing of items required to be highlighted pursuant to Local Rule 6004-1(b)(iv):

(a)     Sale to Insider. The Stalking Horse Bidder may be an insider of one or more of the Debtors. Nonetheless, the Asset Purchase Agreement and the Bidding Procedures were negotiated in good faith and at arm's length, and the Bidding Procedures are designed to provide for an open and fair sale process.

(b)     Agreements with Management. The Debtors understand that the Stalking Horse Bidder has discussed compensation and future employment of certain of the Debtors' management and key employees. The Debtors are unaware of any formal agreements in that regard. Nonetheless the Debtors believe that the proposed Bidding Procedures provide for an open and fair sale process. Indeed none of the Debtors' management personnel that conducted the negotiations with the Stalking Horse Bidder on behalf of the Sellers are the subject of any agreements with the Stalking Horse Bidder, formal or informal, with regard compensation and future employment.

(c)     Releases. The Motion seeks a release of the Stalking Horse Bidder from any successor liability, an injunction against creditors and others from bringing claims against the Stalking Horse Bidder arising prior to the Closing.

(d)     Private Sale/No Competitive Bidding.  If no Qualified Bids are received other than from the Stalking Horse Bidder, no Auction will occur and the Debtors will seek approval of the Sale to the Stalking Horse Bidder without an Auction.

(e)     Closing Deadlines.  The Asset Purchase Agreement shall terminate 75 days after the Petition Date if the Bankruptcy Court by that time has not approved the Asset Purchase Agreement and entered the Sale Order. See Section 8.1(m) of the proposed Asset Purchase Agreement.  Further, the Stalking Horse Bidder may terminate the Asset Purchase Agreement if the Closing has not occurred on or before one hundred (100) days following its signing.  See Section 8.1(c) of the proposed Asset Purchase Agreement.

(f)     Good-Faith Deposit and Conditions for Forfeiture.  The Stalking Horse Bidder shall not be required to provide a deposit.  Each other Bid must be accompanied by a deposit in the form of cash or a certified bank check payable to the order of Banner Holding in the amount of $1,000,000.    If the Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, Sellers shall be entitled to retain the deposit as part of its damages resulting from the breach or failure to perform by such Bidder.

(g)     Interim Arrangements with Proposed Buyer.  The Debtors are seeking approval for the Stalking Horse Bidder to provide debtor-in-possession financing to the Debtors.

(h)     Use of Proceeds.  The Stalking Horse Bidder's Bid provides for repayment or refinancing of PNC's secured debt.  Qualified Bids must be higher and/or better than the Stalking Horse Bidder's Bid, and thus the Successful Bid must either refinance or repay the PNC loan obligations (as does the Stalking Horse Bid).  Thus following the Closing, PNC will no longer be a creditor of the Debtors' estates.

(i)     Tax Exemption.  N/A

(j)     Record Retention.  The Asset Purchase Agreement provides for continued access by the Debtors to the books and records of the Sellers following the Closing.  See Section 5.11 of the proposed Asset Purchase Agreement.

(k)     Sale or Release of Avoidance Actions.   The Asset Purchase Agreement requires the Sellers not to assert, and to waive and release at Closing, all avoidance claims and causes of action under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds thereof, against (1) any employee of the Sellers or their affiliates performing services under the Transition

Services Agreement and (2) any supplier of Sellers relating to the Acquired Assets. See Section 5.23 of Asset Purchase Agreement.

(l)     Requested Findings as to Successor Liability. Yes. See paragraphs M and 8 of the proposed Sale Order.

(m)     Sale Free and Clear of Possessory Leasehold Interests, Licenses or Other Rights. N/A.

(n)     Credit Bid. The proposed Bidding Procedures allow for credit bidding, including by the Stalking Horse Bidder if the Debtors are authorized to obtain debtor-in-possession financing from the Stalking Horse Bidder.

(o)     Relief from Bankruptcy Rule 6004(h). The Debtors seek such relief with respect to the proposed Bidding Procedures Order and the proposed Sale Order. See paragraph 20 of the proposed Bidding Procedures Order and paragraphs B and 25 of the proposed Sale Order.

## Basis for Relief

A.     The Bidding Procedures, Including the Break-Up Fee and
Expense Reimbursement, Are Appropriate.

50.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Official Comm. Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Intl Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

51.     The primary goal of any proposed sale is to maximize the value for the estate. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (explaining

-28-

fiduciary duty of debtor-in-possession to maximize estate's assets); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (goal of bankruptcy sales is to enhance the value of the estate).

52.     Bidding procedures should be approved when they benefit the estate by maximizing the value of the assets.  In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate").

53.     The use of bid protections such as these has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  Historically, bankruptcy courts have approved bidding incentives similar to the bid protections solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").  See also In re Integrated Res., 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

54.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien

Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that, even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as the Break-Up Fee and Expense Reimbursement must provide benefit to a debtor's estate. Id. at 533.

55. The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

56. The Debtors respectfully submit that the Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Debtors' assets and, therefore, should be approved by this Court. The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a Bid, and which the Debtors believe is fair and reasonable in view of the assets to be sold.

57. Further, the bid protections embodied in the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement, were judged by the Debtors to be necessary to incentivize the Stalking Horse Bidder to submit its Bid. The Debtors believe that in addition to the risks ordinarily associated with a competitive bidding process, the Stalking Horse Bidder in

this case is taking additional risks by also agreeing to provide the Junior DIP Loan. Accordingly, the Bidding Procedures and, in particular, the proposed Break-Up Fee and Expense Reimbursement, are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard.

58.     Moreover, the Break-Up Fee of $1.5 million (which is approximately 4.5% of the Purchase Price, estimated at approximately $34.4 million) sought to be approved by this Motion is comparable to break-up fees approved in other chapter 11 cases in this Court. See In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Archway Cookies LLC, Case No. 08-12323 (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); see also In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (Bankr. D. Del. February 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%).

59.     Similarly, the "overbid" protection contained in the Bidding Procedures, requiring Bids to be at least $500,000 greater than the Bid of the Stalking Horse Bidder, is consistent with practice in this District. This overbid increment is reasonable and appropriate under the circumstances and will enable the Debtors to maximize the value for the Acquired Assets and will not have a chilling effect on bidding, but rather is a reasonable protection for the Stalking Horse Bidder which in the judgment of the Debtors was necessary to incentivize the Stalking Horse Bidder to submit its Bid and agree to provide subordinated post-petition financing. Overbid increments such as the one proposed herein is consistent with other increments previously approved by this Court. See Dura Automotive Systems, Inc., Case No. 06-11202

(KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 overbid increment); New Century

TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 20, 2007) (approving

$500,000 overbid increment); Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D.

Del. Sept. 7, 2006) (approving $500,000 overbid increment).

60.     Therefore, because the procedures and incentives included in the sale, including

the proposed Break-Up Fee, are fair and reasonable, are reasonably calculated to produce the

best and highest offers for the Acquired Assets and thereby confer actual benefits upon the

estates herein, and are within the range of incentives customarily approved by courts, such

procedures should be approved in these Chapter 11 Cases.

B.      Credit Bidding Should Be Authorized.

61.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363

of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim

secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such

claim purchases such property, such holder may offset such claim against the purchase price of

such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured, as determined in

accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured

creditor to bid the total face value of its claim and does not limit the credit bid to the claim's

economic value. See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432

F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and

bankruptcy courts that creditors can bid the full face value of the their secured claims under

§ 363(k)").

62.     The Debtors respectfully submit that the provisions of the Bidding Procedures

permitting the Debtors' secured creditors to credit bid some or all of their claims for their

respective collateral pursuant to section 363(k) of the Bankruptcy Code is appropriate and should be approved.

C.    Sale of the Acquired Assets Is a Product of the Debtors' Reasonable Business Judgment.

63.    Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

64.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82

-33-

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

65.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith. In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.

66.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

67.     The proposed Bidding Procedures meet the "sound business reason" test. First, sound business purposes justify the sales. The Debtors believe that a prompt sale of the Acquired Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the estate's assets for distribution to the estate and its creditors. The Debtors further believe that the net benefit to their creditors may be adversely affected absent an immediate sale, as a result of the ever-diminishing value of the assets. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

-34-

68.     The proposed Bidding Procedures also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders.  Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

69.     Finally, the proposed Bidding Procedures satisfy the good faith requirement of Abbotts Dairies.  The Debtors submit that the results of the Auction will be the product of good-faith, arm's-length negotiations with respect to the price and other terms of the sale of the Acquired Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

70.     As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the sale of the Acquired Assets to the highest and best bidder at the Auction is appropriate and in the best interests of their estate and creditors.  The Sale of the Acquired Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed Bidding Procedures for Sale of the Acquired Assets to the highest or otherwise best bidder at the Auction and approve the Sale presented to the Court at the Sale Hearing.

D.     Sale Should be Free and Clear of Liens, Claims, Encumbrances and Other Interests.

71.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Acquired Assets to the Stalking Horse Bidder (or Successful Bidder) free and clear of all Interests, with such Interests to attach to the proceeds of the sale of the Acquired

Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if —
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

72.    A sale free and clear of Interests is necessary to maximize the value of the Acquired Assets. A sale subject to Interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates. A sale free and clear of Interests is particularly appropriate under the circumstances because any Interests in, to or against the Acquired Assets that exists immediately prior to the closing of the Sale will attach to the Sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of Interests, if any, will be adequately protected by the availability of the proceeds of the Sale to satisfy their Interests. Thus, the proposed Sale satisfies section 363(f) of the Bankruptcy Code. Moreover, any holder of an Interest that receives notice of the Sale and which fails to object to the Sale of the Acquired

5677097

Assets free and clear of Interests should be deemed to consent to the Sale, thereby complying with section 363(f)(2) of the Bankruptcy Code.

E.    The Successful Bidder Is Entitled to a Finding of No
Successor Liability, and a Release and Injunction of Claims.

73.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See In re TWA, 322 F.3d 283, 293 (3d Cir. 2003) (affirming bankruptcy court's authorization of sale of debtor's assets to buyer free and clear of claims asserted against debtor); Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (N.D. Ill. 1996) (explaining that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling claims to proceeds consistent with sales free and clear under section 363(f) of the Bankruptcy Code); Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property through a sale free and clear under section 363(f) was free and clear of discrimination claims held by debtor's employees).

74.    The Debtors respectfully submit that the Sale Order should provide for a release of the Stalking Horse Bidder (or the Successful Bidder) from any successor liability, enjoin creditors and others from bringing claims against the Stalking Horse Bidder (or the Successful Bidder) arising prior to the Closing, and find that the Stalking Horse Bidder (or the Successful Bidder) is not a successor-in-interest of Fairchild or Banner Holding for any purpose.

F.    Notice of the Proposed Sale Is Reasonable.

75.    The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, the Bidding Procedures, the Auction, the Cure Amounts and the Sale Hearing to the

Debtors' creditors and other parties in interest that are entitled to notice of the Sale, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Acquired Assets  As such, the Debtors respectfully request that the Bankruptcy Court approve the notice procedures proposed above.

G.    The Assumption and Assignment of the Designated Contracts Should be Authorized.

76.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

77.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

78.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

79.     To the extent any defaults exist under any Assigned Contract, any such default will be cured promptly or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Bidder or Successful Bidder (or the Back-Up Bidder, as the case may be) and willingness and ability to perform under the Designated Contracts. The Sale Hearing will therefore provide the Bankruptcy Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or Successful Bidder (or the Back-Up Bidder, as the case may be) to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Bankruptcy Court should therefore authorize the Debtors to assume and assign the Designated Contracts as set forth herein.

80.     Moreover, to assist in the assumption, assignment and sale of the Designated Contracts, the Debtors request entry of an order providing that any anti-assignment provisions in the Designated Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Designated Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

81.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign leases and contracts despite assignment restrictions in the contract or lease.    11 U.S.C. § 365(f)(1). Section 365(f)(1), by operation of law, invalidates provisions that restrict, prohibit or condition assignment of an unexpired lease or executory contracts.  See Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 190 B.R. 370 (B.A.P. 9th Cir. 1995).  Section 365(f)(3) goes further and prohibits enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  See In re Jamesway Corp., 201 B.R. 73, 77-78 (Bankr. S.D.N.Y 1996).

82.     Therefore, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment or sale of the Designated Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 363(f) of the Bankruptcy Code.

H.    Waiver of Automatic Ten-Day Stay Under
      Bankruptcy Rules 6004(g) and 6006(d) Is Appropriate.

83.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."   The Debtors request that any order approving the Purchase Agreement and the assumption and

-40-

assignment of the Designated Contracts be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

84. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006). Additionally, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

85. The Debtors respectfully submit that waiver of any applicable stays is appropriate under the circumstances to allow implementation of the Bidding Procedures immediately following entry of the Bidding Procedures Order, and to allow the Closing to proceed immediately following entry of the Sale Order. The Debtors have limited postpetition financing and each day that passes jeopardizes the Debtors' ability to consummate the Sale. Absent such relief, the Debtors bear risk of irreparable harm in the event that the Closing fails to occur due to delays associated with such ten-day periods.

I. <u>The Stalking Horse Bidder (or the Successful Bidder) Is a Good-Faith Purchaser Pursuant to Section 363(m) of the Bankruptcy Code and the Sale Should Not Be Avoided Pursuant to Section 363(n) of the Bankruptcy Code.</u>

86. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

5677097

> The reveral or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of such appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., 1993 U.S. Dist. LEXIS 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 at 147). See also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

87. The Stalking Horse Bidder's Bid was the product of good-faith, arm's-length negotiations. Moreover, the selection of the Successful Bidder pursuant to the Bidding Procedures will be the product of a good-faith competitive bidding process. The Debtors intend to seek a finding at the Sale Hearing that the Stalking Horse Bidder (or the Successful Bidder) is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

88. Similarly, the Debtors intend to seek a finding at the Sale Hearing that the terms and conditions of the Asset Purchase Agreement and the Sale, including without limitation the consideration provided in respect thereof, are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code, as a result of any improper or collusive bidding or otherwise.

J.    No Severance for Transferred Employees.

89. Prior to the Closing, Sellers will provide notice to the Transferred Employees that any employee of Sellers who is offered and accepts employment by the Stalking Horse Bidder at comparable compensation levels will not be entitled to severance under Seller's practices.

-42-

90.     The Debtors hereby respectfully request that upon receipt of such notice, any employee of Sellers who is offered and accepts employment by the Stalking Horse Bidder at comparable compensation levels shall be deemed to waive any claim for severance against the Debtors' estates.

## Notice

91.     The Debtors shall provide notice of this Motion by facsimile and/or overnight mail to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) counsel to the Debtors' prepetition secured lenders; (iv) counsel to the Debtors' proposed postpetition secured lenders; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; (vii) the Office of the United States Attorney for the District of Delaware; (viii) counsel to the Pension Benefit Guaranty Corporation; (ix) any person or entity known to have asserted a lien or interest in all or any portion of the Acquired Assets, and their counsel if known; (x) all taxing authorities or recording offices known to have an interest in the relief requested; (xi) the U.S. Department of State, Directorate of Defense Trade Controls; (xii) the U.S. Department of Commerce, Bureau of Industry and Security; and (xiii) the U.S. Department of the Treasury, Office of Foreign Assets Control.

92.     In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## No Prior Request

93.     No prior motion for the relief requested herein has been made to this or any other court.

## Conclusion

WHEREFORE, for the reasons set forth herein and in the Miller Declaration, the Debtors respectfully request entry of an order granting the relief request herein and such other and further relief as the Court deems just and proper.

Dated: March 18, 2009
      Wilmington, Delaware

**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
Steven J. Reisman (SR-4906)
Timothy A. Barnes (TB-0409)
James V. Drew (JD-2344)
101 Park Avenue
New York, New York 10178-0061
Telephone:   (212) 696-6000
Facsimile:   (212) 697-1559

- and -

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (Bar No. 2981)
Michael J. Merchant (Bar No. 3854)
Jason M. Madron (Bar No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701

Proposed Co-Counsel for the Debtors and Debtors-in-Possession

5677097