# **Exhibit 1**

EXECUTION COPY

ASSET PURCHASE AGREEMENT

Among

BANNER AEROSPACE HOLDING COMPANY I, INC.

Certain of Its Affiliates Named Herein, as Sellers,

and

GREENWICH AEROGROUP ACQUISITION CORP., as Buyer

Dated as of May 13, 2009

Table of Contents

Page

ARTICLE I    PURCHASE OF ACQUIRED ASSETS AND ASSUMPTION OF
             ASSUMED LIABILITIES.........................................................................2

1.1.    Purchase and Sale of Assets.................................................................2
1.2.    Excluded Assets...................................................................................4
1.3.    Assumption of Certain Liabilities.........................................................5
1.4.    Excluded Liabilities.............................................................................5
1.5.    Assignment..........................................................................................7

ARTICLE II    CLOSING; PURCHASE PRICE.........................................................9

2.1.    Closing.................................................................................................9
2.2.    Closing Deliveries by Sellers...............................................................9
2.3.    Closing Deliveries by Buyer...............................................................10
2.4.    Purchase Price....................................................................................11
2.5.    Purchase Price Adjustment.................................................................14
2.6.    Allocation of Purchase Price...............................................................16
2.7.    Withholding Rights.............................................................................17

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF SELLERS..................17

3.1.    Corporate Status, etc..........................................................................17
3.2.    Governmental Authorization, Filings and Approvals............................18
3.3.    Conflicts, Consents, Non-Contravention.............................................18
3.4.    Certain Financial Information..............................................................19
3.5.    Notices to Parties to Acquired Contracts.............................................19
3.6.    Bankruptcy Court Matters...................................................................20
3.7.    Litigation............................................................................................20
3.8.    Compliance with Laws; Permits..........................................................20
3.9.    Intellectual Property............................................................................21
3.10.   Insurance............................................................................................22
3.11.   Contracts............................................................................................23
3.12.   Inventories..........................................................................................26
3.13.   [Intentionally Omitted].......................................................................27
3.14.   Customers...........................................................................................27
3.15.   Suppliers; Raw Materials....................................................................27
3.16.   [Intentionally Omitted].......................................................................27
3.17.   Employee Benefits..............................................................................27
3.18.   Labor Matters.....................................................................................28
3.19.   [Intentionally Omitted].......................................................................29
3.20.   Leases.................................................................................................29
3.21.   Real Property......................................................................................29
3.22.   Environmental Matters........................................................................30

i

| | | |
|---|---|---|
| 3.23. | Aviation Regulatory Matters | 31 |
| 3.24. | [Intentionally Omitted] | 31 |
| 3.25. | [Intentionally Omitted] | 31 |
| 3.26. | Disclosure | 31 |
| 3.27. | Receivables | 31 |
| 3.28. | Payables | 32 |
| 3.29. | Tax Matters | 32 |
| 3.30. | Sufficiency of the Acquired Assets | 32 |
| 3.31. | [Intentionally Omitted] | 32 |
| 3.32. | Title to Assets and Properties; Liens | 32 |

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF BUYER ..................... 33

| | | |
|---|---|---|
| 4.1. | Corporate Status | 33 |
| 4.2. | Authorization, etc. | 33 |
| 4.3. | Governmental Authorization | 33 |
| 4.4. | Conflicts; Consents, Non-Contravention | 33 |
| 4.5. | Compliance with Applicable Laws | 34 |
| 4.6. | Litigation | 34 |
| 4.7. | Brokers | 34 |
| 4.8. | No Other Representations | 34 |
| 4.9. | Financial Ability to Perform this Agreement | 34 |

ARTICLE V  COVENANTS ................................................................................. 34

| | | |
|---|---|---|
| 5.1. | Conduct of Sellers | 34 |
| 5.2. | Reasonable Best Efforts; Satisfaction of Closing Conditions | 37 |
| 5.3. | General Access and Information | 39 |
| 5.4. | Contact with Customers and Suppliers, etc | 39 |
| 5.5. | Publicity | 39 |
| 5.6. | Employees | 40 |
| 5.7. | Transfer Taxes | 42 |
| 5.8. | Bulk Transfer Laws | 42 |
| 5.9. | Refunds and Remittances | 42 |
| 5.10. | Further Assurances | 43 |
| 5.11. | Maintenance of Books and Records | 44 |
| 5.12. | Transfers Not Effected as of Closing | 44 |
| 5.13. | Bankruptcy Court Approvals | 45 |
| 5.14. | Non-Competition; Non-Disparagement | 46 |
| 5.15. | Confidentiality | 47 |
| 5.16. | Insurance | 47 |
| 5.17. | Cure Amounts | 47 |
| 5.18. | Certifications | 48 |
| 5.19. | Certain Actions | 48 |
| 5.20. | Tax Cooperation and Exchange of Information | 49 |
| 5.21. | Transition Services | 49 |

5.22.     Fairchild Mortgage.................................................................50
5.23.     Waiver and Release................................................................50

ARTICLE VI CONDITIONS TO CLOSING .............................................50

6.1.     Conditions to the Obligations of Sellers and Buyer....................50
6.2.     Conditions to the Obligation of Buyer....................................51
6.3.     Conditions to the Obligation of Sellers...................................53

ARTICLE VII INDEMNIFICATION.......................................................54

7.1.     Survival of Representations and Warranties..............................54
7.2.     Indemnification by Sellers ...................................................54
7.3.     Indemnification by Buyer ....................................................54
7.4.     Certain Limitations on Indemnification...................................55
7.5.     Notice and Opportunity to Defend.........................................55
7.6.     Resolution of Claims..........................................................56
7.7.     Holdback ........................................................................57

ARTICLE VIII TERMINATION.............................................................57

8.1.     Termination of Agreement...................................................57
8.2.     Effect of Termination.........................................................59
8.3.     [Intentionally Omitted] .......................................................59
8.4.     [Intentionally Omitted] .......................................................59

ARTICLE IX DEFINITIONS.................................................................59

9.1.     Definition of Certain Terms..................................................59

ARTICLE X    GENERAL PROVISIONS ......................................................74

10.1.     Expenses ........................................................................74
10.2.     Notices ...........................................................................74
10.3.     Binding Effect; Benefits .....................................................75
10.4.     Assignment; Successors......................................................75
10.5.     Amendment; Waivers, etc....................................................76
10.6.     Entire Agreement..............................................................76
10.7.     Severability .....................................................................76
10.8.     Governing Law ................................................................76
10.9.     Consent to Jurisdiction, etc..................................................77
10.10.    Good Faith ......................................................................77
10.11.    Amendment; Waiver...........................................................78
10.12.    No Third Party Beneficiaries ................................................78
10.13.    Right to Rely ...................................................................78
10.14.    Time of Essence ...............................................................78
10.15.    Headings ........................................................................78
10.16.    Usage.............................................................................78
10.17.    Interpretation...................................................................78
10.18.    Counterparts; Facsimile Signatures .......................................79

10.19.      Specific Performance ................................................................................79
10.20.      Allowed Administrative Expense ...........................................................79

Exhibit A:      Sellers' Disclosure Schedule
Exhibit B:      Buyer Disclosure Schedule
Exhibit C:      Bills of Sale
Exhibit D:      Sellers' Budget
Exhibit E:      [Intentionally Omitted]
Exhibit F:      Sale Order
Exhibit G:      Affidavit of Foreign Person
Exhibit H:      [Intentionally Omitted]
Exhibit I:      [Intentionally Omitted]
Exhibit J:      Deeds

This **ASSET PURCHASE AGREEMENT**, dated as of May 13, 2009 (as such may be amended, restated or supplemented from time to time and including Sellers' Disclosure Schedule attached hereto as Exhibit A and Buyer Disclosure Schedule attached hereto as Exhibit B, this "Agreement"), by and among Banner Aerospace Holding Company I, Inc., a Delaware corporation ("Banner Holding") and certain of its Affiliates listed on the signature pages hereto (each, a "Seller", and collectively, the "Sellers") and Greenwich AeroGroup Acquisition Corp., a Delaware corporation (the "Buyer"). Capitalized terms used in this Agreement are defined in Article IX.

## R E C I T A L S:

**WHEREAS**, Sellers are engaged in (i) the distribution of aircraft parts to commercial airlines and air cargo carriers, fixed base operators, corporate aircraft operators and other aerospace companies worldwide; and (ii) component repair and overhaul services and design services for aircraft (the "Business");

**WHEREAS**, on March 18, 2009 (the "Petition Date"), each Seller filed a voluntary petition commencing a Chapter 11 Bankruptcy Case, Case No. 09-10899 (as jointly administered the "Bankruptcy Cases"), thereby creating Sellers' estates (collectively, the "Bankruptcy Estate") pursuant to Title 11 of United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on March 18, 2009, Sellers filed a motion (the "Sale Motion") in the Bankruptcy Court for the authority to sell certain assets, and on April 17, 2009, the Bankruptcy Court issued an Order (the "Bidding Procedures Order") establishing certain procedures (the "Bidding Procedures") in connection with such sale;

**WHEREAS**, upon the terms and subject to the conditions set forth herein, as part of a unified transaction (the "Transaction"), and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, all of the Acquired Assets (as hereinafter defined), and Buyer is willing to assume all of the Assumed Liabilities (as hereinafter defined);

**WHEREAS**, in lieu of delivering the Acquired Assets (as hereinafter defined) to Buyer pursuant to this Agreement, Buyer will direct Sellers to deliver, and Sellers shall deliver, or cause to be delivered, the Acquired Assets to Buyer and its Subsidiaries.

**WHEREAS**, Sellers' authority to consummate the transactions set forth in this Agreement will be subject to, among other things, the entry of the Sale Order.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## PURCHASE OF ACQUIRED ASSETS
### AND ASSUMPTION OF ASSUMED LIABILITIES

1.1.    Purchase and Sale of Assets.  Subject to and upon the terms and conditions set forth in this Agreement, on the Closing Date, Sellers shall sell, transfer, convey, assign and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer free and clear of all Liabilities and Liens (other than Assumed Liabilities and Liens set forth in Section 3.32 of Sellers' Disclosure Schedule), and Buyer shall purchase and accept from Sellers, all of Sellers' and the Bankruptcy Estate's right, title and interest in, to and under all the assets, properties, rights, claims of Sellers and the Bankruptcy Estate, contracts and businesses of every kind, character and description, whether tangible or intangible, whether personal or mixed, whether accrued, contingent or otherwise, and wherever located, that are used or held for use in, or otherwise relating to or required for, the Business, including all those items in the following categories that are used or held for use in, or otherwise relating to or required for, the Business, but expressly excluding the Excluded Assets (collectively, the "Acquired Assets"):

(a)    Equipment.    All machinery, furniture, fixtures, equipment, apparatus, appliances, spare parts, signage, automobiles, trucks, vehicles, tooling, tools, dies, molds, office equipment, furnishings and all other personal property in which Sellers have an interest, including the furniture located at 1750 Tysons Blvd, McLean, VA listed in Section 1.1(a) of Sellers' Disclosure Schedule;

(b)    Inventory.    All inventory including, without limitation, finished goods, labels, parts, works in process, raw materials, consigned goods (to the extent such goods may be assigned along with the agreement governing such consignment) and packaging materials, including without limitation, any of the foregoing held for the benefit of Sellers and in possession of third party manufacturers, suppliers, dealers or goods-in-transit (collectively, the "Inventory");

(c)    Materials and Supplies.    All materials, supplies, parts, point of purchase materials, accessories, goods and other like products or items;

(d)    Intellectual Property.    All Intellectual Property and all rights thereunder or in respect thereof that are either owned by or licensed to Sellers or any Affiliate, including but not limited to those identified in Section 3.9 of Sellers' Disclosure Schedule, and including but not limited to, rights to sue for and remedies against past, present and future infringements thereof, rights of priority and protection of interests therein under the Laws of any jurisdiction worldwide and all tangible embodiments thereof (collectively, the "Acquired Intellectual Property");

(e)    Contracts. All Contracts arising out of or relating to any of the Acquired Assets or the Business under which Sellers or their Affiliates (acting on behalf

2

of Sellers) have or may acquire any rights, all non-disclosure agreements and outstanding offers or solicitations made by or to Sellers to enter into any such Contracts, including (i) all non-disclosure agreements entered into between any Seller and a Bidder; and (ii) the Real Property Leases, and all other Contracts, in all cases, that are listed or described in Section 1.1(e) of Sellers' Disclosure Schedule, as updated from time to time by Buyer prior to the Contract Designation Date (collectively, the "Acquired Contracts");

   (f) Real Property. All right, title and interest of Sellers in the Real Property, including all easements and other rights and interests appurtenant thereto;

   (g) Accounts Receivable. All accounts and notes receivable, letters of credit and other rights to receive payments and the full benefit of all security for such accounts receivable or rights to receive payments (collectively, "Acquired Accounts Receivable");

   (h) Claims. All causes of action, lawsuits, judgments, choses in action, rights of recovery, rights of recoupment, rights, privileges, claims (including claims arising out of or relating to insurance policies of Sellers with respect to any of the Acquired Assets or the Business), demands, indemnification agreements in favor of any transferring party with, and indemnification and similar rights against, against third parties, warranty claims, offsets and any other rights or claims of any nature to the extent related to the Acquired Assets or the Business (the "Acquired Claims");

   (i) Books and Records. All books and records (subject to Section 1.2(b)), including, but not limited to, all sales and business records, files, reports, databases, books of account, customer and supplier lists, litigation files, books and records related to Taxes related to the Business and the Acquired Assets, product specifications, product formulations, drawings, correspondence, engineering, maintenance, operating and production records, advertising materials, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, credit records of customers, personal records and other books and records, manuals and other materials (in any form or medium) (collectively, the "Acquired Books and Records");

   (j) Goodwill. All goodwill of the Business (the "Acquired Goodwill");

   (k) Permits. Solely to the extent assignable, all Permits and pending applications therefor, subject to Section 5.12;

   (l) Guaranties and Similar Rights. All guaranties, warranties, indemnities and similar rights in favor of Sellers;

   (m) Credits and Prepaid Items. All credits, prepaid expenses, refunds deferred charges, deposits (including security deposits), prepaid items and duties;

(n)     Cash. All cash, cash equivalents and short-term investments (plus all uncollected bank deposits and less all outstanding checks) held by Sellers or related to the Business;

(o)     Information Technology. All application systems and Software, systems hardware and networking and communications assets, including, without limitation, those described in Section 1.1(o) of Sellers' Disclosure Schedule;

(p)     Governmental Authorizations. Solely to the extent assignable, all right, title and interest of Sellers as of the Closing Date in, to and under each Governmental Authorization arising out of or relating to any of the Acquired Assets or the Business, including the Governmental Authorizations listed in Sections 1.1(p) and 3.2 of Sellers' Disclosure Schedule;

(q)     Third Party Authorizations. All right, title, and interest of Sellers as of the Closing Date in, to and under each Third Party Authorization arising out of or relating to any of the Acquired Assets or the Business, including the Third Party Authorizations listed in Section 1.1(q) of Sellers' Disclosure Schedule; and

(r)     Other Assets. All other assets and properties of every character, description and kind, tangible or intangible, owned by Sellers and used or held for use in the Business.

1.2.    Excluded Assets. Notwithstanding anything to the contrary herein, the right, title and interest of Sellers in, to and under the following (collectively, the "Excluded Assets") are not part of the Acquired Assets:

(a)     All goodwill other than the Acquired Goodwill;

(b)     All Tax records and personal records (other than those related to the Transferred Employees, the Business and the Acquired Assets); provided, that Sellers shall provide Buyer with copies of any such Tax and (to the extent permitted by Applicable Law) personal records upon Buyer's request;

(c)     All insurance policies and the rights and proceeds thereunder which are in the name of Fairchild unless the proceeds relate to the Business or any of the Sellers;

(d)     All rights in connection with, and assets of, any Employee Benefit Plans; provided, that the disposition or retention of assets in any such Employee Benefit Plans vested in any Transferred Employees shall be dealt with in accordance with the terms and conditions of the Employee Benefit Plans and Applicable Law;

(e)     All rights, title and interest in the assets set forth in Section 1.2(e) of Sellers' Disclosure Schedule; and

4

(f)     All shares of capital stock or other equity interests of any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests.

1.3.    Assumption of Certain Liabilities.    On the terms and subject to the conditions set forth in this Agreement, at the Closing (and, pursuant to Section 1.5, on the applicable Assumption Date with respect to Assumed Liabilities under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall assume and become responsible for the Assumed Liabilities. Anything contained herein to the contrary notwithstanding, except for the Assumed Liabilities and as otherwise expressly provided herein, Buyer shall not and Buyer does not assume any Liabilities or obligations (fixed or contingent, known or unknown, now existing or hereafter arising, matured or unmatured) whether or not arising out of or relating to the Acquired Assets or the Business or any other business, all of which such non-assumed Liabilities, and obligations shall, at and after the Closing, remain the exclusive responsibility of Sellers (as applicable).

1.4.    Excluded Liabilities.    Notwithstanding anything to the contrary herein, regardless of any disclosure to Buyer, except as set forth in Section 1.3 hereof, Buyer shall not assume and Sellers shall retain all Liabilities, obligations or commitments of Sellers, whether contingent or material, known or unknown, and whether relating to or arising out of the operation of the Business or the Acquired Assets or otherwise (the "Excluded Liabilities"), including but not limited to:

(a)     any and all Liabilities for Taxes, whether or not accrued, assessed or currently due or payable (including deferred Taxes of any nature): (i) of Sellers or Fairchild, or (ii) arising out of or relating to any of the Acquired Assets or the Business that relate to any Pre-Closing Tax Period; provided, however, that this exclusion is not intended to exclude any Tax expressly agreed to be paid by Buyer under Section 5.7 hereof;

(b)     any and all Liabilities and obligations arising out of or relating to any violation of any Law, rule, writ, regulation, judgment, injunction, order or decree occurring or arising out of or relating to any event or condition occurring or existing on or prior to the Closing;

(c)     any and all Liabilities, obligations and commitments of Sellers associated with any leased real or personal property (other than real or personal property that is the subject of any Acquired Contract);

(d)     any and all Liabilities, obligations and commitments of Sellers relating to or arising out of the Excluded Assets;

(e)     any and all Liabilities arising out of or relating to any Proceeding pending on or prior to the Closing Date, any Proceeding commenced after the Closing

Date or request of any Governmental Authority on or prior to the Closing Date or on account of the Closing, in each case, arising out of or relating to any action occurring, arising or existing, in whole or in part, on or prior to the Closing Date or any actual or alleged violation or failure to comply with any Applicable Law;

(f)     any and all Liabilities, obligations and commitments with respect to environmental conditions, the presence or release of Hazardous Substances and violations of Environmental Laws, existing, occurring or relating to any period prior to the Closing;

(g)     other than as required by Section 1.5, Section 5.12 and Section 5.17, all Liabilities, commitments and obligations that arise (whether under the Acquired Contracts or otherwise) with respect to the Acquired Assets or the use thereof prior to the Closing or that relate to periods prior to the Closing or are to be observed, paid, discharged or performed prior to the Closing (in each case, including all Liabilities that result from, relate to or arise out of tort or other product liability claims);

(h)     any and all Liabilities, obligations and commitments of Sellers with respect to current or former Employees and their dependents and beneficiaries including, but not limited to, arising under any collective bargaining agreement, Employee Benefit Plan, COBRA or WARN; provided, however, that this limitation shall not exclude any Liability under WARN arising as a result of the termination of any Transferred Employee by Buyer after Closing, which such Liability shall be Buyer's sole and absolute responsibility;

(i)     any and all Liabilities, obligations and commitments of Sellers or Fairchild relating to or arising out of: (i) any third-party indebtedness or other obligations (other than those trade payables and Cure Costs) incurred or owed by Sellers or any Affiliate of Sellers or (ii) any intercompany indebtedness or other obligations incurred or owed by Sellers or any Affiliate of Sellers;

(j)     any and all Liabilities of Sellers arising out of or relating to the Acquired Contracts (other than Cure Costs) and the Governmental Authorizations that are (A) included in the Acquired Assets to the extent arising out of or relating to any period on or prior to the Closing Date or (B) otherwise excluded from the Acquired Assets;

(k)     any and all Liabilities of Sellers arising out of or relating to any product shipped or sold on or prior to the Closing Date, except as expressly set forth in Section 1.3, including any product liability claims or Liability, any Liabilities for adjustments, allowances, exchanges, refunds, returns and express or implied warranty, merchantability and other claims and any Proceeding of any nature relating to any such Liability; provided, however, that any such Liability required to be paid under an Acquired Contract assumed by Buyer hereunder constituting a Cure Cost is a Liability assumed by Buyer hereunder;

(l)      any and all Liabilities of Sellers to the extent arising out of or relating to the conduct of the Business or any portion thereof on or prior to the Closing Date, or the lease, ownership, sale or use of any assets or property (including any of the Acquired Assets) leased, owned, sold or used by Sellers on or prior to the Closing Date;

(m)      any and all Liabilities arising out of or relating to any actual or alleged breach of any Contract (including any Real Property Lease or other Acquired Contract) by Sellers on or prior to the Closing Date; provided, that to the extent such Liability is required to be paid under an Acquired Contract assumed by Buyer hereunder constituting a Cure Cost such Liability is assumed by Buyer hereunder;

(n)      any and all Liabilities based upon Sellers' actions after the Closing Date; and

(o)      any and all Liabilities, to advance, indemnify or reimburse amounts to any representatives of Sellers.

1.5.    Assignment.

(a)      Section 1.5(a) of Sellers' Disclosure Schedule lists all Acquired Contracts and the Cure Costs with respect thereto, that Buyer may elect to assume and request Sellers to assume and assign to Buyer at Closing (such Acquired Contracts so elected by Buyer, the "Designated Contracts"). Buyer shall have until Closing to designate which of such Contracts it wishes to assume and have Sellers assume and assign to Buyer at Closing (such date being referred to herein as the "Contract Designation Date"). In all cases, appropriate additions and deletions to Section 1.5(a) of Sellers' Disclosure Schedule (and corresponding additions and deletions to Section 1.2 of Sellers' Disclosure Schedule) shall be made promptly to reflect (i) such elections made by Buyer and (ii) any material changes to the Cure Costs.

(b)      If, at any time after the date hereof through the 90th Business Day after the Closing Date, any party to this Agreement becomes aware that any Seller is a party to any Contract related to the Business that is not an Excluded Asset and is not disclosed on Section 1.5(a) of Sellers' Disclosure Schedule (each, an "Undisclosed Contract"), the discovering party shall immediately notify the other parties to this Agreement in writing (the "Notification") of such Undisclosed Contract. For a period of thirty (30) Business Days after the date of Buyer's receipt or delivery, as the case may be, of the Notification, Buyer shall have the right, in it sole discretion, to require such Seller that is the party to such Undisclosed Contract to file one or more motions with the Bankruptcy Court (which motion(s) shall be in form and substance reasonably satisfactory to Buyer) seeking the entry of an Order (the "Undisclosed Contract Assignment Order"), pursuant to Sections 363 and 365 of the Bankruptcy Code, to assign, transfer, convey and deliver to Buyer such Undisclosed Contract as if it had been disclosed on Section 1.5(a) of Sellers' Disclosure Schedule, or to otherwise transfer the benefits of such Undisclosed Contract to Buyer without any additional consideration

(except for the obligation of Buyer to pay applicable Cure Costs pursuant to Section 5.17), by written notice to such Seller or any Affiliate of such Seller acting solely on behalf of such Seller. Any Cure Costs in relation to any such Undisclosed Contract shall be paid in accordance with Section 5.17. In the event that Buyer notifies a Seller of Buyer's desire to assume any Undisclosed Contract, such Seller shall, as soon as practicable after receiving such notification, file with Bankruptcy Court the motion(s) seeking the entry of the Undisclosed Contract Assignment Order. In addition, such Seller shall (i) use its reasonable best efforts to cause the Undisclosed Contract Assignment Order to become final and non-appealable and (ii) not take any action that would reasonably be expected to delay, prevent or impede the entry of, or result in the revocation, modification or amendment of, the Undisclosed Contract Assignment Order. Any Undisclosed Contract that Buyer elects to acquire pursuant to Section 1.5(a) of Sellers' Disclosure Schedule and for which an Undisclosed Contract Assignment Order is entered, subject to payment of all Cure Costs and becomes final and non-appealable shall constitute an Acquired Asset.

(c)     Sellers shall promptly notify Buyer in writing of any new Contract entered into after the commencement of the Bankruptcy Cases (each, a "Post-Petition Contract"). No later than the date that is the later of (i) Contract Designation Date, and (ii) ten (10) Business Days subsequent to the date that a copy of such Post-Petition Contract is delivered or made available to Buyer, Buyer shall notify Sellers in writing whether it will assume such Post-Petition Contract and Buyer shall pay the Cure Costs related thereto.

(d)     With respect to each Designated Contract, on the Closing Date, Sellers shall (i) assume such Designated Contract in the Bankruptcy Cases and (ii) subject to Buyer paying all Cure Costs under such Designated Contract, assign such Designated Contract to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Effective on the Closing Date, Buyer shall assume each such Designated Contract.

(e)     The Sale Order shall provide that as of the Closing, Sellers (as applicable) shall assign to Buyer the Designated Contracts, subject to payment of the Cure Costs related thereto and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the other party to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order. Such exhibit shall also (i) set forth the amounts necessary to cure any amounts owed under each of the Designated Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court, and (ii) delineate a procedure for transferring to Buyer the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Designated Contract.

8

(f)     In the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Acquired Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, fully cooperate with Buyer in endeavoring to obtain such consent; provided, however, that all out-of-pocket costs related thereto shall be Buyer's.

## ARTICLE II

## CLOSING; PURCHASE PRICE

2.1.    Closing. The closing of the Transaction (the "Closing") shall take place at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, at 10:00 AM, New York time, on the third (3rd) Business Day following the satisfaction or waiver of the conditions set forth in Article VI (other than those conditions that by their (i) terms cannot be waived and must be fulfilled, and (ii) nature are to be fulfilled only at the Closing, but subject to the fulfillment or waiver (subject to Applicable Law) of such conditions), or at such other place, time and date as the parties hereto may mutually agree. The "Closing Date" shall be the date upon which the Closing occurs.

2.2.    Closing Deliveries by Sellers. At Closing, Sellers shall deliver to Buyer:

(a)     one or more bills of sale, assignment and assumption agreement substantially in the form of Exhibit C attached hereto, to be duly executed by Sellers, and, in each case reasonably satisfactory to Buyer (the "Bills of Sale");

(b)     customary instruments of assignment or transfer, to be duly executed by Sellers, in form suitable for recording in the appropriate office or bureau, to record the transfer of the Acquired Intellectual Property to Buyer;

(c)     an officer's certificate duly executed by Sellers' chief restructuring officer or chief financial officer, as to the fulfillment of the conditions set forth in Sections 6.2(a), 6.2(b) and 6.2(f);

(d)     the Transition Services Agreement duly executed by Sellers;

(e)     an unconditional and irrevocable commitment or commitments from a title insurance company reasonably acceptable to Buyer (the "Title Company") to issue a policy for each parcel of Owned Real Property in the form and with such endorsements as requested by Buyer, insuring Buyer that title to the Owned Real Property is vested in Buyer, subject only to the Liens set forth in Section 2.2(e) of Sellers' Disclosure Schedule (the "Title Policies");

9

(f)     Deeds in the form customarily provided by sellers to sophisticated buyers of commercial real estate in the state in which the Owned Real Property is located, executed by Sellers in proper form for recordation and sufficient to convey to and vest in Buyer good, indefeasible and marketable fee simple title to the Owned Real Property, free and clear of all Liens (except for Liens set forth in Section 2.2(e) of Sellers' Disclosure Schedule), together with all other affidavits, Tax forms and other documentation required by Applicable Law;

(g)     customary instruments of assignment or transfer, to be duly executed by Sellers, in form suitable to any necessary Governmental Authorities, to record and effect the assignment, transfer, amendment, or reissuance of aviation Permits of Sellers to Buyer;

(h)     the Escrow Agreement, reasonably satisfactory to Buyer and Sellers, executed by Sellers;

(i)     evidence that any and all Liens under the PNC DIP Agreements, PNC Credit Agreements and the Junior DIP Loan in respect of the Acquired Assets have been released including, without limitation, the filing of any and all UCC-3s reasonably requested by Buyer; and

(j)     such other instruments and documents (including the Ancillary Documents), in form and substance reasonably acceptable to Buyer as may be necessary to effect the transaction contemplated by this Agreement and Closing.

2.3.     Closing Deliveries by Buyer. At Closing, Buyer shall deliver to Sellers:

(a)     The Cash Amount of the Initial Purchase Price less the amount of the Holdback, in the manner set forth in Section 2.4;

(b)     one or more Bills of Sale duly executed by Buyer;

(c)     an officer's certificate duly authorized by an executive officer of Buyer, as to the fulfillment of the conditions set forth in Section 6.3(a) and Section 6.3(b);

(d)     written instructions executed by Buyer directing Sellers to transfer, convey, assign and deliver, or cause to be transferred, assigned, conveyed and delivered, to Buyer's Affiliates the Acquired Assets as set forth in the written instructions;

(e)     The Escrow Agreement, reasonably satisfactory to Buyer and Sellers, executed by Buyer;

(f)     the Transition Services Agreement duly executed by Buyer;

(g)    evidence of the DIP Repayment, reasonably satisfactory to Sellers;
and

(h)    such other instruments and documents (including the Ancillary Documents), in form and substance reasonably acceptable to Sellers as may be necessary to effect the transaction contemplated by this Agreement and Closing.

2.4.    Purchase Price.

(a)    Subject to the terms and conditions of this Agreement, in consideration of the aforesaid sale, transfer, assignment, conveyance and delivery of the Acquired Assets, at the Closing the Buyer shall (i) deliver (or cause to be delivered) to Sellers, by wire transfer of immediately available funds, an amount in cash equal to (A) Thirteen Million Four Hundred Fifty Thousand U.S. Dollars (US$13,450,000); plus (B) Five Hundred Thousand U.S. Dollars (US$500,000) (the "Expense Reimbursement"); plus (C) One Million Fifty Thousand U.S. Dollars (US$1,050,000) (the "Break-Up Fee"); minus (D) One Million U.S. Dollars (US$1,000,000) (the "Deposit") ((A) plus (B) plus (C) minus (D), as may be adjusted pursuant to Section 2.5, the "Cash Amount"); minus (E) the Holdback (as defined below); (ii) to the extent not included in Section 2.4(a)(iii), pay all Cure Costs to cure defaults under the Designated Contracts in accordance with Section 5.17; (iii) assume the Assumed Liabilities, to the extent not already counted herein; and (iv) repay the PNC Bank Amount to PNC Bank (the "DIP Repayment"). The Cash Amount is hereinafter subject to adjustment, if any, in accordance with Section 2.5 (such amount is hereinafter referred to as the "Initial Purchase Price"), and as adjusted in accordance with Section 2.5, the "Purchase Price"). Sellers shall deliver wire transfer instructions to Buyer not fewer than two (2) days prior to the anticipated Closing Date for the wire transfer of the Cash Amount at Closing. At Closing, Buyer shall pay to Sellers the Cash Amount, less the amount of the Holdback.

(b)    Escrow Account. On the Closing Date, Buyer shall deposit funds in an amount equal to Five Hundred Thousand U.S. Dollars (US$500,000) into an account established at Wilmington Trust Company (the "Holdback") to be held by the Escrow Agent pursuant to the terms and conditions of an escrow agreement by and among Wilmington Trust Company, as escrow agent ("Escrow Agent"), Buyer and Sellers (the "Escrow Agreement"), pursuant to which the Holdback shall be used to satisfy the following claims: (i) (A) any healthcare claims of Transferred Employees and their covered dependents for claims made under The Fairchild Corporation Flex Benefits Plan prior to Closing, but for which payment has not been made on or before Closing and (B) healthcare claims (for services provided to Transferred Employees and their covered dependents prior to Closing under the Fairchild Corporation Flex Benefits Plan) that have not been made by such Transferred Employee prior to Closing, but made during the sixty (60) day period following the Closing (each, a "Healthcare Claim, and collectively the Healthcare Claims"); (ii) claims by Buyer for the Shortfall Amount finally determined to be due and owing to Buyer in accordance with Section 2.5; and (iii) Sellers' obligations

11

for indemnification claims by any Buyer Indemnified Party under this Agreement, to the extent that such amounts have been finally determined to be due and owing pursuant to Section 7.2. To the extent there is a deficiency in the amount of the Holdback available to pay all claims hereunder, pending Healthcare Claims shall have priority over all unpaid claims made hereunder, to the cash amount of the Holdback, and all remaining unpaid claims made hereunder shall be super-priority administrative expense claims, subject to a cap equal to Two Hundred Fifty Thousand U.S. Dollars (US$250,000). The fee of the Escrow Agent shall be paid fifty percent (50%) by Sellers and fifty percent (50%) by Buyer. The Holdback shall be released in accordance with the following:

        (i)      during the one hundred fifty (150) day period following the Closing, Buyer (on behalf of the Transferred Employees and their covered dependents) shall notify Sellers in writing of any Healthcare Claims. The notice shall (A) describe the Healthcare Claim in reasonable detail, (B) specify the amount of the healthcare costs incurred and the Transferred Employee entitled to such payment, and (C) provide Sellers with a copy of the claim submitted to Sellers and the date so submitted. If Sellers do not contest such Healthcare Claim within twenty (20) days of delivery of the notice, Buyer and Sellers shall jointly deliver instructions to Escrow Agent to release the amount of the Healthcare Claim to the applicable Transferred Employee to a bank account designated by such Transferred Employee; and

        (ii)      if a Healthcare Claim is disputed by Sellers within such twenty (20) day period, Sellers shall provide Buyer (acting on behalf of the Transferred Employee) the reason that such Healthcare Claim is being disputed, and Buyer and Sellers shall work in good faith to resolve the disputed Healthcare Claim; provided, that any dispute that cannot be resolved by Buyer and Sellers to their mutual satisfaction within ten (10) days shall be resolved in the same manner as disputes involving the Consolidated Adjusted Net Worth in Section 2.5(d); and

        (iii)      within three (3) Business Days following the final determination of all Healthcare Claims that were disputed under Section 2.4(b)(ii) Sellers and Buyer shall jointly deliver instructions to Escrow Agent to pay such Healthcare Claims, if any, to the applicable Transferred Employees to a bank account(s) designated by Buyer on behalf of such Transferred Employees. In the event the Holdback is insufficient to pay all Healthcare Claims, Sellers acknowledge and agree that the obligation to pay any remaining approved Healthcare Claims shall constitute a super-priority administrative expense of Sellers under the Bankruptcy Code; and

        (iv)      pursuant to the Escrow Agreement, Buyer and Sellers agree that once Consolidated Adjusted Net Worth as of the Closing Date is finally determined pursuant to Section 2.5, they will jointly deliver instructions to Escrow Agent, which state either: (i) that the Shortfall Amount is owed to Buyer

(because the Consolidated Adjusted Net Worth as of the Closing Date is less than the Consolidated Adjusted Net Worth as of February 28, 2009) and to the extent there are funds in the Holdback not otherwise subject to Healthcare Claims under Section 2.4(b)(i), (ii) or (iii), such amount shall be delivered to Buyer in immediately available funds within two (2) Business Days; or (ii) that the Excess Amount is owed to Sellers (because the Consolidated Adjusted Net Worth as of February 28, 2009 is less than the Consolidated Adjusted Net Worth as reflected as of the Closing Date) and subject to Section 2.5(f)(ii) and (iii), such amount less the aggregate amount of any Healthcare Claims pending under Section 2.4(b)(i), (ii) or (iii) or pending indemnification claims under Section 7.02 shall be delivered by Buyer to Sellers in immediately available funds within two (2) Business Days, to an account designated by Sellers;

(v)   in the event that there are insufficient funds in the Holdback to make all or any part of the payment to Buyer as and if required above, Sellers agree that the unpaid portion of the Shortfall Amount shall constitute a super-priority administrative expense of Sellers under the Bankruptcy Code.

(vi)   During the one hundred fifty (150) day period following the Closing, any indemnification finally determined to be due and owing under Article VII of this Agreement, to the extent there are any available funds in the Holdback, Buyer and Sellers will instruct the Escrow Agent to pay Buyer the amount of the finally determined indemnification claim from the Holdback, and to the extent all or a part thereof cannot be paid from the Holdback, Sellers agree that the unpaid portion of the indemnification amount shall constitute a super-priority administrative expense of Sellers under the Bankruptcy Code.

(vii)   In no event shall the amount of super-priority administrative expense claims paid exceed Two Hundred Fifty Thousand U.S. Dollars (US$250,000). Buyer's sole and exclusive remedy for any claims arising under this Agreement shall be limited to the Holdback and the administrative expense claims provided for herein, subject to a maximum aggregate dollar value (Holdback plus dollar value of super-priority administrative expense claim) equal to Seven Hundred Fifty Thousand U.S. Dollars (US$750,000) (the "Maximum Payment Amount") provided; that notwithstanding the foregoing, the limitations set forth in this Section 2.4(b) shall not apply (a) in the case of fraud, intentional misrepresentation or deliberate or willful misconduct of Sellers or any breach of any covenant set forth in Section 8.3 or Article V or VII of this Agreement other than Section 7.2(i) and (b) with respect to Buyer's rights for specific performance as provided in Section 10.19 hereof.

2.5.    Purchase Price Adjustment.

(a)    Preliminary Statement of Consolidated Adjusted Net Worth. The Consolidated Adjusted Net Worth of Sellers as of February 28, 2009, prepared by Sellers, setting forth the Consolidated Adjusted Net Worth of Sellers as of February 28, 2009, is attached to Sellers' Disclosure Schedule in Section 2.5(a) (the "Preliminary Statement of Consolidated Adjusted Net Worth").

(b)    Preparation of the Closing Date Statement of Consolidated Adjusted Net Worth. As soon as reasonably practicable after the Closing Date (but not later than thirty (30) Business Days thereafter), Buyer will prepare, or cause to be prepared by its independent accountant, a Closing Date Statement of Consolidated Adjusted Net Worth of Sellers prepared in a manner consistent with the preparation of the Preliminary Statement of Consolidated Adjusted Net Worth and the Reference Balance Sheet from which it was prepared (the "Closing Date Statement of Consolidated Adjusted Net Worth"), setting forth the Consolidated Adjusted Net Worth of Sellers as of 12:01 a.m. E.D.T. on the Closing Date.

(c)    Review of the Closing Date Statement of Consolidated Adjusted Net Worth. On or prior to the date that is thirty (30) Business Days after the Closing Date, Buyer shall deliver to Sellers or their authorized representative the Closing Date Statement of Consolidated Adjusted Net Worth. Buyer will make available to Sellers and their representatives, as reasonably requested by Sellers, all books and records relating to the Closing Date Statement of Consolidated Adjusted Net Worth within its possession. Seller and their independent accountants may review the Closing Date Statement of Consolidated Adjusted Net Worth and may make inquiry of Buyer and its representatives (including Buyer's independent accountant to the extent such accountant prepared such Closing Date Statement), for the purpose of verifying the Closing Date Statement of Consolidated Adjusted Net Worth. The Closing Date Statement of Consolidated Adjusted Net Worth shall be binding and conclusive upon, and deemed accepted by, Sellers unless Sellers or their authorized representatives shall have notified Buyer in writing of any objections thereto consistent with the provisions of this Section 2.5 within twenty (20) Business Days after the delivery of the Closing Date Statement of Consolidated Adjusted Net Worth to Sellers or their authorized representatives. The written notice delivered by Sellers or their authorized representatives to Buyer under this Section 2.5(c) shall specify in reasonable detail each item on the Closing Date Statement of Consolidated Adjusted Net Worth that Sellers dispute, a summary of the reasons for such dispute and the portion of the Closing Date Statement of Consolidated Adjusted Net Worth, if any, which Sellers do not dispute.

(d)    Disputes. Disputes between Buyer and Sellers relating to the Closing Date Statement of Consolidated Adjusted Net Worth that cannot be resolved by Buyer and Sellers within twenty (20) Business Days after receipt by Buyer of the objection notice referred to in Section 2.5(c) may be referred thereafter for decision at the

insistence of either Buyer or Sellers to any nationally recognized independent accounting firm selected by Buyer, other than the accounting firm then serving as Buyer's independent auditor (the "Arbiter"). Promptly, but no later than ten (10) Business Days after its acceptance of its appointment as Arbiter, the Arbiter shall determine, based solely on presentations by Buyer and Sellers, and not by independent review, those items in dispute on the Closing Date Statement of Consolidated Adjusted Net Worth and shall render a written report as to the resolution of each dispute and the resulting calculation of the Final Statement of Consolidated Adjusted Net Worth. The Arbiter shall have exclusive jurisdiction over, and resort to the Arbiter as provided in this Section 2.5(d) shall be the sole recourse and remedy of the parties against one another or any other Person with respect to, any disputes arising out of or relating to the Closing Date Statement of Consolidated Adjusted Net Worth or the Final Statement of Consolidated Adjusted Net Worth (as defined below); and the Arbiter's determination shall be conclusive and binding on all of the parties hereto and shall be enforceable in a court of law. The fee of the Arbiter shall be borne fifty percent (50%) by Sellers and fifty percent (50%) by Buyer, unless the Arbiter decides, based on its determination with respect to the reasonableness of the respective positions of Buyer and Sellers, that the fee shall be borne in unequal proportions.

(e)     Final Statement of Consolidated Adjusted Net Worth. The Closing Date Statement of Consolidated Adjusted Net Worth shall become final and binding upon the parties hereto upon the earliest of:  (i) the failure by Sellers to object thereto within the period permitted under, and otherwise in accordance with the requirements of, Section 2.5(c); (ii) the written agreement between Buyer and Sellers with respect thereto, and (iii) the decision by the Arbiter with respect to disputes under Section 2.5(d). The Closing Date Statement of Consolidated Adjusted Net Worth, as deemed to be agreed pursuant to clause (i) above, or as adjusted pursuant to the written agreement of Buyer and Sellers hereto or the decision of the Arbiter, when final and binding, is referred to herein as the "Final Statement of Consolidated Adjusted Net Worth."

(f)     Purchase Price Adjustment. Within five (5) Business Days of final determination of the Final Statement of Consolidated Adjusted Net Worth:

(i)     If the Consolidated Adjusted Net Worth of Sellers as reflected on the Final Statement of Consolidated Adjusted Net Worth is less than the Consolidated Adjusted Net Worth of Sellers as reflected on the Preliminary Statement of Consolidated Adjusted Net Worth, then an amount in immediately available same day funds equal to such shortfall (the "Net Worth Shortfall") shall be remitted to Buyer from the Holdback in accordance with the terms of the Escrow Agreement, together with any interest on the Net Worth Shortfall from the Closing Date to the date of the payment of the Net Worth Shortfall to Buyer (collectively, the "Shortfall Amount"); and

(ii)     If the Consolidated Adjusted Net Worth as reflected on the

Preliminary Statement of Consolidated Adjusted Net Worth is less than the Consolidated Adjusted Net Worth as reflected on the Final Statement of Consolidated Adjusted Net Worth, then, subject to (iii) below, an amount in immediately available same day funds equal to such excess (the "Net Worth Excess") less the aggregate amount of any pending Healthcare Claims under Section 2.4(b)(i)(ii) or (iii) or any pending indemnification claims under Section 7.2 (collectively, the "Reduction Amount") shall be delivered by Buyer to Sellers in immediately available funds within two (2) Business Days, to an account designated by Sellers, together with any interest on the Net Worth Excess from the Closing Date to the date of the payment of the Net Worth Excess to Sellers; provided, however; that the Reduction Amount shall in no event exceed the Maximum Payment Amount less the aggregate dollar amount of all Healthcare Claims and indemnification claims arising under Section 7.2, in each case satisfied by disbursement from the Holdback or receipt of super-priority administrative expense claims (collectively, the "Excess Amount");

(iii)      Buyer has agreed to pay all Transfer Taxes due and owing as a result of the sale contemplated hereby, in consideration for which Sellers have agreed that in the event there is an Excess Amount due and owing to Sellers hereunder, Sellers shall instruct Buyer, in writing, to set off from the Excess Amount the aggregate amount of all duly documented payments of Transfer Taxes (copies of which are to be delivered to Sellers upon payment thereof), subject to a maximum set off amount relating to such Transfer Taxes of Forty Thousand U.S. Dollars (US$40,000).

2.6.    Allocation of Purchase Price

(a)      The Purchase Price (including only those Assumed Liabilities that constitute Liabilities for federal income tax purposes) shall be allocated among the Acquired Assets and the Acquired Contracts to Buyer in a manner consistent with Section 1060 of the Code. Buyer shall prepare, within ninety (90) days after the Closing Date, and provide to Sellers for their review and comment an allocation schedule (the "Allocation Schedule"). Sellers shall have fifteen (15) days to comment on the schedule, and Buyer and Sellers shall resolve in good faith any disputes regarding the schedule. In the event that an adjustment to the Purchase Price is made, the Allocation Schedule shall be revised accordingly by Buyer and presented to Sellers for approval (which approval shall not be unreasonably withheld or delayed).

(b)      Each of Sellers and Buyer shall: (i) timely file all forms (including IRS Form 8594) and Tax Returns required to be filed in connection with the Allocation Schedule, (ii) be bound by such allocation for purposes of determining Taxes, (iii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation, and (iv) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return. Each of

Buyer, on the one hand, and Sellers, on the other hand, will provide the other with copies of IRS Form 8594 and any required exhibits thereto, consistent with the allocation determined pursuant to this Section 2.6(b) upon request. In the event that the allocation set forth on the Allocation Schedule is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

2.7.    Withholding Rights.  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to Sellers pursuant to this Agreement such amounts as may be required to be deducted and withheld with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or under any provision of any state or foreign Law with respect to Taxes.  To the extent that amounts are so withheld and paid over to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sellers in respect of which such deduction and withholding was made by Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLERS

Each Seller hereby, jointly and severally, represents and warrants to Buyer as of the date hereof and, if made as of a specific date, as of such date, as follows:

3.1.    Corporate Status, etc.

(a)    Organization.  Each Seller is an entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, as the case may be, and has full corporate power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate and use its properties, including the Acquired Assets, and to carry on its business, including the Business, as presently conducted.  Each Seller is duly qualified or licensed to do business and is in good standing in each of the jurisdictions specified in Section 3.1(a) of Sellers' Disclosure Schedule.

(b)    Authorization, etc.  Subject to the entry of the Sale Order, each Seller has full power and authority to execute, deliver and perform its obligations under this Agreement and the other Ancillary Documents to which it is, or is specified to be, a party at Closing and to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Sale Order, the execution and delivery by each Seller of this Agreement and the performance of its obligations hereunder and thereunder, have been duly authorized by all necessary corporate action on the part of each Seller including by each Seller's board of directors (or similar governing body) and, subject to the entry of the Sale Order, does not require any authorization or consent of any Seller's stockholders or members that has not been obtained.  This Agreement has been duly executed and

delivered by each Seller, subject to the entry of the Sale Order and assuming the due authorization, execution and delivery of this Agreement by Buyer, will be a valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, except as limited by laws affecting the enforcement of creditors' rights generally or by general equitable principles.

      3.2.    Governmental Authorization, Filings and Approvals.  Except as set forth in Section 3.2 of Sellers' Disclosure Schedule, and subject to the ITAR Approval and DOD Authorizations, entry of the Sale Order, the execution, delivery and performance by each Seller of this Agreement and any other Ancillary Documents to which it is, or is specified to be, a party at Closing does not, and the consummation by each Seller of the transactions contemplated by this Agreement and any other Ancillary Documents to which it is, or is specified to be, a party at Closing will not, require any Seller to obtain any consent, approval, Permit or Order of, make any filing with, or give any notice to, any Governmental Authority under any Applicable Laws.

      3.3.    Conflicts, Consents, Non-Contravention.  Except as set forth in Section 3.3 of Sellers' Disclosure Schedule, and subject to the entry of the Sale Order, the execution, delivery and performance by each of Sellers of this Agreement and the consummation by each Seller of the transactions contemplated hereby and the performance by each Seller of its obligations hereunder, will not:

      (a)    violate any provision of the charter, bylaws or any other organizational document of any Seller;

      (b)    violate, conflict with, result in a material breach of or default under (or with notice, lapse of time, or both would result in such a breach or default), result in any modification of the effect of, provide the other contracting party the right to terminate, cancel, accelerate or materially amend, or require the other contracting party to consent to the assignment or continuation of, any Acquired Contract to which any Seller is a party or to which any Seller or any Acquired Asset is bound or subject;

      (c)    result in or require the creation or imposition of any Lien on the Acquired Assets, except for Permitted Liens or Liens created by Buyer;

      (d)    violate any Order against or binding upon any Seller;

      (e)    violate any agreement with, or condition imposed by, any Governmental Authority upon any Seller;

      (f)    subject to obtaining the Governmental Authorizations referred to in Section 3.2, violate any Applicable Law; or

      (g)    result in a breach or violation of any of the terms or conditions of, constitute a material default under, or otherwise cause an impairment or a revocation of,

any Permit utilized in the operation of the Business (except to the extent any of the foregoing set forth in Sections 3.3(a) through Section 3.3(g) is rendered inapplicable by the Bankruptcy Court).

3.4.    Certain Financial Information.    Section 3.4 of Sellers' Disclosure Schedule contains the following financial statements of Sellers (the "Financial Statements"): (i) the audited consolidated balance sheet of Sellers (other than Fairchild Realty, LLC, "Fairchild Realty") for the fiscal year ended as of September 30, 2007 and the related audited consolidated statements of operations and cash flows for the year then ended, together with all related footnotes and schedules thereto and the related auditor's reports containing opinions without qualification by the independent certified public accountants, (ii) the audited consolidated balance sheet of Sellers (other than Fairchild Realty) for the fiscal year ended as of September 30, 2008 and the related audited consolidated statements of operations and cash flows for the year then ended, together with all related footnotes and schedules thereto, (iii) the unaudited balance sheet of Fairchild Realty for the fiscal years ended as of September 30, 2007 and 2008 and the related unaudited statements of operations and cash flows for the years then ended, (iv) the unaudited interim consolidated balance sheet of Sellers (other than Fairchild Realty) as of February 28, 2009 (the "Reference Balance Sheet," and the date of such balance sheet, the "Reference Balance Sheet Date") and a consolidated statement of operations and changes in cash flows for the five months ended on the Reference Balance Sheet Date and (v) the unaudited interim balance sheet of Fairchild Realty as of February 28, 2009 ( the "Fairchild Reference Balance Sheet," and the date of such balance sheet, the "Fairchild Reference Balance Sheet Date") and a statement of operations and changes in cash flows for the five months ended on the Fairchild Reference Balance Sheet Date.    The Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods covered thereby, fairly present the consolidated financial condition, results of operations and cash flows of Sellers as of the respective dates thereof and for the periods referred to therein and are consistent with the books and records of Sellers; provided, however, that the Financial Statements referred to in clauses (ii) through (v) of this Section 3.4 are subject to normal recurring year-end audit adjustments and do not include footnotes.    Sellers' books of account have been maintained in accordance with good business and bookkeeping practices.

3.5.    Notices to Parties to Acquired Contracts.    Each Seller has provided timely and proper written notice of the motions seeking entry of the Sale Order to all parties to executory contracts and unexpired leases to be assumed by such Seller and assigned to Buyer pursuant to this Agreement and has taken or will take all other actions necessary to cause such executory contracts and unexpired leases to be assumed by such Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code and each Seller shall, at or prior to the Closing, comply with all requirements under Section 365 necessary to assign to Buyer the contracts and agreements included in the Assumed Liabilities.

3.6.    Bankruptcy Court Matters.  Each Seller has given due and adequate notice of the Sale Motion, the Bidding Procedures, the proposed Sale Order and the Transaction to all affected parties, including all counterparties to all Acquired Contracts, all Acquired Intellectual Property and all holders of Liens on the Acquired Assets.

3.7.    Litigation.  Except as set forth in Section 3.7 of Sellers' Disclosure Schedule and except in connection with the Bankruptcy Cases, there is no civil, criminal or administrative suit, action, claim, proceeding, demand, suit, summons, subpoena, arbitration, investigation of any nature, review or inquiry pending or, to Sellers' Knowledge , threatened against or affecting any Seller or any of its properties, assets or rights, nor is there any judgment, decree, injunction, rule, settlement, forbearance to sue, consent or Order of any Governmental Authority or arbitrator outstanding against or affecting any Seller or any of its properties or rights (the foregoing collectively referred to as "Proceedings").  No event has occurred or circumstance exists which could reasonably be expected to give rise to or serve as a valid basis for the commencement of any Proceeding by or against any Seller.  Except as set forth in Section 3.7 of Sellers' Disclosure Schedule, in the past five years, no Seller has been subject to any Proceeding nor has any Seller settled any claim prior to being sued or prosecuted.

3.8.    Compliance with Laws; Permits.

(a)    Except as set forth in Section 3.8(a) of Sellers' Disclosure Schedule, each Seller has conducted and continue to conduct the Business in material compliance with all Laws and Orders applicable to such Seller or the Acquired Assets, and no Seller has received any notice within the past five years that any Seller is in violation of any such Law or Order.

(b)    Without limiting the generality of the foregoing, (i) each of Sellers is in compliance with the U.S. Foreign Corrupt Practices Act (15 U.S.C. § 78m and 15 U.S.C. § 78dd-1 et seq.) (the "FCPA") (and Sellers' Employees have been informed of their obligations with respect to the FCPA); and (ii) no Seller is in violation of any U.S. export control laws or regulations, including, but not limited to, the ITAR, the EAR, and the OFAC regulations; and (iii) no Seller is in violation of the requirements of the NISPOM or any DoD Security Agreement.

(c)    Each Seller has in effect all Permits necessary for it to own, lease or operate the Business in the manner it is presently conducted or otherwise material to the Business.  All such Permits are listed in Section 3.8(c) of Sellers' Disclosure Schedule, and each such Permit is in full force and effect and, except as set forth in Section 3.8(c)(i) of Sellers' Disclosure Schedule, no notification to, or consent (to assignment or otherwise) from any Governmental Authority is required for the Permits to remain in full force and effect immediately following the Closing. Except as set forth in Section 3.8(c)(ii) of Sellers' Disclosure Schedule, receipt of any required Governmental Authorizations or consents necessary for such Permits to remain in full force and effect has been obtained. Except as set forth in Section 3.8(c) of Sellers' Disclosure Schedule,

there has occurred no material default under, or violation of, any such Permit, and each such Permit is in full force and effect. Except as set forth in Section 3.8(c) of Sellers' Disclosure Schedule, the execution, delivery and performance by each Seller of this Agreement and any Ancillary Documents to which it is, or is specified to be, a party at Closing, and the consummation by each Seller of the transactions contemplated hereby and thereby will not result in a violation of or material default under and will not cause the revocation or cancellation of any such Permit.    No Seller has received any communication or otherwise has knowledge of any facts that have, or reasonably should have, led it to believe that any of the Permits are not currently in good standing, or subject to pending enforcement or other administrative actions.    Except as set forth in Section 3.8(c) of Sellers' Disclosure Schedule, no Seller holds any Permit issued by the Federal Aviation Administration ("FAA"), or by the U.S. Department of Transportation, or by other Governmental Authorities regulating the services provided by any Seller.

3.9.    Intellectual Property.

(a)    Section 3.9(a) of Sellers' Disclosure Schedule sets forth a true and complete list of all Acquired Intellectual Property as of the date hereof. Each Seller is the exclusive owner or valid licensee of all Acquired Intellectual Property, free and clear of all Liens (other than the Permitted Liens). Except as set forth on Section 3.9(a) of Sellers' Disclosure Schedule, all Acquired Intellectual Property will be fully transferable, alienable or licensable by Buyer without restriction and without payment of any kind to any third party.

(b)    Each Seller owns or otherwise has the rights to use all Acquired Intellectual Property necessary to conduct the Business as currently conducted.

(c)    All registrations and applications, if any, for the Acquired Intellectual Property (including without limitation registrations with, filed in or issued by, as the case may be, the United States Patent and Trademark Office or such other filing offices, domestic or foreign) that are owned by each Seller and that are used in and are material to the conduct of the Business as currently conducted (i) to Sellers' Knowledge are valid, subsisting, in proper form and enforceable, and have been duly maintained, including the submission of all necessary filings and fees in accordance with the legal and administrative requirements of the appropriate jurisdictions, and (ii) have not lapsed, expired or been abandoned. To Sellers' Knowledge, no Acquired Intellectual Property or any registration or application therefor is the subject of any opposition, reexamination, interference, cancellation proceeding or other legal proceeding (including litigation) or governmental proceeding before any Government Authority in any jurisdiction, or of any order, judgment, decree or agreement adversely affecting the ownership, validity, registrability, or enforceability of the Acquired Intellectual Property or any Seller's use thereof or rights thereto. To Sellers' Knowledge, there are no facts or circumstances that would render any Acquired Intellectual Property invalid or unenforceable. To Sellers' Knowledge, no Seller has taken, or failed to take, any action in the application for or

prosecution of the Acquired Intellectual Property that is registered Intellectual Property that would render such Acquired Intellectual Property invalid or unenforceable.

(d)    With respect to the Acquired Intellectual Property: (i) to Sellers' Knowledge, each Seller owns and possess all right, title and interest in and to, or has a valid, binding and enforceable license to use, such Acquired Intellectual Property; (ii) no claim by any third party contesting the validity, enforceability, use, registrability or ownership of any of the Acquired Intellectual Property has been made or is, to each Sellers' Knowledge, threatened; (iii) none of the Acquired Intellectual Property is being infringed upon or violated by any other Person; and (iv) no Seller has received any notice of any infringement or misappropriation by any third party with respect to the Acquired Intellectual Property.

(e)    To Sellers' Knowledge, no Seller, nor any Acquired Assets nor any products, services, and activities and conduct of the business and operations of any Seller have infringed, misappropriated, violated or otherwise conflicted with any Intellectual Property of any third party. No Seller has received notice from any Person claiming that the Business or the Acquired Assets infringe or misappropriate the Intellectual Property of any Person, require or should require a license to the Intellectual Property of any Person, or constitute unfair competition or trade practices under the laws of any jurisdiction (nor does any Seller have Knowledge of any basis therefor).

(f)    Each Seller has taken all commercially reasonable measures to protect the secrecy, confidentiality and value of all Trade Secrets, Software, personal and user information, databases and data collections required for, related to and used in the Business, and such Trade Secrets, Software, databases and data collections have not been used, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure and/or license agreements, which have not been breached. No Employee has any Patents for any device, process, design or invention of any kind now used or needed by any Seller in the furtherance of the Business that have not been assigned to such Seller. To Sellers' Knowledge, no third party possesses any copy of any source code to any Software of any Seller, except any Software obtained by such Seller from a third party in the first instance or as permitted under a license set forth in Section 3.9(a) of Sellers' Disclosure Schedule.

3.10.    Insurance.

(a)    Section 3.10(a) of Sellers' Disclosure Schedule contains (i) a complete and correct list and summary description of all insurance policies maintained by, or for the benefit of, any Seller in connection with the Business or the Acquired Assets; (ii) the premiums and losses by year, by type of coverage, for the past three fiscal years; (iii) general comprehensive liability policies for the past three years, including excess liability policies; and (iv) any agreements, arrangements or commitments by or relating to any Seller, the Business or the Acquired Assets under which any Seller indemnifies any other Person or is required to carry insurance for the benefit of any other

Person. Each Seller has made available to Buyer complete and correct copies of all such policies together with all riders and amendments thereto. Section 3.10 of Sellers' Disclosure Schedule sets out all insurance claims made by, or for the benefit of, any Seller under any policy of insurance during the past three fiscal years with respect to the Business.

(b)     The current policies are in full force and effect, and all premiums with respect thereto covering all periods up to and including the Closing Date have been paid. Each Seller and its Affiliates have performed all obligations thereunder and no notice of cancellation or termination has been received by any Seller and its Affiliates with respect to any such policy. Such policies are valid, outstanding and enforceable policies and will remain in full force and effect through the respective dates set forth on Section 3.10(b) of Sellers' Disclosure Schedule without the payment of additional premiums. Except as set forth on Section 3.10(b)(i) of Sellers' Disclosure Schedule, such policies will not in any way be affected by, or terminate or lapse by reason of, this Agreement and the contemplated transactions. No Seller or its Affiliate (on behalf of such Seller) has received any notice that the issuer of any insurance policy is not willing or able to perform its obligations thereunder. Section 3.10(b)(ii) of Sellers' Disclosure Schedule sets forth all risks that are being self insured with respect to the Business and any reserves established thereunder, as well as the loss experience for all self-insured claims (including the number and aggregate cost of such claims).

3.11.   Contracts.

(a)     Section 3.11 of Sellers' Disclosure Schedule lists all Material Contracts. The term "Material Contracts" means all of the following types of Contracts that relate to the Acquired Assets and the Business to which any Seller or its Affiliate is a party or by which any of Sellers (or their Affiliates) or any of their respective properties or assets is bound:

(i)     sales, distribution and marketing Contracts for the purchase, sale or provision of materials, supplies, products or services involving in excess of Fifty Thousand U.S. Dollars (US$50,000) in the aggregate of materials, supplies, products or services per year;

(ii)     any Contract that contains covenants limiting or purporting to limit the ability of any Seller to compete in any line of business or with any Person (in any geographic area or during any period of time) or, except as part of any confidentiality agreement entered into in the ordinary course of business, not to solicit or hire with respect to employment;

(iii)     any Contract that contains a "most-favored nation" or "most-favored-customer" clause;

(iv)     any management, employment, service, consulting,

23

severance or other similar type of Contract;

(v)     any Contract relating to the storage or warehousing of any inventory or products of any Seller, or the charter or purchase of transportation or shipping services, in each case involving in excess of Fifty Thousand U.S. Dollars (US$50,000) in the aggregate;

(vi)     any Contract between or among any Seller, on one hand, and any Affiliate of any Seller, on the other hand;

(vii)     any Contract providing for the indemnification of any current or former director, officer or employee of any Seller, other than in the ordinary course of business;

(viii)     any Contract with any Governmental Authority to which any Seller or any Affiliate of any Seller is a party;

(ix)     any collective bargaining Contract or other Contract with any labor association, employee representative, organization or union;

(x)     any Contract for the lease, purchase or sublease of any Real Property or personal property by any Seller, or the lease, sale or sublease by any Seller of any Real Property or personal property or under which any Seller makes available for use any portion of any Real Property or personal property;

(xi)     any lease, sublease or similar Contract with any Person under which (A) any Seller is lessee of, or holds or uses, any equipment owned by any Person or (B) any Seller is a lessor or sublessor of, or makes available for use by any Person, any tangible personal property owned or leased by such Seller, in any such case that has an aggregate future liability or receivable, as the case may be, in excess of Fifty Thousand U.S. Dollars (US$50,000) or is not terminable by such Seller by notice of not more than thirty (30) days;

(xii)     any Contract relating to the Indebtedness of any of Sellers;

(xiii)     any Contract regarding the release, transportation or disposal of Hazardous Substances, or the clean-up, abatement or other action relating to Hazardous Substances or Environmental Laws;

(xiv)     any Contract (including any so-called take-or-pay or keepwell Contract) under which (A) any Person has directly or indirectly guaranteed Liabilities of any Seller or (B) any Seller has directly or indirectly guaranteed Liabilities of any third party (in each case other than endorsements for the purpose of collection in the ordinary course of business consistent with past practice);

(xv)        any Contract under which any Seller has, directly or indirectly, made any advance, capital contribution, extension of credit or loan to, or other investment in, any third party other than extensions of trade credit in the ordinary course of business consistent with past practice and advances made in the ordinary course of business consistent with past practice to Employees of the Business for travel expenses;

(xvi)       any Contract granting a Lien upon any Acquired Asset;

(xvii)      any Contract providing for indemnification (other than for breach thereof) of any Person with respect to Liabilities relating to any current or former business of any Seller or any predecessor Person;

(xviii)     any Contract or agreement entered into other than in the ordinary course of business involving aggregate payments in excess of Fifty Thousand U.S. Dollars (US$50,000), to be made by or to any Seller after the date hereof;

(xix)       (A) a continuing Contract for the future purchase of materials, supplies, equipment, raw materials, packaging or commodities, (B) a management, service, consulting or other similar Contract (other than Contracts for services in the ordinary course of business, including transportation and warehousing Contracts) or (C) an advertising Contract, in any such case that has an aggregate future liability to any Person in excess of Fifty Thousand U.S. Dollars (US$50,000) and is not terminable by Seller by notice of not more than thirty (30) days;

(xx)        any Contract (A) licensing Intellectual Property to or from any Seller and any other Person; (B) otherwise granting or restricting the right to use Intellectual Property; (C) transferring, assigning, indemnifying with respect to or otherwise relating to Intellectual Property used or held for use in the Business, in each case, to the extent material to the Business; or (D) indemnifying any other Person for breach, misappropriation or infringement of Intellectual Property;

(xxi)       any Contract for any joint venture, limited liability company, limited liability partnership, partnership or similar arrangement;

(xxii)      any confidentiality Contract (other than a confidentiality Contract entered into in the ordinary course of business consistent with past practice and not with any Person who (together with its Affiliates) competes in any manner with the Business);

(xxiii)     any Contract (A) for the sale of any Acquired Asset (other than Inventory sales in the ordinary course of business consistent with past practice); (B) for the grant of any preferential rights to purchase any Acquired

Asset (other than Inventory in the ordinary course of business consistent with past practice); or (C) requiring the consent of any party to the transfer of any Acquired Asset or affecting the use of an asset or assets that are material to the Business;

(xxiv)    any Contract providing for the services of any dealer, franchisee, sales representative or similar representative or a Contract providing for payments to any Person based on profits, purchases or sales, other than direct payments for goods;

(xxv)    a Contract involving a sharing of costs, losses, profits or other Liabilities by any Seller with any third party;

(xxvi)    any Acquired Contract; and

(xxvii)    any other Contract to which any Seller is a party or by which it or any of its assets are bound, material to the Business.

(b)    Sellers have provided or made available to Buyer true and complete copies of all Material Contracts. Except as set forth in Section 3.11(b) of Sellers' Disclosure Schedule, (i) each such Material Contract is a valid and binding agreement of each Seller and is in full force and effect, (ii) no Seller nor, to any Seller's Knowledge, any other party to any Material Contract is in violation of or in material default under any Material Contract, nor, to any Seller's Knowledge, has any event occurred or circumstance or condition exist, that (with or without notice, lapse of time or both) would reasonably be expected to (A) result in a violation of or material default under any Material Contract, (B) give any party the right to cancel or terminate or modify any Material Contract or (C) give any party to any Material Contract the right to seek damages or other remedies, and (iii) none of the Material Contracts requires the consent of any other party thereto in connection with the transactions contemplated by this Agreement. To Sellers' Knowledge , none of the Material Contracts will expire or are renewable within the next ninety (90) days.

(c)    Except as set forth in Section 3.11(c) of Sellers' Disclosure Schedule, there is no Contract, agreement or other arrangement to which any Seller is a party or otherwise subject or aware granting any Person any preferential right to purchase, other than in the ordinary course of business consistent with past practice, any of the Acquired Assets.

3.12.    Inventories. Each item of Inventory, whether reflected on the Reference Balance Sheet or subsequently procured or produced is properly stated on the Reference Balance Sheet (to the extent existing on the date thereof) and on the Acquired Books and Records of the Business at the lesser of cost and fair market value on a first in, first out basis, with adequate (as determined in accordance with GAAP) obsolescence and defective product reserves, all as determined in accordance with GAAP consistently applied.

26

3.13.    [Intentionally Omitted]

3.14.    Customers.    Section 3.14 of Sellers' Disclosure Schedule lists, for the fiscal years ended September 30, 2007 and 2008, and the five months ended February 28, 2009, the names of the ten (10) largest customers of each Seller with respect to the Business based on aggregate value of products purchased. No Seller has received any notice or has any reason to believe that any significant customer of such Seller (i) has ceased, or shall cease, to use the products, goods or services of such Seller, (ii) has substantially reduced or shall substantially reduce, the use of products, goods or services of such Seller or (iii) has sought, or is seeking, to reduce the price it shall pay for products, goods or services of such Seller, including in each case after the consummation of the Transaction. To Sellers' Knowledge, none of such ten (10) largest customers has ceased, or has delivered to any Seller notice of any intention to cease, to purchase products from any of Sellers.

3.15.    Suppliers; Raw Materials.    Section 3.15 of Sellers' Disclosure Schedule sets forth (a) the names and addresses of the top five (5) suppliers (including without limitation any Affiliates of Sellers) from which any Seller orders raw materials, supplies, merchandise and other goods and services with an aggregate purchase price for each such supplier of Five Hundred Thousand U.S. Dollars (US$500,000) or more during the two year period ended September 30, 2008. To Sellers' Knowledge, no supplier of any Seller described in clause (a) of the first sentence of this section has otherwise threatened not to sell raw materials, supplies, merchandise and other goods to Buyer at any time after the Closing Date on terms and conditions similar to those used in its current sales to Sellers, subject to general and customary price increases and general economic conditions.

3.16.    [Intentionally Omitted]

3.17.    Employee Benefits.    (a) Each employee benefit plan of any Seller or any other Affiliate or otherwise relating to any Employee, defined as:

(i)    any bonus, vacation entitlement, commission, fee, stock option plan, stock purchase plan, incentive compensation plan, deferred compensation plan, retention plan or agreement, profit-sharing plan and other similar benefit plan or arrangement for any current or former employee, director, officer, consultant or agent whether written or unwritten, registered or unregistered;

(ii)    any retirement, supplementary retirement, or unemployment compensation plan; employment, consultant or change in control agreement; and severance benefit plan, program, policy, agreements or other severance arrangements for any current or former employee, director, officer, consultant or agent, whether written or unwritten, registered or unregistered; and

(iii)    any insurance, health, welfare, disability, travel,

hospitalization, medical, dental, survivor, legal, counseling, eye care and other similar benefit, plan or arrangement or any fringe benefit arrangement for any current or former Employee, director, officer, consultant or agent whether written or unwritten, registered or unregistered;

(hereafter, an "Employee Benefit Plan" or, collectively, the "Employee Benefit Plans") is listed on Section 3.17(a) of Sellers' Disclosure. Any "change of control" or similar provisions therein which will be affected by the transactions contemplated hereby are specifically identified in such Schedule.

(b)     Except as set forth in Section 3.17(b) of Sellers' Disclosure Schedule, all of the Employee Benefit Plans are in compliance in all material respects with all applicable state, local and federal laws in the United States including but not limited to the Code, ERISA, the Family and Medical Leave Act of 1993, as amended, and COBRA. Except as set forth in Section 3.17(b) of Sellers' Disclosure Schedule, there are no pending or, to Sellers' Knowledge, threatened claims or litigation relating to the Employee Benefit Plans (other than routine claims for benefits). Except as set forth in Section 3.17(b) of Sellers' Disclosure Schedule, all contributions to each Employee Benefit Plan which were required under the terms of such Employee Benefit Plan, ERISA, the Code, or other Applicable Law have been made by the due date thereof, including any valid extension.

(c)     Except as set forth in Section 3.17(c) of Sellers' Disclosure Schedule, each Employee Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and intended to be qualified under Section 401(a) of the Code has received a favorable determination letter (or in the case of a master or prototype plan, a favorable opinion letter) as to its qualification under the Code, and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification. Except as set forth in Section 3.17(c) of Sellers' Disclosure Schedule, no Seller or any other organization that is a member of the same "controlled group" as Seller (within the meaning of Sections 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate") has taken any action or failed to take any action, nor has any event occurred, which has resulted or will likely result in Buyer becoming subject to liability under Title IV of ERISA or the minimum funding requirements of Sections 412 or 430 of the Code, or the Acquired Assets becoming subject to a lien imposed pursuant to such statutory provisions.

3.18.   Labor Matters.     There are no pending, or to Sellers' Knowledge, threatened, material strikes, slowdowns, picketing, work stoppages, concerted refusals to work overtime, organized efforts to impair the value of any Acquired Assets. Each of Sellers is in compliance in all material respects with all Applicable Laws respecting employment and employment practices, independent contractor arrangements, terms and conditions of employment, workers' compensation, wages, hours of work and occupational safety and health as such Laws relate to the Business and the Acquired

Assets, or other similar material labor activities with respect to any Employees. Sellers have no collective bargaining agreements, Contract or other agreement or understanding with a labor union or labor organization, including any employee benefit obligations thereunder.

3.19. [Intentionally Omitted]

3.20. Leases. Schedule 3.20 of Sellers' Disclosure Schedule sets forth a true and complete list of each Real Property Lease (including lessor name, lease date and termination date), as of the date hereof, relating to the Leased Real Property, true and complete copies of which have heretofore been delivered to Buyer. Subject to the approval of the Bankruptcy Court pursuant to the Sale Order, each Real Property Lease is in full force and effect and, except as limited by the Bankruptcy Code is a valid and binding obligation of the applicable Seller and each third party thereto, enforceable against such Seller and each such third party in accordance with its terms. Following the assumption by Seller, payment by Buyer of Cure Costs, if any, and upon the assignment of such leases by the applicable Seller to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and the requisite Order of the Bankruptcy Court, there will be no existing defaults by Sellers under any of the Real Property Lease that constitute Acquired Assets. No Seller has assigned its rights under any of the Real Property Leases to any Affiliates or third parties or subleased or given others any occupancy rights with respect to the Leased Real Property. Each Seller is in actual possession of the applicable Leased Real Property.

3.21. Real Property.

(a)    Identification of Real Property.    Section 3.21(a) of Sellers' Disclosure Schedule sets forth all Real Property, including the address, the owner of record, the Tax parcel identification number and a correct legal description of each and every parcel of Real Property.

(b)    Interest in Real Property. Except as set forth in Section 3.21(b) of Sellers' Disclosure Schedule, each Seller (i) owns and has good, indefeasible and marketable title in, and fee simple ownership of, the Owned Real Property and (ii) has good, valid, peaceful and undisturbed leasehold estates in the Leased Real Property, in each case, free and clear of all Liens (except for Permitted Liens). Except as set forth in Section 3.21(b) of Sellers' Disclosure Schedule, each Seller has discharged, paid or reserved for all claims that, if unpaid, could become a Lien against the Real Property or any portion thereof. Except as listed in Section 3.20 of Sellers' Disclosure Schedule, none of the Owned Real Property is subject to any lease, license, sublease or other occupancy agreement granting to any third party any right to use, occupy or enjoy any portion of the Owned Real Property. No Person has any option or right of first refusal to acquire the Owned Real Property or any portion thereof.

(c)     Condemnation. To Sellers' Knowledge, no condemnation of the Real Property or any portion thereof has occurred. There is no pending or, to Sellers' Knowledge, threatened appropriation, condemnation, eminent domain or like Proceeding affecting the Real Property or any part thereof or any sale or other disposition of the Real Property or any part thereof in lieu of condemnation.

(d)     [Intentionally Omitted]

(e)     [Intentionally Omitted]

(f)     [Intentionally Omitted]

(g)     [Intentionally Omitted]

(h)     [Intentionally Omitted]

(i)     [Intentionally Omitted]

(j)     [Intentionally Omitted]

(k)     Zoning. The Real Property and the current operation thereof is in compliance with all applicable zoning, building, set back requirements and other applicable requirements and other applicable regulations of any Governmental Authority and all certificates of occupancy required to operate the Real Property in its current manner have been issued by the applicable Governmental Authority and remain in full force and effect.

(l)     Governmental Authorizations. Each Seller has all material Governmental Authorizations required under Applicable Law with respect to the occupancy, ownership and use of the Real Property. The current occupancy and use of the Real Property do not violate any of such Governmental Authorizations, and no Proceeding is pending or, to Sellers' Knowledge, threatened to limit, modify, revoke or suspend any of the Governmental Authorizations or to challenge, condition or restrict the lease, occupancy, operations, ownership or use of any Seller at any portion of the Real Property.

(m)     [Intentionally Omitted]

3.22. Environmental Matters. Except as set forth in Schedule 3.22 of Sellers' Disclosure Schedule (a) no Seller has received any notice or request for information alleging that it may be in violation of or liable under any Environmental Law related to the Business or the Acquired Assets; (b) no release of Hazardous Substances has occurred in connection with the Acquired Assets or the Business that has resulted or would reasonably be expected to result in any Liability, obligation or cost under any Environmental Law; and (c) none of the Owned Real Property, and to the Knowledge of

Sellers, none of the Leased Real Property, contains any underground storage tanks, asbestos-containing material, lead-based paint, or polychlorinated biphenyls.

    3.23.  Aviation Regulatory Matters.

        (a)    Each Seller has provided or made available to Buyer with access to true and complete copies of the Governmental Authorities' administrative compliance, enforcement and related regulatory documents listed on Section 3.23(a) of Sellers' Disclosure Schedule related to Sellers' aviation activities and business (collectively, the "Aviation Reports"). To Sellers' Knowledge, the Aviation Reports constitute all material documents, including voluntary disclosures, internal, third party and Governmental Authority audits, enforcement and compliance related actions and Proceedings (including, but not limited to, Letters of Investigation, correspondence, notices, and Orders), and related documents with respect to the each of Seller's compliance with FAA requirements.

        (b)    No Seller has received written notice of any pending or threatened Proceedings, enforcement actions, claims, complaints, notices, or requests for information by any private parties or any Governmental Authority, or received notice of any threatened judicial or administrative actions or other similar proceedings alleging material violations by any Seller of any Aviation Law including violations regarding operation of the Business, the Real Property or the Leased Real Property.

        (c)    Each Seller is in material compliance with all applicable Aviation Laws under Aviation Laws regarding its operation of the Business, the Real Property and the Leased Real Property.

    3.24.  [Intentionally Omitted]

    3.25.  [Intentionally Omitted]

    3.26.  Disclosure. There is no fact known to any Seller which has had or would reasonably be expected to have a Material Adverse Effect which has not been set forth in this Agreement, including Sellers' Disclosure Schedule and the Financial Statements.

    3.27.  Receivables. Each Seller's receivables (including accounts receivable, loans receivable and advances) that have arisen in connection with the Business and that are reflected in the Financial Statements shall have arisen only from bona fide transactions in the ordinary course of business and are fully collectible subject to the reserve for doubtful accounts appearing in the Financial Statements. Section 3.27 of Sellers' Disclosure Schedule accurately lists as of the February 28, 2009, all receivables (including accounts receivable, loans receivable and advances) arising out of or relating to the Business in excess of Fifty Thousand U.S. Dollars (US$50,000), the amount owing and the aging of such receivable, the name and last known address of the party from

whom such receivable is owing, and any security in favor of such Seller for the repayment of such receivable that Sellers purports to have.

3.28. Payables. Except as set forth in Section 3.28(i) of Sellers' Disclosure Schedule, all accounts payable appearing on the Reference Balance Sheet and the Fairchild Reference Balance Sheet or subsequently created, have arisen from bona fide transactions in the ordinary course of business. Section 3.28(ii) of Sellers' Disclosure Schedule, sets forth a true and correct aged list as of February 28, 2009 of all accounts payable included in the Assumed Liabilities.

3.29. Tax Matters. There are no Tax Liens on any of the Acquired Assets or any assets of the Business. No Seller has received any claim from any Governmental Authority in a jurisdiction in which such Seller has filed Tax Returns that it may be subject to taxation by that jurisdiction relating to the Acquired Assets or the Business. No Seller is subject to any action or Proceeding of a Governmental Authority imposing on such Seller any obligations or Liabilities with respect to another Person's Taxes relating to the Acquired Assets or the Business.

3.30. Sufficiency of the Acquired Assets. Except as set forth in Section 3.30(a) of Sellers' Disclosure Schedule, except for the Excluded Assets, the Acquired Assets constitute all of the assets, properties and rights required or necessary for the conduct of the Business as currently conducted and as conducted as of the Closing Date. The equipment included in the Acquired Assets is in good repair and operating condition, subject only to ordinary wear and tear, and are adequate and suitable for the purposes for which they are presently being used or held for use. Except as set forth in Section 3.30(b) of Sellers' Disclosure Schedule, none of the assets, properties, rights or claims that are used in or are otherwise related to the Business are held or owned by any Person other than a Seller. There are no facts or conditions affecting any Acquired Assets which would reasonably be expected, individually or in the aggregate, to interfere with the current use or operation of such Acquired Assets. Except as expressly set forth in this Agreement (including Sellers' Disclosure Schedule hereto), Sellers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Sellers or any of their assets, liabilities or operations, including with respect to merchantability or fitness for any particular purpose or any other warranty of quality, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express, or implied that extend beyond the warranties contained in this Agreement. Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in this Agreement, Buyer is purchasing the Acquired Assets on an "as-is, where-is" basis.

3.31.   [Intentionally Omitted]

3.32.   Title to Assets and Properties; Liens. Subject to entry and effectiveness of the Sale Order and Buyer's payment of Cure Costs, and except as set forth in Section 1.5 hereof, at the Closing, Sellers shall transfer to Buyer good title to, or a valid lease or

license interest in, all of the Acquired Assets, free and clear of all Liens, other than the Liens set forth in Section 3.32 of Sellers' Disclosure Schedule. Except as set forth in Section 3.33 of Sellers' Disclosure Schedule, no Affiliate of any Seller has any right, title or interest in or to the Acquired Assets.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as of the date hereof and, if made as of a specific date, as of such date, as follows:

4.1.    Corporate Status.  Buyer is a corporation duly formed, validly existing and in good standing under the laws of the state of Delaware and has full limited liability company power and authority to own, lease and operate its properties, and to carry on its business as presently conducted.

4.2.    Authorization, etc.  Buyer has all requisite corporate power and authority to execute and deliver, and to perform its obligations under this Agreement and the other Ancillary Documents to which it is, or is specified to be, a party at Closing and to consummate the transactions contemplated hereby and thereby, and the execution and delivery by Buyer of this Agreement and any other Ancillary Documents to which it is, or is specified to be, a party at Closing, and the performance by Buyer of its obligations under this Agreement, have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been, duly executed and delivered by Buyer and, subject to the entry of the Sale Order and assuming the due authorization, execution and delivery by Sellers, this Agreement will be a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by laws affecting the enforcement of creditors' rights generally or by general equitable principles.

4.3.    Governmental Authorization.  Except as set forth in Section 4.3 of Buyer Disclosure Schedule and subject to the entry of the Sale Order, the execution, delivery and performance by Buyer of this Agreement and any other Ancillary Documents to which it is, or is specified to be, a party at Closing and consummation by Buyer of the transactions contemplated by this Agreement and any other Ancillary Documents to which it is, or is specified to be, a party at Closing will not, require Buyer to obtain any consent, approval, Permit or Order of, make any filing with, or give any notice to, any Governmental Authority under any Applicable Laws.

4.4.    Conflicts; Consents, Non-Contravention.  Subject to the entry of the Sale Order, the execution, delivery and performance by Buyer of this Agreement and each Ancillary Document and the consummation by Buyer of the transactions contemplated hereby and thereby will not (i) violate any provision of the certificate of formation, bylaws or any other organizational document of Buyer; (ii) violate, conflict with, result in a material breach of or default under (or with notice, lapse of time, or both would result

33

in such a material breach or default), result in any modification of the effect of, provide the other contracting party the right to terminate or materially amend, or require the other contracting party to consent to the assignment or continuation of, any material Contract to which Buyer is a party or to which Buyer is subject; (iii) subject to obtaining the Governmental Authorizations referred to in Section 4.3, violate any Applicable Law; or (iv) result in a breach or violation of any of the terms or conditions of, constitute a material default under, or otherwise cause an impairment or a revocation of any Permit related to Buyer's business (except to the extent any of the foregoing actions is rendered inapplicable by the Bankruptcy Court).

4.5.    Compliance with Applicable Laws.    Buyer is in compliance with all Applicable Laws, except where such non-compliance would not, individually or in the aggregate, be reasonably expected to prevent or materially delay consummation of the Transaction.

4.6.    Litigation.    As of the date hereof, there is no judicial or administrative action, claim, suit, proceeding or investigation pending or, to the knowledge of Buyer, threatened against Buyer, that questions the validity of this Agreement, or any action taken or to be taken by Buyer in connection herewith.

4.7.    Brokers.    All negotiations relating to this Agreement and the Transaction have been carried out without the intervention of any Person acting on behalf of Buyer in such manner as to give rise to any valid claim against Buyer or Sellers for any brokerage or finder's commission, fee or similar compensation.

4.8.    No Other Representations.    Except for the representations and warranties contained in this Article IV, neither Buyer nor any other Person makes any representation or warranty, express or implied, on behalf of Buyer.

4.9.    Financial Ability to Perform this Agreement.    Buyer has, or will have on the Closing Date, sufficient cash or other sources of immediately available funds to enable it to fulfill its obligations under this Agreement.

## ARTICLE V

## COVENANTS

5.1.    Conduct of Sellers.    Except (i) as set forth in Section 5.1 of Sellers' Disclosure Schedule, (ii) for entering into this Agreement and performing the obligations hereunder, (iii) as otherwise expressly set forth in this Agreement or (iv) as otherwise consented to by Buyer in writing, from the date hereof to the Closing Date, each Seller shall (in connection with or relating to the Business or the Acquired Assets):

(a)    operate the Business in the ordinary course consistent with past practice and in accordance with Sellers' Budget previously agreed to by Buyer (attached

hereto as Exhibit D) (the "Budget") , and reflective of its current and anticipated financial and staffing situations, preserve intact its business organization and maintain its customary relationships with creditors, licensors, suppliers and customers of the Business and maintain all material Licenses and Permits, subject to any Seller's obligations as debtors or debtors-in-possession under the Bankruptcy Code;

(b)     not terminate or amend any Acquired Contract, except in the ordinary course of business consistent with past practice or necessary to assume and assign the Acquired Contracts pursuant to Section 365 of the Bankruptcy Code;

(c)     not make any capital expenditure with respect to the Business not previously committed or make any new commitment for capital expenditures in excess of Fifty Thousand U.S. Dollars (US$50,000) individually or Two Hundred Fifty Thousand U.S. Dollars (US$250,000) in the aggregate other than (i) capital expenditures made in the ordinary course of business consistent with past practice, (ii) the capital expenditures set forth in Section 5.1(c) of Sellers' Disclosure Schedule, (iii) maintenance of capital expenditures made in the ordinary course of business, and (iv) capital expenditures as may be reasonably consented to by Buyer and approved by the Bankruptcy Court;

(d)     not (i) incur or assume any long-term debt; (ii) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person; or (iii) make any loans, advances or capital contributions to any other Person other than pursuant to a draw under the Junior DIP Loan; or (iv) mortgage or pledge any of the Acquired Assets or create any Lien upon the Acquired Assets except for Permitted Liens;

(e)     not change any of the accounting principles used by the Business unless required by GAAP or Applicable Law;

(f)     not incur any material obligation or liability, except current liabilities for trade or business obligations incurred in connection with the purchase of goods or services in the ordinary course of business consistent with prior practice or otherwise permitted by the terms of this Agreement;

(g)     not sell, transfer, lease to others or otherwise dispose of any of the Acquired Assets, except for inventory sold in the ordinary course of business consistent with prior practice, or cancel or compromise any debt or claim, or waive or release any right of substantial value;

(h)     not (i) sell, assign, transfer or grant any rights or licenses under, or enter into any settlement regarding the breach or infringement of, any Acquired Intellectual Property, or modify, terminate or dispose of any existing rights or licenses with respect thereto or enter into any licensing or similar agreements or arrangements, except for non-exclusive licenses in the ordinary course of business consistent with past

35

practice, and (ii) permit to lapse any rights to any Acquired Intellectual Property other than in the ordinary course of business consistent with past practice;

(i)    not terminate or permit to lapse any Permits, licenses, exemptions, Orders and approvals (including Governmental Authorizations and Third Party Authorizations) which are necessary for the operation of the Business;

(j)    not (i) grant or announce any increase in the wages, salary, compensation, bonus or incentive award payable to any Employee, other than as required by Law or any Contract or otherwise involving ordinary increases consistent with past practice and reflective of Sellers' current and anticipated financial and staffing situations, nor (ii) adopt or amend any employment, collective bargaining, bonus, profit-sharing, compensation, stock option, pension, retirement, vacation, severance, deferred compensation or other plan, agreement, trust, fund or arrangement for the benefit of any Employee (whether or not legally binding), to the extent the obligations under such plan, agreement, trust, fund or arrangement will (i) be an Assumed Liability or (ii) have a material impact on the Business;

(k)    not enter into or assume any Material Contract relating to the Business, or enter into or permit any material amendment, supplement, waiver or other modification in respect thereof, other than in the ordinary course of business or as may be reasonably consented to by Buyer and approved by the Bankruptcy Court;

(l)    not make any material change in the selling, distribution, advertising, terms of sale or collection practices for the Business from those used during the past twelve (12) months;

(m)    not purchase, order or otherwise acquire inventory for the Business in excess of the reasonably forecast requirements of the Business;

(n)    pay accounts payable and other obligations of the Business when they become due and payable in the ordinary course of business consistent with past practice, subject to any of Sellers' obligations as debtors or debtors-in-possession under the Bankruptcy Code;

(o)    use reasonable best efforts to perform in all material respects all of its obligations under all Acquired Contracts (including Real Property Leases) and other agreements and instruments relating to or affecting the Business or the Acquired Assets;

(p)    not cancel, terminate or allow to lapse any insurance policy that covers the Business or the Acquired Assets;

(q)    timely respond to all material customer complaints as required by Applicable Law or any Governmental Authority and shall promptly notify Buyer of any such complaint received;

36

(r)    (1) not offer employment for any period on or after the Closing Date to any employee or agent of the Business unless Buyer (in its sole discretion) has determined not to make an offer of employment in accordance with the terms set forth herein to such employee or agent; or (2) not attempt to persuade any such employee or agent to terminate his or her relationship with the Business;

(s)    (1) not sell ship any products to any Affiliate of any Seller or any other party that has not paid its invoices to such Seller when due, except upon advance payment by such Affiliate or other party of the third party price for such products in cash, and (2) use reasonable best efforts to maintain the collectability of its accounts receivable; and

(t)    not take any action that would reasonably be expected to cause any of the representations and warranties of Sellers not to be true and correct as of the date of such action or as of the Closing or otherwise prevent, delay or impede the consummation of the transactions contemplated hereby;

(u)    other than pursuant to a draw under the Junior DIP Loan, not declare, set aside for payment or pay any dividend on, or make any distribution in respect of, any shares of its capital stock or other equity interests or otherwise make any payments to its equity holders in their capacity as such;

(v)    not alter, amend, waive any provision of, or otherwise modify, the PNC DIP Agreements; and

(w)    not enter into any agreement, Contract, commitment or arrangement to do any of the foregoing actions set forth in Section 5.1, or authorize, recommend, propose or announce an intention to do any of the foregoing.

5.2.    Reasonable Best Efforts; Satisfaction of Closing Conditions.

(a)    Each of Buyer and each Seller shall use its reasonable best efforts to cooperate with each other with respect to the notices and filings to be made in connection with the consents, approvals, waivers, authorizations, licenses, Permits, qualifications and Orders necessary to consummate the Transaction. In addition, the Sellers and Buyer acknowledge that consents will be required to transfer Acquired Assets which are not assignable by their terms. Each of Sellers and Buyer shall use its reasonable best efforts to promptly obtain the consents, approvals, waivers, authorizations, licenses, Permits, qualifications and Orders required to be obtained by it prior to Closing in order to consummate the Transaction, if not rendered inapplicable by Order of the Bankruptcy Court, and all other things reasonably necessary to consummate and make effective the transactions contemplated hereby by the expected Closing Date, provided that nothing in this Agreement shall be construed as requiring Sellers or Buyer to litigate or agree to hold separate or to dispose of any assets or property in order to obtain approval of the consummation of the transactions contemplated hereby.

(b)    Each Seller and Buyer shall promptly file the appropriate applications and documentary materials required to be filed by them in connection with obtaining all necessary consents, franchises, licenses, Permits, approvals, waivers, authorizations and registrations of any Governmental Authority given, granted, issued or otherwise made available by or under the authority of such Governmental Authority (including the ITAR Applications, DoD Authorizations, all other registrations, and all pending applications therefor or renewals thereof, and including those held in the name of any Affiliate or insider of any Seller) required to be obtained prior to Closing ("Governmental Authorizations"), and promptly file any additional information required in connection with such filings as soon as practicable after receipt of request therefor. Each Seller and Buyer agree to cooperate with and to consult promptly with the other party and the other party's counsel with respect to the Governmental Authorizations and to provide advance drafts and copies of all presentations and filings to be made in connection with the Governmental Authorizations, and any reasonably available information with respect to such presentations and filings, to the other party's counsel with appropriate confidentiality provisions, provided that nothing herein shall obligate any party to obtain the consent, approval or other authorization of any other party hereto prior to the making of any such presentation or filing.

(c)    At all times prior to the Closing, each party hereto shall promptly notify the other party hereto in writing of any fact, condition, event or occurrence that will or may result in the failure of any of the conditions applicable to such party's obligation to effect the Closing pursuant to Article VI, promptly upon such party becoming aware of the same. During the period prior to the Closing Date, each party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. Sellers shall provide copies of any notices received under any Acquired Contracts (including Real Property Leases). It is acknowledged and understood that no notice given pursuant to this Section 5.2(c), shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

(d)    Each Seller shall use reasonable best efforts to assist Buyer in accomplishing a smooth transition of the Business from such Seller to Buyer, including, without limitation, (i) providing customer information to Buyer as appropriate and (ii) obtaining any necessary consents with respect to the assignment of any Acquired Contracts. Buyer acknowledges and agrees that unless and until the Closing occurs, any information concerning customers of the Business provided by any Seller to Buyer, or any of its Affiliates, members, directors, officers, employees, authorized representatives or agents (collectively, the "Buyer Representatives"), shall be subject to the terms and conditions of the confidentiality and non-disclosure agreement, dated March 24, 2009, among Sellers and Buyer's Affiliate (the "Confidentiality and Non-Disclosure

38

Agreement"). Nothing in this Section 5.2(d) will modify or alter the provisions of the Confidentiality and Non-Disclosure Agreement.

(e)    Sellers and Buyer understand that Sellers currently receive such services through Fairchild as set forth in Section 5.2(e). Sellers agree to continue to provide such services to Buyer, through the Transition Services Agreement in the same manner and with the same efforts as in the past for the periods provided on Schedule 5.2(e).

5.3.    General Access and Information.    After the earlier of (a) the date of execution of this Agreement by Sellers and (b) the entry by the Bankruptcy Court of the Sale Order and prior to the Closing, each Seller shall, subject to the Confidentiality and Non-Disclosure Agreement, permit Buyer and Buyer Representatives to have reasonable access during normal business times to the properties, books, contracts and records of such Seller with respect to Acquired Assets and the Business (provided that any such access by Buyer shall not unreasonably interfere with the conduct of the business of any Seller) and such Seller shall furnish or make available promptly to Buyer all information and documents in its possession relating to the Acquired Assets and the Business as Buyer may reasonably request; provided that no investigation pursuant to this Section 5.3 shall affect or be deemed to modify any representation or warranty made by any Seller.

5.4.    Contact with Customers and Suppliers, etc.    After the earlier of (a) the date of execution of this Agreement by Sellers and (b) the entry by the Bankruptcy Court of the Sale Order and prior to the Closing Buyer (and all of the agents and Affiliates thereof and any employees, directors and officers thereof) may, in accordance with all Applicable Law and subject to the terms and conditions of the Non-Disclosure Agreement executed by an affiliate of Buyer, contact and communicate with the employees, consultants, sponsors, lenders, endorsers, customers, suppliers, distributors and licensors of any Seller in connection with the Transaction. Following the Closing, each Seller shall use its best efforts to cooperate with Buyer and assist Buyer in the transfer of customers from such Seller to Buyer, such assistance to include, but not be limited to, meetings with the customers in which such Seller and Buyer jointly attend, but will not, under any circumstance, obligate such Seller to spend or pay money.

5.5.    Publicity.    Except as required by Applicable Law, Buyer shall not, directly or indirectly, make or cause to be made any press release, public statement, public announcement or issue any notice in respect of this Agreement or the Transaction without the prior written consent of Sellers, and Sellers shall not, directly or indirectly, make or cause to be made any such press release, public statement, public announcement or issue any such notice (other than with respect to filings to be made in connection with the Bankruptcy Case) without the prior written consent of Buyer; in each case, such consent shall not be unreasonably withheld, delayed or conditioned. Sellers and Buyer shall consult with each other prior to issuing any press releases or otherwise making public

statements with respect to the Transaction and prior to making any filings with any Governmental Authority or with any national securities exchange with respect thereto.

5.6.   Employees.

(a)   With respect to each current Employee, Section 5.6(a) of Sellers' Disclosure Schedule lists, to the extent such information is permitted to be disclosed under Applicable Law, (i) title or job/position; (ii) job designation and description (*i.e.*, salaried or hourly); (iii) each such person's location of employment; (iv) employment status (*i.e.*, actively employed or not actively at work (due to, *e.g.*, illness, short-term disability, sick leave, authorized leave or absence, etc.); (v) each such person's current annual base rate of compensation and bonus and commission accruals and opportunities; (vi) accrued sick leave, accrued vacation benefits and accrued severance pay; (vii) if applicable, any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.) and (viii) such other information Buyer may reasonably request for the purpose of extending offers to the Employees (collectively, the "Employee Information"). Not later than one day prior to the Closing Date, Sellers will provide Buyer with an updated Section 5.6(a) of Sellers' Disclosure Schedule.

(b)   Their workload permitting, Sellers shall permit Employees to be available to interview with Buyer concerning prospective employment with Buyer. In the event an Employee's workload makes it difficult to schedule an interview with Buyer, Sellers will use reasonable best efforts to enable such Employee to have time to interview with Buyer as requested. Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any Employee. To the extent Buyer determines in its sole discretion, to make offers of employment to any Employee, such offers shall be contingent on the following: (i) the issuance of the Sale Order; (ii) such Employee's termination of employment with the applicable Seller immediately prior to the Closing and (iii) the Closing. Buyer's employment of any individuals previously employed by any Seller shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion. Subject to Buyer's responsibility with respect to WARN Obligations in the event of a termination of employment by Buyer of a Transferred Employee after Closing, or as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period. The new employment of each Employee who accepts Buyer's offer of employment shall commence with effect from the later of the first Business Day after the Closing or the date of acceptance. All such Employees who accept offers of employment with Buyer as of Closing shall be referred to herein as "Transferred Employees"; provided, however, that employees who are disabled on the Closing Date shall not be considered Transferred Employees until they report to work for Buyer.

(c)   Buyer's offer of employment will include benefits that are comparable in the aggregate to those currently being received by such Employee.

(d)    With respect to each Transferred Employee, upon the consummation of the transactions contemplated hereby, each Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by such Seller on the employment, activities or other conduct of such individuals after their termination of employment with such Seller; provided, however, that each Seller shall assign to Buyer such Seller's rights to all obligations of each Transferred Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to such Seller by such Transferred Employee.

(e)    Nothing herein, express or implied, shall confer upon any current or former Employee any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement.  Buyer and each Seller agrees that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former Employee.

(f)    Neither Buyer nor any of its Affiliates shall have any Liability or responsibility for any (i) claims arising out of the employment by any Seller of any current or former Employee or a beneficiary or dependent thereof or (ii) benefits payable in respect of any current or former Employee under the Employee Benefit Plans, except as expressly provided for as an Assumed Liability or set forth in Section 5.6(f) of Sellers' Disclosure Schedule.  Sellers shall remain solely responsible for any and all Liabilities, obligations and commitments in respect of such current or former Employee relating to or arising out of or as a result of the employment or the actual or constructive termination of employment of any such current or former Employee by Sellers (including in connection with the consummation of the Transaction).  Sellers shall remain responsible for the payment of any and all severance, retention, change in control or other similar compensation or benefits under the various plans and arrangements maintained or entered into by Sellers and that are or may become payable in connection with the consummation of the Transaction.  Sellers shall provide notice to all Transferred Employees who are offered and accept employment with Buyer at comparable compensation levels that they shall not be entitled to any severance under Sellers' practices and may seek a waiver to any other severance obligations due to any such persons, if any.

(g)    From and after the Closing Date, Sellers shall remain solely responsible for any and all Liabilities to or in respect of the Employees or their beneficiaries or dependents relating to or arising in connection with any claims (whether such claims or liabilities are asserted before, on or after the Closing) incurred before, on, or after the Closing under the Employee Benefit Plans which provide life, disability, accidental death or dismemberment, worker's compensation, medical, dental or health benefits, except as expressly provided for as an Assumed Liability or set forth in Section 5.6(g) of Sellers' Disclosure Schedule.

(h)    From and after the Closing, Sellers shall remain solely responsible for any and all liabilities relating to health care continuation coverage required to be provided under the Consolidated Omnibus Reconciliation Act of 1985, as amended ("COBRA Coverage") to Employees and their eligible dependents in respect of qualifying events occurring before, on, or after the Closing Date. Following the Closing Date, Sellers or a member of the "selling group" (as such term is defined in Treasury Regulation Section 54.4980B-9) that includes Sellers, shall maintain a group health plan currently in effect as of the Closing Date until the latest date on which any current or former Employee, or the eligible dependent of any such current or former Employee, is entitled to COBRA Coverage. Notwithstanding the foregoing, Buyer shall be responsible for providing COBRA Coverage to any Transferred Employee and his or her eligible dependents in respect of qualifying events occurring after such individual's commencement of coverage under Buyer's group health plan.

(i)    From and after the Closing, Sellers shall remain solely responsible for any and all obligations that might arise under the Worker Adjustment Retraining Notification Act ("WARN"), 29 U.S.C. Section 2101 *et seq.*, or under any similar provision of any federal, state, regional, foreign or local law, rule or regulation (hereinafter referred to collectively as "WARN Obligations") arising as a result of any employment losses occurring prior to, on or after the Closing Date with respect to all current and former Employees.    Notwithstanding the foregoing, Buyer shall be responsible for WARN Obligations arising as a result of the termination of any Transferred Employee's employment by Buyer after the Closing Date.

5.7.    Transfer Taxes.    All Transfer Taxes relating to the sale and transfer of the Acquired Assets and the Business shall be paid by Buyer. Buyer and Sellers shall file all Tax Returns relating thereto as required by Law and shall cooperate in the filing of such Tax Returns and in the minimization of such Transfer Taxes.

5.8.    Bulk Transfer Laws.    Sellers and Buyer agree to waive compliance with provisions of any applicable bulk sales, fraudulent conveyance or other law for the protection of creditors to the extent that such Laws are applicable to the transaction contemplated hereby.

5.9.    Refunds and Remittances.    After the Closing, if any Seller receives any refund or other amount that is an Acquired Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, such amount shall be held in trust. The applicable Seller shall promptly remit, or shall cause to be remitted, such amount to Buyer at the address set forth in Section 10.2. After the Closing, if Buyer or any of its Affiliates receives any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to any Seller in accordance with the terms of this Agreement, Buyer shall promptly remit, or shall cause to be remitted, such amount to such Seller at the address set forth in Section 10.2. After the Closing, if Buyer or any of its Affiliates receives any refund or other amount that is related to claims (including

workers' compensation), litigation, insurance or other matters for which such Seller is responsible hereunder, and which amount is not an Acquired Asset, or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Buyer shall promptly remit, or cause to be remitted, such amount to such Seller at the address set forth in Section 10.2. After the Closing, if any Seller receives any refund or other amount which is related to claims, litigation, insurance or other matters for which Buyer is responsible hereunder, and which amount is not an Excluded Asset, or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, such Seller shall promptly remit, or cause to be remitted, such amount to Buyer at the address set forth in Section 10.2.

    5.10.  Further Assurances.

        (a)    At the Closing, and at all times thereafter as may be necessary, upon the request of either party, the other party shall execute and deliver (or use its reasonable best efforts to have any applicable third party execute and deliver) such further instruments of transfer, sale, conveyance and assignment, including without limitation, endorsements of checks and/or transfer of receipts received by any Seller after Closing, and instruments of release as shall be reasonably necessary to vest in Buyer title to the Acquired Assets, including the Acquired Contracts and Real Property, free and clear of all Liens, and such other instruments, agreements and documents as shall be reasonably necessary to evidence the assignment by Sellers and the assumption by Buyer of the Assumed Liabilities. Each Seller and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby.

        (b)    At the Closing, and at all times thereafter as may be necessary, each of Sellers and Buyer shall, at the reasonable request of the other, execute, deliver, and file, or cause to be executed, delivered, and filed by any applicable third party, such other instruments of conveyance, transfer and release and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement, to vest in Buyer title to the Acquired Intellectual Property free and clear of all Liens, except Liens as set forth in Section 3.32 of Sellers' Disclosure Schedule, and to assist Buyer to obtain full protection and benefit of the Acquired Intellectual Property, including, without limitation, executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Acquired Intellectual Property and to obtain protection of the Acquired Intellectual Property.

        (c)    At the Closing, and at all times thereafter as may be necessary, Buyer may execute, deliver and file, or cause to be executed, delivered and filed by any applicable third party, termination statements or Lien terminations in any required jurisdiction to remove any record, notice filing or financing statement recorded to

attached, prefect or otherwise notice any Lien or encumbrance on any of the Acquired Assets, other than Permitted Liens.

5.11.   Maintenance of Books and Records.   Without prejudice to Sellers' obligations to transfer, each of the parties hereto shall, and shall cause their Affiliates to, preserve, until at least the fifth (5th) anniversary of the Closing Date, all pre-Closing Date records possessed or to be possessed by such party relating to the Business. After the Closing Date and up until at least the fifth (5th) anniversary of the Closing Date, upon any reasonable request from a party hereto or its representatives, the party holding such records shall (i) provide to the requesting party or its representatives reasonable access to such records during normal business hours and (ii) permit the requesting party or its representatives to make copies of such records, in each case at no cost to the requesting party or its representatives (other than for reasonable out-of-pocket expenses). Such records may be sought under this Section 5.11 for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the audit, accounting, Tax, litigation, federal securities disclosure or other similar needs of the party seeking such records. Notwithstanding the foregoing, any and all such records may be destroyed by a party if such destroying party sends to the other party hereto written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the 30th day following such notice unless the other party hereto notifies the destroying party that such other party desires to obtain possession of such records, in which event the destroying party shall transfer the records to such requesting party and such requesting party shall pay all reasonable expenses of the destroying party in connection therewith.

5.12.   Transfers Not Effected as of Closing.   Nothing herein shall be deemed to require the conveyance, assignment or transfer of any Acquired Asset that by its terms and by operation of the Sale Order and Applicable Law cannot be freely conveyed, assigned, transferred or assumed. To the extent the parties hereto have been unable to obtain any governmental or any third-party consents or approvals required under Applicable Law for the transfer of any Acquired Asset and to the extent not otherwise prohibited by the terms of any related Governmental Authorization or Permit, Applicable Law or Acquired Asset, each Seller shall continue to be bound by the terms and Liabilities of such applicable Acquired Asset and Buyer (at its sole discretion) shall pay, perform and discharge fully all of the obligations of such Seller thereunder from and after the Closing, but only to extent that the corresponding benefit with respect to such Acquired Asset is received by Buyer and such retention and/or continuation is not to the detriment of such Seller. Each Seller shall, without additional consideration therefor, pay, assign and remit to Buyer promptly all monies, rights and other consideration received in respect of such performance. Each Seller shall exercise or exploit its rights in respect of such Acquired Assets only as reasonably directed by Buyer and at Buyer's expense. Subject to and in accordance with Sections 5.2 and 5.10, for not more than two hundred ten (210) days following the Closing Date, the parties hereto shall continue to use their reasonable best efforts to obtain all such unobtained consents or approvals

required to be obtained by it at the earliest practicable date. If and when any such consents or approvals shall be obtained, then Sellers shall promptly assign its rights and obligations thereunder to Buyer without payment of additional consideration and Buyer shall, without the payment of any additional consideration therefor, assume such rights and obligations. The parties shall execute such good and sufficient instruments as may be necessary to evidence such assignment and assumption.

5.13.    Bankruptcy Court Approvals.

(a)    Bankruptcy Petitions.    .    Sellers shall use their best efforts to promptly obtain entry of an Order of the Bankruptcy Court approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to the terms of this Agreement (the "Sale Order"), and shall obtain such entry no later than seventy (70) days after the Petition Date.

(b)    The Bidding Procedures Order.    Seller shall comply with the Bidding Procedures Order and the Bidding Procedures in all material respects.

(c)    [Intentionally Omitted]

(d)    The Sale Order. The Sale Order shall be substantially in the form (with such changes thereto as Buyer shall approve in its sole discretion) of Exhibit F hereto, and shall, among other matters:

(i)    approve this Agreement and the Transaction contemplated hereby in all respects;

(ii)    find that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to Buyer and shall vest Buyer with title of Sellers to such Acquired Assets free and clear of all Liens (including, but not limited to, Liens asserted by the Pension Benefit Guaranty Corporation), claims (including, but not limited to, successor Liability), interests and encumbrances whatsoever;

(iii)    enjoin and forever bar any creditors or any other Person from bringing any claims against Buyer arising prior to the Closing;

(iv)    find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets;

(v)    extend the time period under Section 365 of the Bankruptcy Code by which Sellers must assume (or assume and assign) or reject any of the Acquired Contracts;

(vi)        approve any other agreement to the extent provided by this Agreement;

(vii)        find that Sellers gave due and proper notice of the Transaction to each party entitled thereto;

(viii)        enjoin and forever bar the non-debtor party or parties to each Acquired Contract from asserting against Buyer or any of the Acquired Assets any objection to the assumption and assignment of such non-debtor party's Acquired Contract;

(ix)        order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry;

(x)        authorize Sellers' assumption and assignment of Acquired Contracts related to ordinary course third party accounts payable obligations to Buyer as to which the relevant affected parties have received notice consistent (in form, substance and timing) with Section 5.13(e) hereof and as to which no objection has been made on or prior to the date that the Sale Order is entered or as to which any objection has been overruled;

(xi)        find that Buyer shall not be considered to be or treated as a successor-in-interest to Fairchild, or any Affiliate, Subsidiary or insider, or any Seller or their respective Affiliates or insiders for any purpose, including, but not limited to, the purpose of asserting or assessing Liability or claim against Buyer with respect to any action, or failure to take action, by Sellers or their Affiliates or insiders;

(xii)        release Buyer from any successor Liability;

(xiii)        find that this Agreement was negotiated and entered into at arms-length and that Buyer is a good-faith purchaser of the Acquired Assets pursuant to Section 363(m) of the Bankruptcy Code and entitled to the benefits and protection of such Section; and

(xiv)        such other matters as shall be agreed by Sellers and Buyer.

5.14.    Non-Competition; Non-Disparagement.

(a)        Non-Competition.  Each Seller agrees that from the Closing Date until the fifth anniversary of the Closing Date, it will not directly or indirectly advise, control, engage in, finance, guarantee the obligations of, invest in, manage, operate, own or render services to any business in competition with the Business as conducted immediately prior to the Closing in the geographical areas in which the Business does

business. Notwithstanding the foregoing, this Section 5.14(a) shall not prohibit any Seller, directly or through any Affiliate, from investing in or holding not more than two percent (2%) of the outstanding capital stock or other ownership interests of any Person whose equity securities are listed on a national securities exchange or automated quotation system or have been registered under Section 12(g) of the United States Securities Exchange Act of 1934, as amended.

(b)    Non-Disparagement.    From and after the date hereof, no Seller will, directly or indirectly, alone or in connection with any Person, engage in any conduct or make any statement, whether in commercial or noncommercial speech, disparage or criticize in any way Buyer or any of its Affiliates, the Business or the Acquired Assets, or any products or services offered by any of these, nor shall any Seller engage in any conduct or make any other statement that could reasonably be expected to impair the goodwill of any of these, or the reputation or marketing of Buyer's products or services (related to the Business), in each case except to the extent required by Law, and then only after consultation with Buyer.

5.15.    Confidentiality.    Except as otherwise required by Law or regulation as advised by counsel or as may be necessary or appropriate in connection with the Bankruptcy Case, each Seller shall treat as confidential and shall safeguard any and all information, knowledge and data included in the Acquired Assets and Assumed Liabilities, in each case by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as such Seller used with respect thereto prior to the execution of this Agreement. The confidentiality obligations set forth herein shall not extend to information, knowledge and data that is publicly available or becomes publicly available through no act or omission of such Seller.

5.16.    Insurance.    Until the Closing Date, each Seller shall maintain or cause to be maintained (including necessary renewals thereof) existing insurance policies against risk and Liabilities to the extent and in the manner and at the levels maintained by such Seller as of the date hereof with respect to the Business and the Acquired Assets. If requested by Buyer, each Seller shall in good faith cooperate with Buyer and take all actions reasonably requested by Buyer that are necessary or desirable to permit Buyer to have available to it following the Closing the benefits (whether direct or indirect) of the insurance policies maintained by or on behalf of such Seller with respect to the Business, the Acquired Assets or the Assumed Liabilities that are currently in force and in the manner and at the levels maintained by or on behalf of such Seller as of the date hereof.

5.17.    Cure Amounts.    Set forth on Section 1.5(a) of Sellers' Disclosure Schedule is a list of the costs that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of any Seller under the Designated Contracts, which costs must be delivered to the non-debtor under the Designated Contracts, or with respect to which adequate assurance of prompt delivery by such Seller must be provided

as a prerequisite to the assumption of such Designated Contracts under Bankruptcy Code Section 365(a) (the "Cure Costs"). Appropriate additions and deletions shall be made to Section 1.5(a) of Sellers' Disclosure Schedule, and the Cure Costs shall be correspondingly amended, to reflect additions and deletions to Section 1.5(a) of Sellers' Disclosure Schedule made from time to time in accordance with Section 1.5. Prior to the Closing, each Seller shall cooperate with Buyer and use its reasonable best efforts to resolve any disputes with the non-debtor party to any of the Designated Contracts regarding the amount of the Cure Costs. All liquidated monetary defaults, claims or other obligations of Sellers arising or accruing under each Designated Contract prior to the assumption of such Designated Contract (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2)) shall be promptly cured by Sellers upon assumption and assignment as provided in Bankruptcy Code section 365(b)(1). Subject to entry of the Approval Order and it becoming a final Order, Buyer shall within five (5) Business Days (or such shorter period as may be required by the Bankruptcy Court) after the Closing pay the Cure Costs except as otherwise agreed by Buyer and such non-debtor counterparty (the "Post-Closing Cure Payment").

5.18.  Certifications.  Prior to the Closing Date, each applicable Seller shall cooperate with Buyer and use its best efforts to assist Buyer in connection with Buyer's negotiation with (i) all EASA authorities, employees, officials and personnel (or FAA personnel acting on their behalf) to obtain the issuance to Buyer of a new or amended (x) EASA Part-145 certificate, of the same quality and type as such Seller's EASA Part145 certificate and (y) all other certificates, approvals and authorizations issued by the EASA (issued to Sellers) necessary to conduct the Business as presently conducted, including but not limited to production approvals and STC (or EASA equivalent) authorities; (ii) all FAA authorities, employees, officials and personnel to obtain the issuance to Buyer of a new or amended (x) FAA air agency (Part 145) certificate, of the same quality and type as such Seller's Air Agency Certificate and (y) all other certificates and authorizations by the U.S. Department of Transportation Federal Aviation Administration (issued to such Seller) necessary to conduct the Business as presently conducted, including but not limited to PMA, TSOA and STC authority; and (iii) all third party employees, officials and personnel to obtain the issuance to Buyer of new or amended letters of direct ship authorization, certificates of good standing (or the like), including "authorized dealer" status or similar. Additionally, where permitted by Law, each Seller agrees to use its best efforts to assist Buyer in the transfer of any of the above referenced certificates or authorities. Where a new certificate or authorization is not required by Law, Buyer reserves the right to seek amendment or transfer of existing authorizations or certificates or pursue new authorizations or certificates in its sole discretion.

5.19.  Certain Actions.

(a)      Prior to the Closing Date, each Seller shall take such corporate and other actions necessary to change its corporate or company name, as the case may be, to a

48

name that is not similar to, or confusing with, the current name of any Seller.    In connection with enabling Buyer, at or as soon as practicable after the Closing Date, to use the current corporate names of each Seller, each Seller, at or prior to the Closing Date, shall execute and deliver to Buyer all consents related to such change of name as may be requested by Buyer, and will otherwise cooperate with Buyer in effecting such name change.  Within ten (10) days after Closing, each Seller shall file in all jurisdictions in which they are qualified to do business any documents necessary to reflect such change of name or to terminate their qualification therein.

(b)    From and after the Closing, Buyer shall be entitled to use (i) the current corporate names of each Seller and (ii) any other names under which each Seller conducts business.

5.20.    Tax Cooperation and Exchange of Information.

(a)    After the Closing Date, Sellers and Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, participating in or conducting any audit or other proceeding in respect of Taxes or effectuating the terms of this Agreement. Sellers and Buyer shall make themselves (and their respective employees) reasonably available on a mutually convenient basis to provide explanations of any documents or information provided under this Section 5.20.  The parties shall retain all Tax Returns, schedules and work papers, and all material records and other documents relating thereto with respect to the Acquired Assets, until the expiration of the statute of limitations (and, to the extent notified by any party, any extensions thereof) with respect to the taxable years to which such Tax Returns and other documents relate and, unless such Tax Returns and other documents are offered and delivered to Sellers and Buyer, as applicable, until the final determination of any Tax in respect of such years. Notwithstanding the foregoing, no party shall be unreasonably required to prepare any document, or determine any information, not then in its possession in response to a request under this Section 5.20(a).  Any information obtained under this Section 5.20 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding.

(b)    Each Seller shall deliver to Buyer on or before the Closing Date an affidavit in the form of Exhibit G to the effect that it is not a "foreign person" within the meaning of Code Section 1445.

5.21.    Transition Services.  For a reasonable time after the Closing Date, but in no event for more than one hundred twenty (120) days after the Closing Date, Buyer and each Seller shall, and Buyer and such Seller shall cause their respective Affiliates, to provide Buyer or such Seller (as the case may be) the transition services and assistance described in the Transition Services Agreement as Buyer or such Seller may reasonably request in order to facilitate a more efficient transition of the operation of the Business to

Buyer following the Closing Date. The manner, scope and amount of such services and assistance shall be mutually defined by the respective transition implementation teams of Buyer and Sellers, acting reasonably and in good faith. Buyer and each Seller may terminate any such services and assistance in accordance with the Transition Services Agreement. Buyer and each Seller shall pay to the other party the fees or other charges set forth in the Transition Services Agreement for such transition services for the time periods contemplated within fifteen (15) days after the completion of each such time period.

5.22. Fairchild Mortgage. Upon the terms and subject to the conditions set forth in this Agreement, each of Sellers shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to transfer, assign and convey to Buyer all of such Seller's rights and obligations under the Fairchild Mortgage. Buyer shall pay all costs and expenses related thereto.

5.23. Waiver and Release.

(a) Subject to the entry of the Sale Order, each Seller shall not assert, and shall within ten (10) days of the Closing waive and release, all bankruptcy claims against any Employee of such Seller or its Affiliates performing services under the Transition Services Agreement.

(b) Subject to the entry of the Sale Order, each Seller shall not assert, and shall within ten (10) days of the Closing waive and release, all bankruptcy claims against any supplier of such Seller relating to the Acquired Assets arising out of or in connection with transactions with or for the benefit of any Seller.

ARTICLE VI

CONDITIONS TO CLOSING

6.1. Conditions to the Obligations of Sellers and Buyer. The obligations of Sellers and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver by both Buyer and Sellers, on or prior to the Closing Date, of each of the following conditions:

(a) No Proceeding. There shall not be any pending suit, action or proceeding asserted by any Governmental Authority challenging or seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement or other Ancillary Documents, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree, injunction, Order or regulation of any Governmental Authority having appropriate jurisdiction; and

(b)    Sale Order. The Sale Order shall have been entered and shall not have been (i) vacated, stayed or reversed or (ii) (except with the express written consent of Buyer) amended, supplemented or otherwise modified.

6.2.    Conditions to the Obligation of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Buyer on or prior to the Closing Date of each of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of Sellers contained in Article III shall be true and correct in all respects (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) at and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must be true and correct as of such specific date);

(b)    Performance of Obligations. Sellers shall have duly performed and complied in all material respects with all agreements contained herein required to be performed or complied with by it at or before the Closing;

(c)    Certificates. Sellers shall have delivered to Buyer an officer's certificate, dated the Closing Date and signed by Sellers' chief restructuring officer or chief financial officer, as to the fulfillment of the conditions set forth in Sections 6.2(a), 6.2(b) and 6.2(f);

(d)    Sellers shall have delivered to Buyer all the documents listed in Section 6.2(d) of Sellers' Disclosure Schedule;

(e)    Permits. Buyer shall have obtained in its name (i) the two (2) certificates issued under 14 CFR Part 145 and EASA Part 145 with respect to Sellers' facility in Titusville, Florida and (ii) all STCs, PMAs and TSOAs previously issued to Sellers.

(f)    Absence of Certain Changes. No Material Adverse Effect shall have occurred since the date of this Agreement with respect to any of Sellers;

(g)    Government Approvals.    All ITAR Approvals and DoD Authorizations shall have been obtained;

(h)    Regulatory Consent. All filings required to be made prior to the Closing by each of Sellers and Buyer, and all consents, approvals and authorizations required to be obtained prior to the Closing by each of Sellers and Buyer, from any Governmental Authority in connection with the execution and delivery of this Agreement

or the other Ancillary Documents (and the consummation of the transactions contemplated hereby and thereby) by each of Sellers and Buyer have been made or obtained (as the case may be);

        (i)    Consents.    All consents set forth in Section 6.2(i) of Sellers' Disclosure Schedule shall have been obtained or waived;

        (j)    Sale Order.  Not later than seventy (70) days after the Petition Date, unless agreed to be extended in writing by Buyer in its sole and absolute discretion, the Bankruptcy Court shall have approved and entered the Sale Order, in form and substance acceptable to Buyer, and shall among other matters: (1) approve this Agreement and the Transaction contemplated hereby in all respects; (2) find that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to Buyer and shall vest Buyer with title to such Acquired Assets free and clear of all Liens (including, but not limited to, Liens asserted by the Pension Benefit Guaranty Corporation), claims (including, but not limited to, any successor Liability), interests and encumbrances whatsoever; (3) enjoin and forever bar any creditors or any other Person from bringing any claims against Buyer arising prior to the Closing; (4) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets; (5) extend the time period under Section 365 of the Bankruptcy Code by which Sellers must assume (or assume and assign) or reject any of the Acquired Contracts; (6) approve any other agreement to the extent provided by this Agreement; (7) find that Sellers gave due and proper notice of the Transaction to each party entitled thereto; (8) enjoin and forever bar the non-debtor party or parties to each Acquired Contract from asserting against Buyer or any of the Acquired Assets any objection to the assumption and assignment of such non-debtor party's Acquired Contract; (9) order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry; (10) authorize Sellers' assumption and assignment of Acquired Contracts related to ordinary course third party accounts payable obligations to Buyer as to which the relevant affected parties have received notice consistent (in form, substance and timing) with Section 13(e) hereof and as to which no objection has been made on or prior to the date that the Sale Order is entered or as to which any objection has been overruled; (11) find that Buyer shall not be considered to be or treated as a successor-in-interest to Fairchild, or any Affiliate, Subsidiary or insider, or any Seller or their respective Affiliates or insiders for any purpose, including, but not limited to, the purpose of asserting or assessing Liability or claim against Buyer with respect to any action, or failure to take action, by Sellers or their Affiliates or insiders; (12) release Buyer from any successor Liability; and (13) find that this Agreement was negotiated and entered into at arms-length and that Buyer is a good-faith purchaser of the Acquired Assets pursuant to Section 363(m) of the Bankruptcy Code and entitled to the benefits and protection of such Section.

(k)     Ancillary Documents. Sellers shall have executed and delivered to Buyer the Ancillary Documents;

(l)     Title Policies. The Title Company shall be unconditionally and irrevocably committed to issue the Title Policies to Buyer, at Buyer's cost and expense; and

(m)     [Intentionally Omitted]

(n)     No Reduction in the Acquired Assets. Sellers shall not have filed any motion with the Bankruptcy Court seeking the rejection of any Material Contract or the sale of any material asset that would be an Acquired Asset as of the date of this Agreement. Seller shall not have abandoned or otherwise relinquished its or the Bankruptcy Estate's interest in any material asset that would be an Acquired Asset as of the date of this Agreement, other than assets disposed of or abandoned in the ordinary course of business consistent with past practice.

6.3.    Conditions to the Obligation of Sellers. The obligation of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Sellers on or prior to the Closing Date of each of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Buyer contained in Article IV shall be true and correct (in the case of any representation or warranty containing any materiality qualification) or in all material respects (in the case of any representation or warranty without any materiality qualification) at and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must be true and correct as of such specific date);

(b)     Performance of Obligations. Buyer shall have duly performed and complied in all material respects with all other agreements contained herein required to be performed or complied with by them at or before the Closing;

(c)     Certificates. Buyer shall have delivered to Sellers an officer's certificate, dated the Closing Date and signed by an executive officer of Buyer's managing member as to the fulfillment of the conditions set forth in Section 6.3(a) and Section 6.3(b); and

## ARTICLE VII

## INDEMNIFICATION

7.1.    Survival of Representations and Warranties.   The representations and warranties of the parties in this Agreement, any Ancillary Document or any certificate or other instrument delivered pursuant to this Agreement, and the right to assert a claim under this Article VII with respect to any such representations and warranties, shall survive the Closing for a period of one hundred fifty (150) days, except that if written notice asserting any bona fide claim for indemnification under this Article VII shall have been given within the applicable survival period, the representations and warranties that are the subject of such claim shall survive until such claim is fully and finally resolved; provided that, in the case of fraud, intentional misrepresentation or deliberate or willful misconduct, all representations and warranties shall survive until the expiration of the applicable statute of limitations period subject to any and all defenses of Sellers.

7.2.    Indemnification by Sellers.   Subject to the limits set forth in this Article VII, from and after the Closing, Sellers agree, jointly and severally, to indemnify, defend and hold Buyer, its Affiliates and their respective managers, officers, directors, members, employees, agents and representatives (the "Buyer Indemnified Party") harmless from and in respect of any and all losses, damages, costs and reasonable expenses (including reasonable fees and expenses of counsel including both those incurred in connection with the defense or prosecution of the indemnifiable claim and those incurred in connection with the enforcement of this provision, whether or not related to a Third Party Claim) (collectively, "Losses"), that they may incur arising out of or due to: (i) any breach of any representation or warranty of any Seller contained in this Agreement or the other Ancillary Documents; (ii) any breach of any covenant or agreement of any Seller contained in this Agreement or the other Ancillary Documents; (iii) the Excluded Assets; (iv) any penalties or other costs incurred as a result of a violation of any Environmental Law by or on behalf of any Seller or any Affiliate prior to or on the Closing Date or the generation, handling, storage, use, transportation, disposal or release of any Hazardous Substance generated, handled, stored, used, transported, disposed or released by any Seller or any Affiliate prior to or on the Closing Date or otherwise related to the Business; (v) all Excluded Liabilities; (vi) the ownership or operation of the Acquired Assets or the Business prior to the Closing Date; (vii) Liabilities of Sellers for any broker's or finder's fees or other fees and expenses, including, but not limited to, legal fees and expenses incurred by Sellers in connection with the transactions contemplated by this Agreement and (viii) any Employee Benefit Plans.

7.3.    Indemnification by Buyer.   Subject to the limits set forth in this Article VII, from and after the Closing, Buyer agrees to indemnify, defend and hold Sellers and their respective Affiliates and their respective, managers officers, directors, members, employees, agents and representatives (the "Seller Indemnified Party")

harmless from and in respect of any and all Losses that they may incur arising out of or due to: (i) any breach of any representation or warranty of Buyer contained in this Agreement; (ii) any breach of any covenant or agreement of Buyer contained in this Agreement or the other Ancillary Documents; (iii) the ownership or operation of the Acquired Assets or the Business related to any period following the Closing Date by Buyer (other than the Excluded Liabilities); and (iv) the Assumed Liabilities.

7.4.    Certain Limitations on Indemnification.

(a)    Anything in this Article VII to the contrary notwithstanding, none of Buyer Indemnified Party or Seller Indemnified Party shall be entitled to recover from the respective other party hereunder for the same Loss more than once.

(b)    Sellers' aggregate maximum Liability for claims under this Agreement is Seven Hundred Fifty Thousand U.S. Dollars (US$750,000), comprised of the Holdback and Two Hundred Fifty Thousand U.S. Dollars (US$250,000) of super-priority administrative expense claims against the Bankruptcy Estate, which shall be the sole amount recoverable, and Buyer's sole remedy, for any claims arising under this Agreement, except (a) in the case of fraud, intentional misrepresentation or deliberate or willful misconduct of Sellers or any breach of any covenant set forth in Section 8.3 or Article V or VII of this Agreement other than Section 7.2(i) and (b) with respect to Buyer's rights for specific performance as provided in Section 10.19 hereof.

7.5.    Notice and Opportunity to Defend.   If there occurs an event which a party asserts is an indemnifiable event pursuant to Section 7.2 or Section 7.3, the party or parties seeking indemnification shall notify the other party or parties obligated to provide indemnification (the "Indemnifying Party") promptly, but no later than twenty (20) days, after such Indemnifying Party receives written notice of any claim, event or matter as to which indemnity may be sought (a "Claim Notice"). Each Claim Notice shall contain a reasonable estimate of the Losses (each such estimate, a "Loss Estimate") against which such Indemnified Party seeks indemnification, to the extent such an estimate can be made. The failure of the Indemnified Party to give notice as provided in this Section 7.5 shall not relieve any Indemnifying Party of its obligations under Section 7.2 or Section 7.3, as the case may be, except to the extent that such failure materially and adversely prejudices the rights of any such Indemnifying Party. In the event of any action, suit or proceeding asserted by any person who is not a party (or a successor to a party) to this Agreement (a "Third Party Claim") which is or gives rise to an indemnification claim, the Indemnifying Party may elect within ten (10) days to acknowledge its obligations to indemnify the Indemnified Party therefor and to assume the defense of any such claim or any litigation resulting therefrom; provided, that the Indemnifying Party provides the Indemnified Party with evidence acceptable to the Indemnified Party that the Indemnifying Party will have sufficient financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder; provided, further, that counsel for the Indemnifying Party, who shall conduct

the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld, conditioned or delayed), and the Indemnified Party may participate in such defense at the Indemnified Party's expense, which shall include counsel of its choice; provided that the Indemnified Party shall have the right to employ, at the Indemnifying Party's expense, counsel of its choice to represent the Indemnified Party if, in the Indemnified Party's reasonable judgment, there exists an actual or potential conflict of interest between the Indemnified Party and the Indemnifying Party or if (i) the Indemnifying Party elects not to defend, compromise or settle a Third Party Claim, (ii) the Indemnifying Party fails to notify the Indemnified Party within the required time period of its election as provided in this section, (iii) the Indemnifying Party does not have the financial resources necessary to defend against the matter and fulfill its indemnification obligations, (iv) the Third Party Claim seeks injunctive or other equitable relief, (v) the Third Party Claim involves a criminal suit, or (vi) the Indemnifying Party having timely elected to defend a Third Party Claim, fails, in the reasonable judgment of the Indemnified Party, after at least ten (10) days notice to the Indemnifying Party, to adequately prosecute or pursue such defense, and in each such case the Indemnified Party may defend such Third Party Claim on behalf of and for the account and risk of the Indemnifying Party.  The Indemnifying Party, in the defense of any such claim or litigation, shall not, except with the consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), consent to entry of any judgment or entry into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release from all Liability in respect of such claim or litigation. The Indemnified Party shall not settle or compromise any such claim or litigation without prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed) that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release from all Liability in respect of such claim or litigation.  The Indemnified Party shall furnish such information regarding itself or the claim in question as the Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and litigation resulting therefrom.

7.6.    Resolution of Claims.  In the event that any Indemnifying Party objects to the amount of any Loss claimed in any Claim Notice or disputes the Indemnifying Party's liability therefor, the Indemnifying Party shall, on or prior to twenty (20) calendar days following the Indemnifying Party's receipt of such Claim Notice (the "Response Date"), deliver to the Indemnified Party a written notice (a "Response Notice") specifying in reasonable detail each amount set forth in such Claim Notice to which the Indemnifying Party objects and the nature and basis for each such objection.  If the Indemnified Party shall not have received a Response Notice prior to the Response Date, the Indemnified Party and the Indemnifying Party shall be deemed to have agreed to the Claim Notice and to have acknowledged the correctness of the amounts claimed therein and the Indemnifying Party's liability therefor.  If the Indemnified Party shall have received a Response Notice prior to the Response Date, the Indemnifying Party and the Indemnified

Party shall negotiate in good faith concerning the related Claim Notice and the amounts claimed and other matters set forth therein until such Claim Notice, amounts and matters shall have been finally determined. A Claim Notice, any amounts claimed therein and any other matters set forth therein shall be deemed to be "finally determined" for purposes of this Agreement when such Claim Notice, amounts and matters have been resolved (i) by a written agreement of the Indemnifying Party and the Indemnified Party, or (ii) by Order of a court having jurisdiction.

7.7.    Holdback.    (a)    Buyer and Sellers agree that the Holdback shall be available to (i) reimburse Buyer Indemnified Parties for any Losses for which they are entitled to be indemnified pursuant to Section 7.2 in accordance with Section 7.6; (ii) pay the amount of any adjustment to the Purchase Price in accordance with Section 2.5 and (iii) pay Healthcare Claims to Transferred Employees, each in accordance with the terms and conditions of Section 2.4.

(b)    To the extent permitted by Law, any reduction to the Holdback, shall be treated on the parties' Tax Returns as an adjustment to the Purchase Price for all Tax purposes.

## ARTICLE VIII

## TERMINATION

8.1.    Termination of Agreement.    This Agreement may be terminated prior to the Closing Date as follows:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer, if there shall be any Applicable Law that makes the consummation of the Transaction illegal or otherwise prohibited (and such Applicable Law is not overturned or otherwise made inapplicable to the Transaction within a period of thirty (30) days after enactment of such Applicable Law) or if any Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining any Seller or Buyer from consummating the Transaction and such Order shall become final and non-appealable;

(c)    by Buyer, if the Closing has not occurred on or before one hundred (100) days following the date hereof (as may be extended by written agreement of the parties hereto, entered into in their sole discretion, the "Outside Date"); provided, however, that the terminating party is not in breach of its obligations under this Agreement in any material respect;

(d)    by Buyer, so long as Buyer is then not in breach of its obligations under this Agreement in any material respect, if any Seller shall have breached or failed

to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.2(a) or 6.2(b) and (ii) is incapable of being cured by Sellers or is not cured by Sellers within fifteen (15) Business Days or prior to the Outside Date, whichever is earlier, following receipt of written notice from Buyer of such breach or failure to perform;

(e)    by Sellers, if Buyer shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Sections 6.3(a) or 6.3(b) and (ii) is incapable of being cured by Buyer or is not cured by Buyer within fifteen (15) Business Days or prior to the Outside Date, whichever is earlier, following receipt of written notice from Seller of such breach or failure to perform;

(f)    by Buyer, if a Material Adverse Effect with respect to any Sellers occurs;

(g)    [Intentionally Omitted]

(h)    [Intentionally Omitted]

(i)    by Buyer, if the Auction shall not have ended on or prior to seventy (70) days following the Petition Date.

(j)    by Buyer, (i) if the Bankruptcy Case is dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee or examiner is appointed for Sellers or (ii) upon the consummation of the sale, or disposition of the Acquired Assets to a Person other than Buyer;

(k)    [Intentionally Omitted]

(l)    [Intentionally Omitted]

(m)    by Buyer, if (i) the Sale Order has not been entered by the Bankruptcy Court within seventy-five (75) days after the Petition Date, provided, however, that Buyer shall not be entitled to exercise its rights under this clause if the Sale Order has been entered by the Bankruptcy Court prior to Buyer exercising such rights; or (ii) following entry of the Sale Order, the Sale Order is revised, revoked, voided, vacated, modified or stayed by an Order of any Governmental Authority in any manner that is materially adverse to Buyer (a "Modifying Order") and such Modifying Order is not reversed, revoked, voided, vacated, stayed or further modified within twenty (20) days such that the Sale Order is in full force and effect.  The Sale Order shall have become final and non-appealable before the eleventh (11th) day following the entry of the Sale

Order.   The Sale Order shall contain terms in accordance with the requirements of Section 6.2(j); and

(n)     by Buyer, in the event any outstanding Indebtedness under the PNC DIP Agreements is accelerated or matured or if there is an event of default under the Junior DIP Loan that has occurred and is continuing.

8.2.     Effect of Termination.   No termination of this Agreement pursuant to Section 8.1 shall be effective until notice thereof shall be given to the non-terminating party specifying the provision hereof pursuant to which such termination is made. If validly terminated pursuant to Section 8.1, this Agreement shall become wholly void and of no further force and effect without liability to Buyer, Sellers, or any of their respective, Affiliates, members, officers, directors, managers, employees, agents, advisors or other representatives; provided, however, that notwithstanding such termination, each party hereto shall remain fully liable for any Losses arising out of or due to any breach of any representation, warranty, covenant or agreement contained in this Agreement or the other Ancillary Documents; provided, further, that the rights and obligations of the parties under this Section 8.2 and Sections 5.5, 5.14(b), and Article X of this Agreement shall remain in full force and effect.   Notwithstanding anything to the contrary in the foregoing, the parties agree that in the event specific performance is sought and obtained pursuant to Article X hereof, the Agreement will remain in full force and effect such that the transactions contemplated hereunder may be consummated in accordance with the terms hereof.

8.3.     [Intentionally Omitted]

8.4.     [Intentionally Omitted]

## ARTICLE IX

## DEFINITIONS

9.1.     Definition of Certain Terms.   The terms defined in this Article IX, whenever used in this Agreement (including in the Sections of Sellers' Disclosure Schedule), shall have the respective meanings indicated below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms so defined). All references herein to a Section or Article are to a Section or Article of this Agreement, unless otherwise indicated and the words "hereof" and "hereunder" shall be deemed to refer to this Agreement as a whole and not to any particular provision. The words "includes" and "including" shall be deemed to be followed by the words "without limitation" whenever used.

"Acquired Accounts Receivable" the meaning set forth in Section 1.1(g).

"Acquired Assets" the meaning set forth in Section 1.1.

"Acquired Books and Records" the meaning set forth in Section 1.1(i).

"Acquired Claims" the meaning set forth in Section 1.1(h).

"Acquired Contracts" the meaning set forth in Section 1.1(e).

"Acquired Goodwill" the meaning set forth in Section 1.1(j).

"Acquired Intellectual Property" the meaning set forth in Section 1.1(d).

"Affiliate" with respect to any Person, a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or partnership or other ownership interests, by Contract or credit arrangement, as trustee or executor, or otherwise.

"Affiliate Arrangements" the meaning set forth in Section 3.32(a).

"Agreement" the meaning set forth in the preamble.

"Allocation Schedule" the meaning set forth in Section 2.6(a).

"Ancillary Documents" means, collectively, the Bills of Sale, the Escrow Agreement, the Deeds, the Transition Services Agreement and all other documents described in or otherwise required by this Agreement or third parties (such as the Bankruptcy Court, Governmental Authorities or the Title Company) relating to, or required to effectuate the transfer of the Acquired Assets.

"Applicable Law" with respect to any Person, any Law applicable to such Person or its business, properties or assets, including, without limitation, the Bankruptcy Code.

"Approval Order" means the Sale Order or any other Order entered by the Bankruptcy Court approving the assumption and assignment of the Designated Contracts or the Undisclosed Contracts.

"Arbiter" the meaning set forth in Section 2.5(d).

"Assumed Liabilities" shall only mean only the following Liabilities and obligations (without duplication):

(i)     All Liabilities of Sellers arising after the Closing Date under or with respect to the Acquired Assets solely to the extent attributable to the lease, ownership, sale, use or operation of the Business or the Acquired Assets after the Closing

Date; and, for the avoidance of doubt, no Liability shall constitute an Assumed Liability where such Liability arose out of or related to a breach that occurred on or prior to the Closing Date;

(ii)  All (A) unpaid trade payables incurred in the ordinary course of business consistent with past practice reflected on the Reference Balance Sheet and Fairchild Reference Balance Sheet as of the Closing Date, and (B) unpaid trade payables incurred in the ordinary course of business consistent with past practice after the Reference Balance Sheet Date as of the Closing Date in each case as determined in accordance with GAAP;

(iii)  [Intentionally Omitted]

(iv)  The Fairchild Mortgage;

(v)  Cure Costs;

(vi)  Sellers' obligations to provide accrued vacation time (measured as of the Closing Date) to Transferred Employees as set forth in Section 9.1 of Sellers' Disclosure Schedule under the heading "Accrued Vacation Time" (the "Transferred Employee Accrued Vacation Time") which Buyer may discharge by permitting Transferred Employees to use such Transferred Employee Accrued Vacation Time after the Closing Date and, for the avoidance of doubt, shall not require Buyer to compensate for in cash or other consideration given to Transferred Employees; and

(vii)  All accrued expenses (including accrued payroll expenses) of the Business incurred in the ordinary course consistent with past practice as determined in accordance with GAAP other than Healthcare Claims and other Liabilities of Sellers under the Employee Benefit Plans.

"Assumption Date" means the date as of which a Designated Contract is assumed by a Seller in the Bankruptcy Cases and assigned to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Aviation Laws" means all applicable international, federal, state, regional, and local statutes, laws, regulations, ordinances, orders, decrees, common law, and similar provisions having the force or effect of law, concerning aviation activities conducted by any Seller, including but not limited to Title 49 of the United States Code, Title 14 of the Code of Federal Register, and applicable FAA orders, policies, guidance, and enforcement actions, including Airworthiness Directives and Service Bulletins.

"Aviation Reports" the meaning set forth in Section 3.23(a).

"Bankruptcy Cases" the meaning set forth in the recitals.

"Bankruptcy Code" the meaning set forth in the recitals.

"Bankruptcy Court" the meaning set forth in the recitals.

"Bankruptcy Estate" the meaning set forth in the recitals.

"Banner Holding" the meaning set forth in the preamble.

"Bid" the meaning specified in the Bidding Procedures.

"Bidders" the meaning specified in the Bidding Procedures.

"Bidding Procedures" the meaning set forth in the recitals.

"Bidding Procedures Order" the meaning set forth in the recitals.

"Bills of Sale" the meaning set forth in Section 2.2(a).

"Break-Up Fee" the meaning set forth in Section 2.4(a).

"Budget" the meaning set forth in Section 5.1(a).

"Business" the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close. Any event the scheduled occurrence of that would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Buyer" the meaning set forth in the preamble.

"Buyer Disclosure Schedule" the meaning set forth in the preamble.

"Buyer Indemnified Party" the meaning set forth in Section 7.2.

"Buyer Representatives" the meaning set forth in Section 5.2(d).

"Cash Amount" the meaning set forth in Section 2.4(a).

"Claim Notice" the meaning set forth in Section 7.5.

"Closing" the meaning set forth in Section 2.1.

"Closing Date" the meaning set forth in Section 2.1.

"Closing Date Statement of Consolidated Adjusted Net Worth" the meaning set forth in Section 2.5(b).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"COBRA Coverage" the meaning set forth in Section 5.6(h).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality and Non-Disclosure Agreement" the meaning set forth in Section 5.2(d).

"Consolidated Adjusted Net Worth" means (A) the total assets minus the total liabilities of Sellers, plus (B) (i) consolidated inter-company payables of Sellers, (ii) outstanding obligations under the Junior DIP Loan, (iii) deferred income tax liabilities of Sellers, and (iv) accrued income taxes of Sellers, less (C) (i) goodwill, (ii) intangible assets, (iii) consolidated inter-company receivables of Sellers (including any DIP advances to Fairchild) and (iv) deferred income tax assets (current and long term) of Sellers, (v) income tax receivables of Sellers, in each case as determined in accordance with GAAP consistently applied.

"Contract" means any agreement, arrangement, binding obligation, bond, commitment, concession, conditional sale agreement, Contract, credit agreement, custodianship, deed of trust, document, equipment financing obligation, indenture, installment sale agreement, instrument, lease (including the Real Property Leases), license, loan agreement, mortgage, note, option, pledge, rental agreement, restriction, right to use, security agreement, shareholders' agreement, sublease, title retention agreement, trust or understanding (oral or written, express or implied), including all amendments, modifications and supplements thereto and any assignments thereof.

"Contract Designation Date" the meaning set forth in Section 1.5(a).

"Copyrights" means all works of authorship and copyrightable subject matter, and copyrights, whether registered or unregistered, copyright registrations and applications therefor, all rights to register and obtain renewals and extensions of copyright registrations, and all other rights corresponding to any of the foregoing throughout the world, including "moral" rights.

"Cure Costs" the meaning set forth in Section 5.17.

"DDTC" means the United States Department of State's Directorate of Defense Trade Controls.

"Deeds" means general warranty deeds with respect to the Owned Real Property substantially in the form of Exhibit J.

"Deposit" the meaning set forth in Section 2.4(a).

"Designated Contracts" the meaning set forth in Section 1.5(a).

"DIP Repayment" the meaning set forth in Section 2.4(a).

"DoD" means the U.S. Department of Defense.

"DoD Authorizations" means completion of all actions, notifications, filings, and furnishing of information with or involving DoD as well as receipt of all consents, approvals or waivers from DoD or the relevant staff thereof pursuant to delegated authority required to be obtained to continue the applicable Material Contracts and to continue or obtain the necessary personnel security clearances and/or facility clearances to support the Material Contracts following the Closing.

"EAR" means the Export Administration Regulations promulgated by the U.S. Department of Commerce.

"EASA" means the European Aviation Safety Agency.

"Employee" means any full or part-time employee or independent contractor of any Seller or any other individual whose primary responsibility is to provide services related to the Business.

"Employee Benefit Plan(s)" the meaning set forth in Section 3.17(a).

"Employee Information" the meaning set forth in Section 5.6(a).

"Environmental Law" means any federal, state, local or foreign Law, regulation, treaty, order, decree, permit, authorization, policy, opinion, common law or agency requirement applicable to any Seller relating to: (A) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (B) the handling, transport, treatment, management, use, storage, presence, disposal, release or threatened release of any Hazardous Substance or waste water or (C) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" the meaning set forth in Section 3.17(c).

"Escrow Agreement" the meaning set forth in Section 2.4(b).

"Excess Amount" the meaning set forth in Section 2.5(f)(ii).

"Excluded Assets" the meaning set forth in Section 1.2.

"Excluded Liabilities" the meaning set forth in Section 1.4.

"Expense Reimbursement" the meaning set forth in Section 2.4(a).

"FAA" the meaning set forth in Section 3.8(c).

"Fairchild" means the Fairchild Corporation and its direct and indirect Subsidiaries (other than Sellers).

"Fairchild Mortgage" means that certain mortgage dated as of July 3, 2008, between Fairchild Realty and INTRUST Bank, N.A., as Lender.

"Fairchild Realty" the meaning set forth in Section 3.4.

"Fairchild Reference Balance Sheet" the meaning set forth in Section 3.4.

"Fairchild Reference Balance Sheet Date" the meaning set forth in Section 3.4(a).

"FCPA" the meaning set forth in Section 3.8(b).

"Final Statement of Consolidated Adjusted Net Worth" the meaning set forth in Section 2.5(e).

"Financial Statements" the meaning set forth in Section 3.4.

"GAAP" the meaning set forth in Section 3.4.

"Governmental Authority" means any domestic or foreign national, federal, national, supranational, state, provincial, local or other government, governmental, regulatory, taxing, or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body, or self-regulated activity.

"Governmental Authorizations" the meaning set forth in Section 5.2(b).

"Hazardous Substances" means any substance that: (i) is or contains asbestos, urea formaldehyde insulation, polychlorinated biphenyls, petroleum or petroleum products, radon gas, microbiological contamination or related materials, (ii) requires investigation or remedial action pursuant to any Environmental Law, or is defined, listed or identified as a "hazardous waste," "hazardous substance," "toxic substance" or words of similar import thereunder, or (iii) is regulated under any Environmental Law.

"Healthcare Claims" the meaning set forth in Section 2.4(b).

"Holdback" means Five Hundred Thousand U.S. Dollars (US$500,000).

"Indebtedness" means, with respect to any Person, (a) all obligations of such Person for principal of, interest on, and premium (if any), whether or not contingent, for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (e) all obligations, contingent or otherwise, of such Person under acceptance, letters of credit or similar facilities, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly in any manner by such Person.

"Indemnified Party" means Buyer Indemnified Party or Seller Indemnified Party.

"Indemnifying Party" the meaning set forth in Section 7.5.

"Intellectual Property" means all of the following:

(a)     all Trademarks;

(b)     all Patents;

(c)     all Copyrights;

(d)     all Trade Secrets;

(e)     all industrial designs and any registrations and applications therefor throughout the world;

(f)     all mask works and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world including, without limitation, all data underlying any PMA or STC of any Seller;

(h)     all Software, rights to uniform resource locators, Web site addresses, and Internet Protocol addresses;

(i)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing;

(j)    all licenses, immunities, covenants not to sue and the like relating to the foregoing;

(k)    books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above; and

(l)    all goodwill, franchises, licenses, permits, consents, approvals, and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Initial Purchase Price" the meaning set forth in Section 2.4(a).

"Inventory" the meaning set forth in Section 1.1(b).

"IRS" the Internal Revenue Service.

"ITAR" means the International Traffic in Arms Regulations promulgated by the DDTC.

"ITAR Applications" means the notifications, registrations, amendments, and any requests or applications for licenses or agreements required to be submitted to DDTC pursuant to the ITAR in relation to the Business.

"ITAR Approval" means receipt of all approvals requested in the ITAR Applications from DDTC or the relevant staff thereof pursuant to delegated authority.

"Junior DIP Amount" means the amount of Indebtedness outstanding under the Junior DIP Loan on the Closing Date.

"Junior DIP Loan" means the subordinated debtor-in-possession financing with Phoenix Banner LLC and the Sellers.

"Law" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Leased Real Property" means each and every parcel of real property held under any lease, license, sublease or other occupancy agreement by any of Sellers or otherwise used but not owned by any of Sellers, wherever located including all tracts of land in which any of Sellers have a leasehold interest, and, to the extent any of Sellers have any interest therein, all rights in any vaults beneath such land, any buildings, improvements and structures located thereon, including those under construction, all off-street parking rights and spaces related thereto, all driveways and garages thereon, all

fixtures and Equipment attached thereto, all oil, gas and mineral rights related thereto, all sewer systems related thereto, all rights in and to all strips and gores related thereto, all alleys or passages adjoining the land, all right in and to the land lying in the bed of any avenue, road or street, open or proposed, adjoining the land, all right in and to any vaults beneath such street, avenue or road, all right, title and interest in, to and under any condemnation award or to any payment in lieu thereof for any taking or for any change in grade of any avenue, road or street thereto, and all appurtenances, easements, hereditaments, privileges, reservations, rights, rights of way and other estates and rights pertaining thereto held by any of Sellers and arising out of or relating to such leased real property.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any Action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, accrued, liquidated or unliquidated, contingent or otherwise and whether due or to become due, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any Action or in investigating any of the same or in asserting any rights hereunder).

"Lien" means any mortgage, pledge, deed of trust, hypothecation, claim, security interest, title defect, encumbrance, burden, charge or other similar restriction, interest, lease, sublease, claim, title retention agreement, option, easement, covenant, encroachment or other adverse claim.

"Losses" the meaning set forth in Section 7.2.

"Loss Estimate" the meaning set forth in Section 7.5.

"Material Adverse Effect" means any event, occurrence, fact, condition, change or effect that is materially adverse to the business, operations, results of operations, condition (financial or otherwise), properties (including intangible properties), assets (including intangible assets) or Liabilities of any of Sellers, in the aggregate, the Business or the Acquired Assets or the ability of any of Sellers to perform any of their respective obligations under this Agreement or the Ancillary Documents to which they are a party (which shall be deemed to include the loss of both of Sellers' top two (2) customers (as confirmed by an email between the parties) for its fiscal year ended September 30, 2008), other than any event, occurrence, fact, condition, change or effect that results or arises from or relates to: (i) changes in the industry in which Sellers operate or the economy generally that do not negatively affect the Business or any Acquired Assets disproportionately to others in the industry or (ii) the filing with the Bankruptcy Court of the Petitions; provided, however, that effects of the filing of the Petitions will be taken into consideration in determining whether or not there has been, or is reasonably likely to be, a Material Adverse Effect.

"Material Contracts" the meaning set forth in <u>Section 3.11</u>.

"Modifying Order" the meaning set forth in <u>Section 8.1(l)</u>.

"Net Worth Excess" the meaning set forth in <u>Section 2.5(f)(ii)</u>.

"Net Worth Shortfall" the meaning set forth in <u>Section 2.5(f)(i)</u>.

"NISPOM" means the "National Industrial Security Program Operating Manual," DoD 5220.22-M.

"Notification" the meaning set forth in <u>Section 1.5(b)</u>.

"OFAC Regulations" means the regulations promulgated by the U.S. Treasury Department's Office of Foreign Assets Control to implement U.S. trade sanctions.

"Order" means any order, injunction, judgment, injunction, decree, stipulation, determination, ruling, writ, assessment or arbitration award.

"Outside Date" the meaning set forth in <u>Section 8.1(c)</u>.

"Owned Real Property" means each and every parcel of real property or interest in real property owned by any of Sellers, wherever located including all tracts of land in which any of Sellers have an ownership interest, all rights in any vaults beneath such land, any buildings, improvements and structures located thereon, including those under construction, all off-street parking rights and spaces related thereto, all driveways and garages thereon, all fixtures and equipment attached thereto, all oil, gas and mineral rights related thereto, all sewer systems related thereto, all rights in and to all strips and gores related thereto, all alleys or passages adjoining the land, all right in and to the land lying in the bed of any avenue, road or street, open or proposed, adjoining the land, all right in and to any vaults beneath such street, avenue or road, all right, title and interest in, to and under any condemnation award or to any payment in lieu thereof for any taking or for any change in grade of any avenue, road or street thereto, any land, improvements and appurtenances subject to a long-term lease of land in which most of the benefits and rights comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof in favor of any of Sellers and all appurtenances, easements, hereditaments, privileges, reservations, rights, rights of way and other estates and rights pertaining thereto held by any of Sellers and arising out of or relating to such real property.

"Patents" means all (a) patent rights, inventions, discoveries, improvements and invention disclosures, whether or not patentable, and (b) U.S. and foreign patents (including certificates of invention and other patent equivalents), utility models, and applications for any of the foregoing, including provisional applications, and

all continuations, and continuations-in-part, divisionals, reissues, re-examinations, renewals, and extensions thereof or related thereto, and all applications or counterparts in any jurisdiction pertaining to any of the foregoing.

"Permits" means all franchises, grants, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances, orders and other Governmental Authorizations that are required to be issued by an applicable Governmental Authority under foreign, federal, state and local laws and regulations in order to conduct the Business as it is presently being conducted.

"Permitted Liens" means all Liens set forth in Section 9.1 of Sellers' Disclosure Schedule.

"Person" means any natural person, firm, partnership, association, corporation, company, trust, business trust, Governmental Authority or other entity.

"Petition Date" the meaning set forth in the recitals.

"PMA" means "Parts Manufacturer Approval".

"PNC Bank" means PNC Bank, National Association, as lender and agent under the PNC Credit Agreements and the PNC DIP Agreements.

"PNC Bank Amount" means the amount of Indebtedness outstanding under the PNC DIP Agreements on the Closing Date.

"PNC Credit Agreements" means (A) that certain Revolving Credit and Security Agreement dated June 20, 2008, between PNC Bank, National Association, as Lender and as Agent, and Sellers (other than Fairchild Realty); and (B) that certain Export-Import Revolving Credit and Security Agreement dated June 20, 2008, between PNC Bank, National Association, as Lender and as Agent, and Sellers (other than Fairchild Realty).

"PNC DIP Agreements" means (A) that certain senior secured super-priority PNC DIP Agreements, and (B) that certain Export-Import DIP Financing, in each case, with PNC Bank, as Lender and as Agent, and Sellers (other than Fairchild Realty).

"Post-Closing Cure Payment" the meaning set forth in Section 5.17.

"Post-Petition Contract" the meaning set forth in Section 1.5(c).

"Pre-Closing Tax Period" means all taxable periods ending on or prior to the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date. For purposes of this definition, in the case of any Taxes that are imposed on a periodic basis and are payable for a Tax period that

includes (but does not end on) the Closing Date, the portion of such Tax related to the portion of such Tax period ending on and including the Closing Date shall (x) in the case of any Taxes other than gross receipts, sales or use Taxes and Taxes based upon or related to income, be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on and including the Closing Date and the denominator of which is the number of days in the entire Tax period, and (y) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, be deemed equal to the amount which would be payable if the relevant Tax period ended on and included the Closing Date.

"Preliminary Statement of Consolidated Adjusted Net Worth" the meaning set forth in Section 2.5(a).

"Proceedings" the meaning set forth in Section 3.7.

"Purchase Price" the meaning set forth in Section 2.4(a).

"Real Property" means, collectively, the Owned Real Property and the Leased Real Property.

"Real Property Leases" means all leases, licenses, subleases, occupancy agreements or other Contracts under or pursuant to which any of Sellers use or occupy or have the right to use or occupy, now or in the future, any Real Property or any portion thereof or pursuant to which Sellers, as lessor or sublessor, leases, licenses, subleases or otherwise grants the right to use any portion of any Real Property to a third party, including all amendments, modifications and supplements thereto and any assignments thereof.

"Reference Balance Sheet" the meaning set forth in Section 3.4.

"Reference Balance Sheet Date" the meaning set forth in Section 3.4.

"Response Date" the meaning set forth in Section 7.6.

"Response Notice" the meaning set forth in Section 7.6.

"Sale Motion" the meaning set forth in the recitals.

"Sale Order" the meaning set forth in Section 5.13(a).

"Seller Indemnified Party" the meaning set forth in Section 7.3.

"Seller's Air Agency Certificate" means Air Agency Certificate Number P81R813N issued to Sellers' on February, 1997 by the U.S. Department of Transportation Federal Aviation Administration.

"Seller's EASA Approval Certificate" means the EASA Part -145 Approval Certificate, identified as EASA.145.4788.

"Seller's Knowledge" means the knowledge of Sellers after due inquiry.

"Sellers' Disclosure Schedule" the meaning set forth in the preamble.

"Sellers" the meaning set forth in the preamble.

"Shortfall Amount" the meaning set forth in Section 2.5(f)(i).

"Software" means all computer software (whether in source code, object code, or other form), including firmware, tools, compilers, higher level or "proprietary" languages, files, records, printouts, specifications, and data, and including all systems, databases and platforms owned, licensed or used by Seller and documentation and tools reasonably necessary for a skilled programmer to maintain, modify, and create derivative works of the applicable Software; and all related documentation, technical manuals and materials, all media on which any of the foregoing is recorded, and any licenses to use or other rights relating to the foregoing.

"STC" means a "Supplemental Type Certificate".

"Subsidiary" or "subsidiary" with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (i) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (A) the total combined voting power of all classes of voting securities of such entity, (B) the total combined equity interests, or (C) the capital or profit interests, in the case of a partnership; or (ii) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

"Tax" or "Taxes" means (i) any taxes of any kind, including, without limitation, those on or measured by or referred to as income, gross receipts, capital, sales, goods and services, use, ad valorem, franchise, profits, stamp, license, withholding, employment, payroll, premium, value added, property or windfall profits taxes, surtaxes, escheat or unclaimed property, environmental, Transfer Taxes, social security taxes, national health contributions, pension and employment insurance contributions, customs, duties or similar fees, assessments or charges of any kind whatsoever (together with any interest or penalties, additions to tax or additional amounts imposed) by any Governmental Authority, including any payments made in lieu of any such Taxes or governmental charges and (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group and (iii) liability for the payment of any amounts as a result of an express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (i) or (ii).

"Tax Return" means any return, declaration, report, election, statement or information return and including any amendment, schedule, attachment, part, supplement, appendix and exhibit thereto, made, prepared, filed or required to be filed with any Governmental Authority, domestic or foreign, with respect to Taxes.

"Third Party Authorizations" means all consents, franchises, licenses, authorizations, endorsements, waivers, authorizations and registration necessary for or related to the conduct of Sellers' Business.

"Third Party Claim" the meaning set forth in Section 7.5.

"Title Company" the meaning set forth in Section 2.2(e).

"Title Polices" the meaning set forth in Section 2.2(e).

"Trade Secrets" means all rights in all confidential, non-public, or proprietary information, including ideas, research and development, know-how, trade secrets, processes, formulae, compositions, processes, technology, methodologies, blueprints, drawings, schematics, flow charts, models, prototypes, testing procedures and results, specifications, designs, plans, concepts, inventor's notes, invention disclosures, algorithms, techniques, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, all documentation relating to any of the foregoing, and the right in any jurisdiction to limit the use or disclosure thereof.

"Trademarks" means all trademarks, service marks, trade and business names (including all assumed or fictitious names under which the Business is conducted), brand names, trade dress, designs, logos, packaging design, slogans, Internet domain names and other commercial symbols in any and all forms, whether registered or unregistered, and all registrations and pending applications to register any of the foregoing (including intent to use applications), throughout the world.

"Transaction" the meaning set forth in recitals.

"Transfer Tax" means all excise, sales, use, value added, transfer (including real property transfer), transfer gains, gross receipts, stamp, documentary, filing, recordation, registration, conveyance, license and other similar Taxes, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties arising out of or in connection with or attributable to the transactions contemplated by this Agreement.

"Transferred Employees" the meaning set forth in Section 5.6(b).

"Transferred Employee Accrued Vacation Time" the meaning set forth in Section 9.1 (definition of "Assumed Liabilities").

"Transition Services Agreement" means a transition services agreement to be dated as of the Closing Date, between Buyer and Sellers, in form and substance reasonably acceptable to Buyer and Sellers.

"TSOA" means Technical Standard Order Authorization.

"Undisclosed Contract Assignment Order" the meaning set forth in Section 1.5(b).

"Undisclosed Contract" the meaning set forth in Section 1.5(b).

"WARN" the meaning set forth in Section 5.6(i).

"WARN Obligations" the meaning set forth in Section 5.6(i).

## ARTICLE X

## GENERAL PROVISIONS

10.1.    Expenses.  Except as otherwise specifically provided in this Agreement, each of Sellers, on the one hand, and Buyer, on the other hand, shall bear their respective expenses, costs and fees (including attorneys', auditors' and financing fees, if any) in connection with the Transaction, including the preparation, execution and delivery of this Agreement and compliance herewith, whether or not the Transaction is effected.

10.2.    Notices.    All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered personally, (ii) mailed, certified or registered mail with postage prepaid, (iii) sent by next-day or overnight mail or delivery or (iv) sent by fax, as follows:

    (i)    if to Sellers,

Banner Aerospace Holding Company I, Inc.
1750 Tysons Blvd., Suite 1400
McLean, Virginia 22102
Fax:  (703) 478-5767
Telephone:  (703) 478-5900
Attention:  Donald Miller

with a copy to (which shall not constitute notice):

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
Fax: (212) 697-1559
Telephone: (212) 696-6000
Attention: Eileen P. Matthews, Steven J. Reisman and Timothy A.
                Barnes

(ii)    if to Buyer,

Greenwich AeroGroup Acquisition Corp.
475 Steamboat Road
Greenwich, CT 06830
Fax: (203) 709-4095
Telephone:  (203) 629-3008
Attention:  John F. Kohler

with a copy to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Fax:  (212) 728-8111
Telephone:  (212) 728-8000
Attention:  John C. Longmire and Rosalind Fahey Kruse

or, in each case, at such other address as may be specified in writing to the other parties
hereto.

All such notices, requests, demands, waivers and other communications shall be
deemed to have been received (i) if by personal delivery, on the day after such delivery,
(ii) if by certified or registered mail, on the fifth (5th) Business Day after the mailing
thereof, (iii) if by next-day or overnight mail or delivery, on the day delivered or (iv) if
by fax, on the next day following the day on which such fax was sent, provided that a
copy is also sent by certified or registered mail.

10.3.    Binding Effect; Benefits.  This Agreement shall be binding upon and inure
to the benefit of the parties hereto and their respective heirs, successors and permitted
assigns.

10.4.    Assignment; Successors.  This Agreement and the interests, obligations
and rights hereunder shall not be assignable or transferable in whole or in part by any
party (including by operation of applicable Law) without the prior written consent of the

other parties; provided, that no consent of any Seller shall be required for Buyer to (i) assign its right to purchase the Acquired Assets or any of its other rights or any portion thereof hereunder or to delegate any obligation to assume any Assumed Liabilities to any of its Affiliates or designees, provided, that Buyer shall remain primarily liable for all Assumed Liabilities and obligations under this Agreement, (ii) grant a security interest in its rights under this Agreement to its lender or lenders, if any, as security for Buyer's obligations to any such lender or lenders (and any such lender or lenders may exercise their rights and remedies with respect to such security interest) or (iii) assign its rights to indemnity, in whole or in part, to any purchaser of all or any of the Acquired Assets, including its Affiliates or designees.   Any attempted assignment in violation of this Section 10.4 shall be void.

10.5.   Amendment; Waivers, etc.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time. The waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall not be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. The rights and remedies herein provided are cumulative and none is exclusive of any other, or of any rights or remedies that any party may otherwise have at law or in equity.

10.6.   Entire Agreement.    This Agreement (including Sellers' Disclosure Schedule, Buyer Disclosure Schedule, Ancillary Documents and the other exhibits attached hereto or referred to herein) and the Sale Order constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. Any information disclosed in each section of Sellers' Disclosure Schedule or Buyer Disclosure Schedule shall be deemed disclosed solely with respect to such section and any matter disclosed in any subsection of a section of Sellers' Disclosure Schedule or Buyer Disclosure Schedule shall be deemed disclosed solely with respect to such subsection.

10.7.   Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

10.8.   Governing Law.    THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING

OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

10.9.    Consent to Jurisdiction, etc.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transaction, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.2; provided, however, that if the Bankruptcy Case has closed, the parties agree to irrevocably and unconditionally submit to the exclusive jurisdiction of any court of the United States located in the State of Delaware or in Delaware state court and any appellate court from any thereof, for the resolution of any such claim or dispute.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby brought in any court specified in Section 10.9(a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.2; provided, however, that such service shall not be effective until the actual receipt thereof by the party being served. Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by law.

10.10.    Good Faith.    All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.11. Amendment; Waiver. This Agreement may be amended, modified and supplemented only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

10.12. No Third Party Beneficiaries. Except as expressly set forth herein, no provision of this Agreement is intended to, or shall, confer any third-party beneficiary or other rights or remedies upon any Person other than the parties hereto. No provision of this Agreement shall create any third-party beneficiary rights in any Employee or former Employee of any Seller or any Affiliate of Sellers (including any beneficiary or dependent thereof) in respect of continued employment by any Seller or any Affiliate of any Seller or otherwise.

10.13. Right to Rely. Notwithstanding any right of Buyer (whether or not exercised) to investigate the affairs of Sellers or any right of any party (whether or not exercised) to investigate the accuracy of the representations and warranties of the other party contained in this Agreement, each of Sellers, on the one hand, and Buyer, on the other hand, has the right to rely fully upon the representations, warranties, covenants and agreements of the other contained in this Agreement.

10.14. Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.15. Headings. The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

10.16. Usage. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their plural or singular forms, respectively. Unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."

10.17. Interpretation. The parties acknowledge and agree that (a) each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision, (b) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement and (c) the terms and provisions of this Agreement shall be construed fairly as to all parties, regardless of which party was generally responsible for the preparation of this Agreement.

10.18. Counterparts; Facsimile Signatures. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.    This Agreement may be executed by facsimile signature(s).

10.19. Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Buyer shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of the United States located in the State of Delaware or in Delaware state court, this being in addition to any other remedy to which they are entitled at Law or in equity. Each party agrees that the provisions of this Section 10.19 are fair and reasonable in the commercial circumstances of this Agreement, and that neither party would have entered into this Agreement but for each Party's agreement with the provisions of this Section.

10.20. Allowed Administrative Expense. Any and all amounts owed to Buyer by Sellers hereunder after the date of this Agreement shall constitute allowed administrative expenses of Seller under Section 503(b)(1) and 507(a)(2), as applicable, of the Bankruptcy Code and Sellers agree to support Buyer's application for allowance of such claims.

**[Remainder of page left intentionally blank]**

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

**BUYER:**

GREENWICH AEROGROUP
ACQUISITION CORP.

By *Frank Medici*

Name: *Frank Medici*

Title: *SVP*

**SELLERS:**

BANNER AEROSPACE HOLDING
COMPANY I, INC.

By *Donald E. Miller*

Name: Donald E. Miller

Title: Chief Restructuring Officer

DAC INTERNATIONAL, INC.

By *Donald E. Miller*

Name: Donald E. Miller

Title: Chief Restructuring Officer

MATRIX AVIATION, INC.

By *Donald E. Miller*

Name: Donald E. Miller

Title: Chief Restructuring Officer

NASAM INCORPORATED

By _Donald E. Miller_

Name: Donald E. Miller

Title: Chief Restructuring Officer

PROFESSIONAL AIRCRAFT ACCESSORIES, INC.

By _Donald E. Miller_

Name: Donald E. Miller

Title: Chief Restructuring Officer

PROFESSIONAL AVIATION ASSOCIATES, INC.

By _Donald E. Miller_

Name: Donald E. Miller

Title: Chief Restructuring Officer

GCCUS, INC.

By _Donald E. Miller_

Name: Donald E. Miller

Title: Chief Restructuring Officer

FAIRCHILD REALTY, LLC

By _Donald E. Miller_

Name: Donald E. Miller

Title: Chief Restructuring Officer